**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-00992-RBJ-KLM

AHMAD AJAJ,

      Plaintiff,

v.

UNITED STATES OF AMERICA;
FEDERAL BUREAU OF PRISONS;
WARDEN BILL TRUE, in his official capacity;
WARDEN JOHN OLIVER, in his individual capacity;
WARDEN DAVID BERKEBILE, in his individual capacity;
ASSOCIATE WARDEN TARA HALL, in her individual capacity;
ASSOCIATE WARDEN CHRIS LAMB, in his official and individual capacity;
ASSOCIATE WARDEN CALVIN JOHNSON, in his individual capacity;
PHYSICIAN ASSISTANT RONALD CAMACHO, in his individual capacity;
MEDICAL STAFF SAMANTHA MCCOIC, in her individual capacity;
MEDICAL STAFF K. MORROW, in her official and individual capacity;
CHAPLAIN MICHAEL CASTLE, in his official and individual capacity;
CHAPLAIN JASON HENDERSON, in his official and individual capacity;
RELIGIOUS COUNSELOR GEORGE KNOX, in his individual capacity;
INMATE TRUST FUND SUPERVISOR KENNETH CRANK, in his official and individual capacity;
NURSE ROGER HUDDLESTON, in his official and individual capacity,
OFFICER D. PARRY, in his official and individual capacity,

      Defendants.

---

**AMENDED COMPLAINT**

---

     Plaintiff Ahmad Ajaj, by and through undersigned counsel, hereby submits this Amended

Complaint for violation of his rights under the First and Fifth Amendments to the United States

Constitution, the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb,

and the Federal Tort Claims Act, 28 U.S.C. 1346(b).

## I.   INTRODUCTION

1.      This lawsuit concerns the Bureau of Prison's ("BOP") utter failure to

accommodate Mr. Ajaj's exercise of his religion, and the BOP's discriminatory treatment of Mr.

Ajaj because of his Muslim faith.  It seeks declaratory and injunctive relief requiring the BOP

and its staff to respect Mr. Ajaj's constitutionally protected religious exercise.  The lawsuit also

seeks compensatory and punitive damages for the BOP's malicious and/or reckless deprivation

of Mr. Ajaj's First Amendment right to exercise his religion.  Finally, this lawsuit seeks damages

from the United States for negligently failing to provide Mr. Ajaj with proper medical care

because of his religious beliefs.

2.       As a devout Muslim, Mr. Ajaj is required to observe the Five Pillars of Islam,

including fasting during certain holidays and offering prayer five times daily.  Mr. Ajaj's

religious faith also requires him to eat a Halal diet and have meaningful meetings with his

spiritual leader once per week.

3.       BOP policies and regulations provide that federal prison officials must respect the

religious beliefs of the prisoners they confine, expressly requiring that religious holidays be

observed, fasting requirements and other dietary restrictions be respected, and visits with

religious leaders be allowed. Yet, in spite of these ostensibly respectful policies, BOP staff have

repeatedly hindered Mr. Ajaj's religious practice.

4.       Throughout his incarceration, Mr. Ajaj has been subject to relentless

discriminatory practices by BOP staff because of his race and religion.  Over the years, BOP

staff have used Mr. Ajaj's faith to deliberately mock and offend him.  For example, during

weekly Islamic programming, staff have shown videos with cartoons depicting the Prophet Mohammed and nude men and women performing sexual acts.  Other times, BOP staff have disrespected the Holy Qu'ran by throwing it in the trash.

5.      For years, Mr. Ajaj has continually requested that Defendants distribute his meals and prescribed medications before dawn and after sunset during religious fasting periods, give him meaningful access to an Imam, allow him to participate in group prayer within his cell or during recreational time, and provide him with Halal meals or certified Halal food options through the commissary.  For years, Mr. Ajaj has consistently and relentlessly explained the sincerity of his religious beliefs and practices to Defendants.

6.      Nonetheless, Defendants have insistently refused to accommodate Mr. Ajaj's requests without providing any legitimate penological interest for their refusal.  Defendants' consistent refusals have placed considerable pressure on Mr. Ajaj to abandon his religious practices.  Mr. Ajaj must choose between obtaining his prescribed medications and observing religious fasts; he must choose between eating and consuming a religiously forbidden diet; and he must choose between receiving a disciplinary action and participating in group prayer. Finally, Defendants' refusal to provide regular access to an Imam in violation of their own policy gives Mr. Ajaj no choice but to forego religious guidance.

## II.      JURISDICTION AND VENUE

7.      This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), the Administrative Procedure Act, 5 U.S.C. § 702, RFRA, 42 U.S.C. § 2000bb–1(c), the FTCA, 28 U.S.C. § 1346(a)(2), and *Bivens v. Six Unknown Agents of Federal Bureau of*

*Narcotics*, 403 U.S. 388 (1971).[1]

8.      Venue is proper within this district pursuant to 28 U.S.C § 1391 because a substantial portion of the events giving rise to the claims occurred in this judicial district.

### III.    PARTIES

9.      Plaintiff Ahmad Ajaj is a federal prisoner in the custody of the United States Bureau of Prisons ("BOP") who has been continuously confined in the United States Penitentiary – Administrative Maximum ("ADX") in Florence, Colorado, since 2012.  Mr. Ajaj is a sincere adherent of Sunni Islam.

10.     At all relevant times, the BOP officers described herein were acting within the scope of their employment with BOP and, as such, Defendant United States of America is the proper defendant under the Federal Tort Claims Act.

11.     Defendant BOP is an agency of the United States charged with the administration of federal prisons, including ADX.  The BOP maintains physical custody of Mr. Ajaj.

12.     Defendant Bill True is the acting warden of ADX temporarily replacing Defendant John Oliver, who left his position as ADX Warden on September 25, 2015.  As acting warden, Defendant True oversees all BOP staff members at ADX and is responsible for

---

[1] Plaintiff acknowledges that this district, relying on dicta in *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) and *Bush v. Lucas*, 462 U.S. 367, 390 (1983), has refused to recognize First Amendment *Bivens* claims. *See, e.g.*, *Shepard v. Rangel*, No. 12–cv–01108–RM–KLM, 2014 WL 7366662, at *15 (D. Colo. Dec. 24, 2014); *Bogard v. Hutchings*, No. 12-cv-01581-KMT, 2014 WL 959496, at *3 (D. Colo. Mar. 12, 2014); *Saleh v. United States*, No. 09-02563, 2011 WL 2682803, at *11 (D. Colo. Mar. 8, 2011), *overruled in part on other grounds*, No. 09–02563, 2011 WL 2682728 (D. Colo. July 8, 2011).  In the event this Court believes Plaintiff's prayer for damages under *Bivens* should be precluded by these decisions, Plaintiff notes he is seeking damages pursuant to Federal Rule of Civil Procedure 11(b)(2) ("the claims . . . are warranted by … a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law.").

implementing policies and procedures.  He is sued in his official capacity.

13.     Defendant John Oliver was the Warden of ADX from mid-2014 until September 25, 2015, and was responsible for the care and custody of all prisoners housed there.  As Warden, Defendant Oliver oversaw all BOP staff members at ADX, and had final authority and responsibility for the promulgation, creation, and implementation of policies and procedures at ADX. He is sued in his individual capacity.

14.     Defendant David Berkebile was the Warden of ADX in 2013 and 2014.  During that time, he was responsible for the care and custody of all prisoners housed in ADX and oversaw all BOP staff members at ADX.  In 2013 and 2014, he had the final authority and responsibility for the promulgation, creation, and implementation of policies and procedures at ADX.  He is sued in his individual capacity.

15.     Defendant Tara Hall was an Associate Warden of ADX in 2013 and 2014.  She was responsible for overseeing the Inmate Trust Fund and various departments within ADX, including the Health Services Department and. She is sued in her individual capacity.

16.     Defendant Chris Lamb is an Associate Warden at the Florence Correctional Complex ("FCC") and is responsible for the Health Services Department at ADX.  He is sued in his individual capacity.

17.     Defendant Calvin Johnson was an Associate Warden of ADX in 2013 until April or May of 2014.  He was responsible for overseeing various departments within ADX, including the Religious Services Department.  He is sued in his individual capacity.

18.     Defendant Kenneth Crank is the Inmate Trust Fund Supervisor for the FCC, including ADX.  He is responsible for ordering all products for the prison commissary.  He is

sued in his individual capacity.

19.     Defendant Michael Castle was the ADX chaplain in 2012, and in 2013 became the regional chaplain at the BOP's North Central Regional Office. As regional chaplain, he is responsible for overseeing the institutional Chaplains.  He is sued in his individual capacity.

20.     Defendant Ronald Camacho was a physician's assistant at ADX in 2013 and part of 2014.  One of his duties was to deliver medications to the prisoners' cells, including during Ramadan.  He is sued in his individual capacity.

21.     Defendant Samantha McCoic was a member of the medical staff at ADX in 2013 and 2014.  She was responsible for delivering medications to the prisoners' cells, including during Ramadan.  She is sued in her individual capacity.

22.     Defendant K. Morrow is a member of the medical staff at ADX.  She is responsible for dispensing medications to the prisoners, including during Ramadan.  She is sued in her individual capacity.

23.     Defendant Roger Huddleston is a member of the medical staff at ADX.  He is responsible for delivering medications to the prisoners' cells, including during Ramadan.  He is sued in his official and individual capacity.

24.     Defendant Chaplain Jason Henderson is the FCC Chaplain and is in charge of the religious services department at ADX.  He is tasked with providing pastoral care and facilitating visits to prisoners by members of the outside religious community.  He is sued in his individual capacity.

25.     Defendant Religious Counselor George Knox is a member of the religious services department at ADX.  As a religious services counselor, he is required to assist the

Chaplain in his duties.  He is sued in his individual capacity.

26.     Defendant D. Parry is a correctional officer at ADX and is responsible for the

custody and care of Mr. Ajaj.  As such, Defendant Parry has the ability to discipline Mr. Ajaj if

he deems it necessary.

## IV.     STATEMENT OF FACTS

### A.  Mr. Ajaj's Background in the BOP

27.     Defendant BOP has had physical custody of Mr. Ajaj, a devout Muslim, since

1993. From 1993-2001, Defendant BOP housed Mr. Ajaj in high security prisons.

28.     On February 1, 2001, Defendant BOP transferred Mr. Ajaj from a high security

facility in Beaumont, Texas, to a medium-security prison in Edgefield, South Carolina ("FCI-

Edgefield").  Seven months later, after the falling of the Twin Towers on September 11, 2001,

Defendant BOP began its practice of targeting and punitively punishing Muslim prisoners,

including Mr. Ajaj.

29.     On September 11, 2001, Defendant BOP abruptly placed Mr. Ajaj in the Special

Housing Unit ("SHU") at FCI-Edgefield without notice and without Mr. Ajaj having any

disciplinary infractions.

30.     The SHU is a housing unit within FCI-Edgefield separate from the general

population, where Mr. Ajaj was housed alone.

31.     Mr. Ajaj remained in the SHU until his unannounced transfer to the ADX in

Florence, Colorado in September 2002.

32.     ADX is the most secure facility within the BOP, and it is meant to house the

"worst of the worst."  ADX is also known as the "Alcatraz of the Rockies."

33.     Mr. Ajaj was transferred to ADX despite having no violent disciplinary infractions.

34.     Mr. Ajaj managed to go from the general population of a medium security prison to the most restrictive federal prison in the country over the course of one year without committing any violent offenses during that time.

35.     After holding Mr. Ajaj in solitary confinement for eight years in ADX, in January of 2010, Defendant BOP transferred Mr. Ajaj to U.S. Penitentiary Marion ("USP-Marion").

36.     In USP-Marion, Mr. Ajaj was housed in the Communications Management Unit ("CMU").

37.     The CMU is a unit in which Defendant BOP severely restricts, manages, and monitors prisoners' communications with the outside world.

38.     The overwhelming majority of prisoners confined in CMU are Muslim.

39.     While he was housed in the CMU, Mr. Ajaj utilized the administrative remedy process at CMU often and helped other prisoners file grievances.

40.     Unhappy with the number of grievances Mr. Ajaj filed and assisted other prisoners in filing, Defendant BOP transferred Mr. Ajaj back to ADX without warning in May 2012.

41.     Defendant BOP's transfer of Mr. Ajaj in 2012 was in clear retaliation for filing administrative grievances, many of them related to religious issues.

42.     Again, Defendant BOP transferred Mr. Ajaj to the most secure facility in the country, meant for the most violent offenders, without ever citing him for a violent prison infraction.

43.     Since his transfer back to ADX in 2012, Defendant BOP has housed Mr. Ajaj in solitary confinement.

44.     Because Mr. Ajaj is locked down in his cell most of the time, ADX staff is therefore responsible for delivering everything from daily meals to prescription medications to Mr. Ajaj's cell.

45.     Given the conditions of his confinement, Mr. Ajaj is at the mercy of ADX officials to observe many tenets of his religion.

46.     For years, Defendant BOP has intentionally or recklessly deprived Mr. Ajaj of his right to practice his religion in various respects discussed herein.

47.     Throughout his incarceration, Mr. Ajaj has utilized the statutorily mandated administrative remedy process for all these issues to no avail.

**B.   Mr. Ajaj's Medications.**

48.     Mr. Ajaj has a history of chronic health problems, including chronic fatigue syndrome, anxiety, severe spinal canal stenosis, fiber peripheral neuropathy, and sciatica.  His neurological problems have caused him to suffer immense back pain and numbness in his extremities.

49.     Doctors employed by Defendant BOP have prescribed Mr. Ajaj a variety of medications in order to treat these and other health issues. Two of the medications prescribed to him are Neurontin and Bupropion.  Neurontin helps Mr. Ajaj manage the pain associated with his neurological issues.  Bupropion is an antidepressant.

50.     When Mr. Ajaj is deprived of his Bupropion for more than a day, he suffers from symptoms that include worsened depression, irritability, agitation, dizziness, mood and

emotional problems, severe night sweats, restlessness, and other related symptoms.

51.     Additionally, when Mr. Ajaj does not take his Neurontin for more than a day, he experiences severe pain in his spine and legs, numbness in his hands and feet, cramping, weakness, and stiffness.

52.     Mr. Ajaj is able, however, to take his prescription medications before dawn and after sunset without an adverse effect on his health.

53.     Mr. Ajaj is housed in solitary confinement at ADX.  BOP medical staff, including Defendants MORROW, MCCOIC, CAMACHO, and HUDDLESTON are responsible for delivering Neurontin and Buproprion to Mr. Ajaj's cell every day.

54.     Defendants BOP, BERKEBILE, HALL, LAMB, MCCOIC, MORROW, HUDDLESTON, and CAMACHO owe a duty to protect the health and safety of the prisoners they confine, including providing for the medical needs.

55.     Mr. Ajaj informed Defendants BOP, BERKEBILE, HALL, and LAMB of his medical conditions necessitating prescription medications.

56.     Defendants BOP, BERKEBILE, HALL, and LAMB therefore were aware that Mr. Ajaj needs his prescription medications to treat his pain and depression.

57.     Defendants MCCOIC, MORROW, HUDDLESTON, and CAMACHO were responsible for delivering Mr. Ajaj's prescribed medications during 2014.

58.     As part of the medical staff, Defendants MCCOIC, MORROW, HUDDLESTON, and CAMACHO were aware of Mr. Aja's medical conditions necessitating prescription medications.

**C.  As a Devout Muslim, Mr. Ajaj is Required to Fast During Certain Muslim**

**Holidays Throughout the Year.**

59.     Mr. Ajaj is a devout Muslim.  His religious beliefs have been constant and unwavering throughout his life, including his years spent incarcerated.

60.     Mr. Ajaj's years of administrative remedies filed in an effort to observe his religious faith demonstrate his firm belief in Islam.

61.     Defendant BOP's annual "Inmate Skills Development Plan" for Mr. Ajaj consistently identifies him as an "active participant" of the Islamic faith.

62.     Chaplain Sacchorello, the current ADX chaplain, confirmed in writing that Mr. Ajaj is sincere in his religious beliefs.

63.     The Five Pillars of Islam are acts that observant Muslims are required to perform and are the basic foundations of the Islamic religion.

64.     Fasting is one of the Five Pillars of Islam.

65.     Ramadan is a holy month during which Muslims must fast.

66.     In order to observe the fast, Muslims must not ingest any medications from dawn until sunset, so long as taking those medications outside of fasting hours will not have an adverse effect on their health.

67.     Like all observant Muslims, Mr. Ajaj is required to fast during Ramadan.

68.     In order to observe the fast during Ramadan, Mr. Ajaj is prohibited by his religious faith from ingesting any food or prescribed medications from dawn until sunset.

69.     Another Pillar of Islam is the Hajj. The Hajj is a religiously mandated pilgrimage to Mecca.  When a practicing Muslim is physically unable to make the pilgrimage to Mecca, alternative forms of worship are highly encouraged in lieu of the Hajj.

70.     Because he is serving a sentence of 114 years, Mr. Ajaj likely will never go for Hajj.

71.     Therefore, it is Mr. Ajaj's firmly held belief that he must participate in additional fasts dictated by the Prophet Mohammed.

72.     Mr. Ajaj firmly believes that participating in additional fasts will earn him great rewards and blessing from Allah.

73.     The verbal teachings of Prophet Mohammed are called the "Sunnah."

74.     The Sunnah dictates that Muslims should fast on Mondays and Thursdays; six days during the month of Shawwal (the tenth month of the Islamic calendar); the day of Arafa, which is the ninth day of the month of Zul-Hijjah; Ashura, which is the tenth day of the Islamic month of Muharram; and during most of the month of Sha'ban (collectively, "Sunnah Fasts").

75.     In order to participate in the Sunnah Fasts, Mr. Ajaj is prohibited by his religious faith from ingesting any food or prescribed medication from dawn until sunset.

76.     Mr. Ajaj has thus repeatedly requested that Defendants BOP, BERKEBILE, HALL, LAMB, OLIVER, CAMACHO, MCCOIC, MORROW, and HUDDLESTON deliver his medications before dawn and after sunset during Ramadan and the Sunnah Fasts.

77.     Mr. Ajaj has repeatedly requested that Defendant BOP deliver his meals before dawn and after sunset during Sunnah Fasts.

**D.  Defendants Unjustifiably Prevented Mr. Ajaj From Observing Ramadan and Continue to Prevent Mr. Ajaj's Participation in Sunnah Fasts.**

78.     In 2011, the BOP housed Mr. Ajaj in USP-Marion in the Communications Management Unit ("CMU").

79.     While in custody at USP-Marion, Mr. Ajaj began taking prescription medications

that BOP medical staff served via the pill line.

80.     Prisoners who consume medications via the pill line must take the medication in the presence of the medical personnel staff member who delivers it.

81.     Therefore, since at least 2011, the medical staff at USP-Marion and ADX dictated the times at which Mr. Ajaj received his prescribed medication.

82.     BOP regulations provide that "the warden shall endeavor to facilitate the observance of important religious days which involve special fasts, dietary regulations, worship, or work proscription." 28 C.F.R. § 548.18

83.     Consistent with BOP policy, Mr. Ajaj requested his prescription medications be delivered outside fasting hours in order to fully observe the fast during Ramadan 2011.

84.     The BOP denied Mr. Ajaj's requests and USP-Marion medical staff dispensed Mr. Ajaj's medications during fasting times throughout Ramadan 2011.

85.     Mr. Ajaj exhausted his administrative remedies about the BOP's refusal to accommodate in Ramadan 2011.

86.     In May 2012, the BOP unexpectedly transferred Mr. Ajaj to ADX.

87.     On June 1, 2012, in response to Mr. Ajaj's Ramadan 2011 grievances, National Inmate Appeals Administrator Harrell Watts informed Mr. Ajaj that because he was transferred to ADX, he must speak with the Chaplain on site.

88.     Defendant CASTLE was the institution chaplain at ADX when Mr. Ajaj arrived in 2012.

89.     In 2012, the BOP's central office sent a memorandum to ADX stating that ingesting medication after daylight and before sundown during Ramadan violates the religiously

required fast.

90.     In conjunction with the memorandum, Defendant CASTLE worked with Mr. Ajaj to ensure that his medications would be delivered outside fasting hours.

91.     As a result, when Mr. Ajaj was first transferred to ADX in 2012, ADX staff delivered Mr. Ajaj's medications to him before dawn and after sunset during Ramadan.

92.     In 2013 and 2014, however, ADX staff refused to deliver Mr. Ajaj's medications as they did during Ramadan 2012.

93.     Mr. Ajaj spent two years filing administrative remedies in an attempt to observe Ramadan in accordance with his religious faith.

94.     For years, Mr. Ajaj also exhausted his administrative remedies for the Sunnah Fasts as they occurred throughout the year.

95.     In these documents, Mr. Ajaj extensively articulated how important observing religiously mandated fasting is to his religious beliefs.

96.     Mr. Ajaj has informed Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, LAMB, CAMACHO, MORROW, MCCOIC, CASTLE, and HUDDLESTON both verbally and in writing that their refusal to distribute his medications before dawn and after sunset during Ramadan and the Sunnah Fasts disrespects the Islamic faith and deprives him of his right to partake in Ramadan and the Sunnah Fasts.

97.     Mr. Ajaj has informed Defendant BOP in writing that its refusal to deliver meals before dawn and after sunset during Sunnah Fasts deprives him of his right to participate in fasts in line with Prophet Mohammed's the Sunnah.

### i. Ramadan 2013

98.     Prior, throughout, and after Ramadan 2013, while housed at ADX, Mr. Ajaj wrote

to Defendants BOP, HALL, BERKEBILE, and LAMB requesting his medication be delivered

outside fasting hours during Ramadan.

99.     In response, Mr. Ajaj received an anonymous response stating simply that that

"[t]he pill lines will be completed twice daily at the standard usual times of 6:00 am and 18:00

pm," and that "I trust this addresses your concerns."

100.    Defendants BOP, BERKEBILE, and HALL also responded that "pill lines are

conducted at approximately 6:00 a.m. and 6:00 p.m. daily" and cannot be changed "for the

convenience of ingesting it at a later time."

101.    In June 2013, the onsite chaplain reiterated the contents of the 2012 central office

memorandum to staff in the ADX medical department.

102.    Despite these reminders, Defendants BOP, BERKEBILE, HALL, and LAMB

directed Defendants CAMACHO, MCCOIC, HUDDLESTON, and MORROW not to make any

special accommodations for Mr. Ajaj with respect to his medication delivery time.

103.    Prior to Ramadan 2013, Defendant HALL met with Mr. Ajaj and assured him that

his medications would be delivered at the appropriate times during Ramadan to allow him to fast.

104.    Despite these assurances, Defendant HALL issued orders to medical staff,

including Defendants CAMACHO, MORROW, MCCOIC, and HUDDLESTON that they need

not accommodate fasting with respect to the timing of dispensing medications to observant

Muslims during Ramadan.

105.    Defendant LAMB also sent a memorandum to medical staff, including

Defendants CAMACHO, MORROW, HUDDLESTON, and MCCOIC explaining it is not necessary to accommodate Ramadan with respect to the pill line distribution.

106.     Therefore, Defendants CAMACHO, MORROW, MCCOIC, and HUDDLESTON refused to deliver Mr. Ajaj's prescribed medications outside fasting hours.

107.     On many occasions during Ramadan, Defendants CAMACHO, MCCOIC, HUDDLESTON, and MORROW were seen in Mr. Ajaj's unit outside fasting hours delivering medications to other prisoners.

108.     Rather than give Mr. Ajaj his medications, Defendants CAMACHO, MCCOIC, HUDDLESTON, and MORROW stood idly by until fasting began, at which point they sometimes attempted to provide Mr. Ajaj with his medications.

109.     On other occasions, Defendants CAMACHO, MCCOIC, HUDDLESTON, and MORROW never attempted to provide Mr. Ajaj his medications.

110.     Instead, Defendants CAMACHO, MCCOIC, HUDDLESTON, and MORROW recorded that he either refused to take his medication or took his medication when asked, when, in fact, Mr. Ajaj was never able to take his medication during Ramadan 2013.

111.     Shortly before and after Ramadan 2013, Defendants MCCOIC, MORROW, CAMACHO, and HUDDLESTON began distributing medications at around 4:00 a.m. and 8:30 p.m.  In other words, Defendants BOP, MCCOIC, MORROW, CAMACHO, and HUDDLESTON delivered Mr. Ajaj's medications at times that were before sunrise and after sunset, demonstrating it was not a substantial burden to do so during Ramadan.

112.     Mr. Ajaj exhausted his administrative remedies with respect to the pill line distribution times to no avail.

113.     Specifically, Mr. Ajaj wrote to Defendants BOP, BERKEBILE, OLIVER, HALL, and LAMB that their failure to accommodate his fasting offended and disrespected the Islamic faith and the Holy Month of Ramadan, causing him "loss of enjoyment" in the exercise of his religion.

114.     In these documents, Mr. Ajaj informed Defendants BOP, BERKEBILE, OLIVER, HALL, and LAMB in writing of the Tenth Circuit's holding regarding a prisoner's right to fully participate in Ramadan.  *See Makin v. Dep't of Corrs.*, 183 F.3d 1205, 1211 (10th Cir. 1999).

115.     Defendants BOP, BERKEBILE, OLIVER, and HALL responded to Mr. Ajaj's administrative remedies by simply stating that pill lines start at specific times and will not be changed to accommodate Mr. Ajaj's request during Ramadan.

116.     On information and belief, when a prisoner appeals a grievance to the regional office, the regional office refers the grievance to a subject matter expert to prepare a response.

117.     On information and belief, Defendant CASTLE, as the regional chaplain, is the subject matter expert assigned to prepare responses to grievances regarding religious exercise grievances.

118.     Mr. Ajaj appealed his 2013 administrative remedy regarding the pill line distribution time.

119.     On information and belief, Defendant CASTLE prepared the response.

120.     Defendant CASTLE reversed course from his prior accommodation of Ramadan procedures during his time at ADX in 2012, and simply responded to Mr. Ajaj's appeal by stating that the "[m]edical administration at [ADX] is conducted at set times," without providing a penological justification.

121.    Defendants BOP, BERKEBILE, OLIVER, CASTLE, and HALL never provided any legitimate or compelling government interest that would justify their denial of Mr. Ajaj's request to respect his religious exercise.

122.    Faced with a Hobson's choice of observing his religion or taking his medication, Mr. Ajaj chose to observe his religion and was therefore forced to forego taking his necessary medications.

123.    Defendants BOP, BERKEBILE, OLIVER, HALL, LAMB, CASTLE, CAMACHO, MORROW, MCCOIC, and HUDDLESTON's refusal to provide Mr. Ajaj with his medication outside fasting times during Ramadan caused him severe pain, including numbness and cramping and led to him suffering many sleepless nights.

**ii. Ramadan 2014**

124.    In 2014, Mr. Ajaj wrote a letter to Defendant CASTLE seeking his help in persuading Defendant BOP to respect his observance of Ramadan by delivering his medications outside fasting hours.

125.    Defendant CASTLE is the regional chaplain of the North Central Region and is therefore responsible for facilitating proper practice of prisoners' religious faith.

126.    In the letter, Mr. Ajaj complained that Defendants BOP, BERKEBILE, HALL, and LAMB were refusing to accommodate the upcoming Ramadan and requested that Defendant CASTLE do something to ensure Ramadan was accommodated.

127.    Defendant CASTLE ignored Mr. Ajaj's letter.

128.    In the middle of Ramadan 2014, Defendant OLIVER became warden at ADX and continued the practice of his predecessors by refusing to accommodate Mr. Ajaj's pill line

requests.

129.     Defendant HALL again issued orders to medical staff, including Defendants

CAMACHO, MORROW, MCCOIC, and HUDDLESTON that they need not accommodate

fasting with respect to the timing of dispensing medications to observant Muslims during

Ramadan.

130.     Therefore, Defendants CAMACHO, MORROW, HUDDLESTON and MCCOIC

continued to refuse to deliver Mr. Ajaj's prescribed medications outside fasting hours during

Ramadan.

131.     Consistent with Ramadan 2013, Defendants CAMACHO, MCCOIC,

HUDDLESTON, and MORROW were seen in Mr. Ajaj's unit outside fasting hours delivering

medications on many occasions.

132.     Rather than give Mr. Ajaj his medications, Defendants CAMACHO, MCCOIC,

HUDDLESTON, and MORROW stood idly by until fasting began, at which point they

sometimes attempted to provide Mr. Ajaj with his medications.

133.     On other occasions, Defendants CAMACHO, MCCOIC, HUDDLESTON, and

MORROW never attempted to provide Mr. Ajaj his medication.

134.     Instead, Defendants CAMACHO, MCCOIC, HUDDLESTON, and MORROW

recorded that he either refused to take his medication or took his medication when asked, when,

in fact, Mr. Ajaj was never able to take his medications during Ramadan 2014.

135.     Defendants CAMACHO, MCCOIC, HUDDLESTON, and MORROW were

acting within the scope of their employment when they failed to serve Mr. Ajaj his medication

during Ramadan 2014.

136.    When Mr. Ajaj asked Defendant CAMACHO why he was not delivering his medications outside fasting hours, Defendant CAMACHO told him that he would not accommodate his fasting as it is Mr. Ajaj's choice to fast during Ramadan, and Mr. Ajaj deserved his pain and suffering.

137.    On another occasion, Defendant CAMACHO asked why Mr. Ajaj worships Allah when Allah is the one depriving him of his medications.

138.    On several occasions during Ramadan 2014, Defendant CAMACHO distributed medications to nearby, non-Muslim prisoners after sunset, but refused to provide Mr. Ajaj with his medication at that time.

139.    Defendants BOP, BERKEBILE, OLIVER, HALL, LAMB, CAMACHO, MORROW, MCCOIC, and HUDDLESTON's refusal to provide Mr. Ajaj with his medication outside fasting times during Ramadan resulted in Mr. Ajaj suffering severe pain, including numbness and cramping, and led to many sleepless nights.

140.    Shortly before and after Ramadan 2014, Defendants MCCOIC, MORROW, CAMACHO, and HUDDLESTON began distributing medications at around 4:00 a.m. and 8:30 p.m.  In other words, Defendants BOP, MCCOIC, MORROW, CAMACHO, and HUDDLESTON delivered Mr. Ajaj's medications at times that were before sunrise and after sunset, demonstrating it was not a substantial burden to do so during Ramadan.

141.    In 2014, Mr. Ajaj exhausted his administrative remedies with respect to the pill line distribution times during Ramadan.

142.    In these documents, Mr. Ajaj continued to inform Defendants BOP, HALL, BERKEBILE, OLIVER, and LAMB of his deeply held religious belief in observing Ramadan

and the Tenth Circuit's endorsement of proper Ramadan observance within prisons.

143.    Defendants BOP, HALL, BERKEBILE, and OLIVER responded that Mr. Ajaj's complaints were repetitive from the prior year's Ramadan and that the pill line would not be modified.

144.    Defendants HALL, BERKEBILE, and LAMB were acting within the scope of their employment when they refused to deliver Mr. Ajaj's medication outside fasting hours during Ramadan 2014.

145.    Mr. Ajaj appealed the denial of his administrative remedy to the regional office regarding the distribution of his medication during Ramadan.

146.    On information and belief, Defendant CASTLE prepared the response to Mr. Ajaj's appeal that simply stated that his appeal was repetitive of his former grievances in 2013, thereby implicitly endorsing Defendant BOP's substantial burden on Mr. Ajaj's observance of Ramadan.

147.    Once again faced with a Hobson's choice of observing his religion or taking his medication, Mr. Ajaj chose to observe his religion and was therefore forced to forego taking his necessary medications.

148.    Defendants BOP, BERKEBILE, OLIVER, HALL, CASTLE, LAMB, CAMACHO, MORROW, MCCOIC, and HUDDLESTON's refusal to provide Mr. Ajaj with his medication outside fasting times during Ramadan resulted in severe pain, numbness, weakness, stiffness, severe night sweating, restlessness, deep depression, irritability, agitation, dizziness, mood and emotional problems, and other related symptoms.

149.    When Defendants BOP, BERKEBILE, CASTLE, HALL, OLIVER, and LAMB

refused to adjust the medication distribution schedule, Defendants forced Mr. Ajaj to choose

between taking his prescribed medications and observing mandatory fasting during Ramadan.

150.     Defendants MORROW, MCCOIC, CAMACHO, and HUDDLESTON's refusal

to distribute Mr. Ajaj's prescribed medications outside fasting hours forced Mr. Ajaj to choose

between taking his prescribed medications when offered and observing mandatory fasting during

Ramadan.

151.     Mr. Ajaj endured severe pain in order to fully observe Ramadan in 2013 and

2014, further evidencing his sincere belief in the Muslim faith.

152.     In addition to exhausting his administrative remedies within the BOP, Mr. Ajaj

also exhausted the administrative process under the FTCA.

153.     Mr. Ajaj submitted a signed "Claim for Damage, Injury, or Death" to the BOP,

North Central Regional Office on July 28, 2014 for Defendant BOP's failure to deliver Mr.

Ajaj's medications, which are necessary to treat his medical conditions, during Ramadan 2014.

154.     Mr. Ajaj requested $130,000 for the injuries he sustained from Defendant BOP's

failure to deliver his medications during Ramadan 2014.

155.     Defendant BOP denied Mr. Ajaj's FTCA claim (claim # TRT-NCR-2014-05750)

on January 21, 2015.

156.     Mr. Ajaj timely requested Defendant BOP reconsider its denial.

157.     On July 31, 2015, Defendant BOP affirmed its denial in writing.

### iii. Ramadan 2015

158.     In May 2015, Mr. Ajaj filed this lawsuit in anticipation of the upcoming Ramadan

after Defendants told him that they would once again not accommodate his fasting with respect

to the distribution of his medications.

159.     After the filing of this lawsuit through counsel, Defendants suddenly changed their position and accommodated Mr. Ajaj throughout Ramadan with the exception of two days.

160.     On August 28, 2015, Defendants amended the "complex supplement" for the Florence Correctional Complex ("FCC"), entitled "Religious Beliefs and Practices" that requires ADX staff to accommodate practicing Muslims during Ramadan with respect to the pill line.

161.     Complex supplements are dynamic policies that are reviewed annually by wardens.

162.     Complex supplements can be overridden at any time by the national program statements created by the BOP.

163.     On September 25, 2015, Warden John Oliver left his position at ADX.  He was replaced by interim Warden Bill True.

164.     In December 2015, Jack Fox will become warden at ADX.

165.     It is not uncommon for new wardens to change institution or complex supplements.

166.     The amendment to the "Religious Beliefs and Practices" complex supplement confirms the BOP's ability to create policies to support inmates' religious practices that, for years, the BOP largely thwarted.

167.     During Ramadan 2015, after the commencement of this lawsuit, Defendants BOP, OLIVER, LAMB, MORROW, HUDDLESTON, and CASTLE accommodated Mr. Ajaj's requests, demonstrating their ability to do so.

168.     Nonetheless, on September 23, 2015, approximately one month after the creation

of the new complex supplement, Amber Nelson, acting Regional Director of the North Central

Region of Defendant BOP, responded to Mr. Ajaj's grievance regarding his request to have the

pill line changed for proper Ramadan observance.

169.    Ms. Nelson explained that the BOP's decision to not modify the pill line

distribution time during Ramadan remains firm.

170.    In other words, the BOP continues to take the position that Mr. Ajaj's observance

of Ramadan will not be accommodated, even after the creation of a complex supplement stating

otherwise.

### iv. Sunnah Fasting

171.    The verbal preaching of Prophet Mohammed is called the "Sunnah."

172.    The Sunnah recommends fasting during certain holy days throughout the Islamic

calendar year, particularly when Muslims physically cannot go for Hajj.

173.    Like Ramadan, the Sunnah Fasts require Muslims not to ingest any food from

dawn until sunset.

174.    In order to observe the Sunnah Fasts, Muslims also must not ingest any

medications from dawn until sunset, so long as taking those medications outside of fasting hours

will not have an adverse effect on their health.

175.    Mr. Ajaj has repeatedly explained to Defendants BOP, BERKEBILE, OLIVER,

KNOX, CASTLE, and HALL that the Prophet Mohammed preaches that Muslims will be

rewarded and blessed by Allah for their participation in the Sunnah Fasts.

176.    For years, Defendants BOP, BERKEBILE, OLIVER, HENDERSON, KNOX,

and HALL have refused to provide Mr. Ajaj with his meals or medication outside fasting hours

during the observance of the Sunnah Fasts.

177.    After Ramadan 2015, the Sunnah Fast during the month of Shawwal began.

178.    During the Sunnah Fast, Defendants BOP, OLIVER, TRUE, MORROW, and HUDDLESTON refused to accommodate Mr. Ajaj's fasting in any way.

179.    Defendants BOP and TRUE refused, and continue to refuse, to provide Halal food before sunrise and after sunset during the Sunnah Fasts.

180.    Defendants BOP, OLIVER, TRUE, MORROW, and HUDDLESTON refused, and continue to refuse, to deliver Mr. Ajaj's prescribed medications before sunrise and after sunset.

181.    The Sunnah Fasting has since concluded, and Defendants MORROW and HUDDLESTON are currently serving Mr. Ajaj his medication at around 3:00 a.m.  In other words, Defendants BOP, TRUE, LAMB, MORROW, and HUDDLESTON are accommodating Mr. Ajaj's previous requests *after* required fasting has concluded.

182.    Mr. Ajaj has exhausted his administrative remedies with respect to the Sunnah Fasts.

**E.  As a Devout Muslim, Mr. Ajaj is Required to Consume Only Certified Halal Food and Certified Halal Meats.**

183.    Islamic principles require observant Muslims to consume only Halal food.

184.    Islamic doctrine dictates that non-Halal (haram or "forbidden") food destroys the spirituality and morality of the consumer.  A Muslim who consumes non-Halal food is termed a "faasiq" (dissolute) and he is considered a flagrant sinner.  The prayers of a person eating haram food are ineffective for forty days.

185.    The Qur'an states "so eat meats on which Allah's name has been pronounced"

and "[h]e who does not eat meat is not of my religion."  As such, Mr. Ajaj believes that to fully observe this mandate of Islam he must eat a completely Halal diet with Halal meats.  In other words, Mr. Ajaj sincerely believes that he is forbidden from being vegetarian.

186.    To meet the requirements of Halal food, herbivorous animals must be fed, raised, and slaughtered according to Islamic dietary laws.  It is not permissible to consume even non-meat products prepared in factories that also process pork and haram meats.

187.    All ingredients for food must be Halal.  Items used in preparing haram foods can contaminate Halal foods, thereby making those foods haram.

**F.  In Order to Observe Islamic Dietary Laws, Mr. Ajaj Must Be Provided a Halal Diet At ADX and Allowed to Purchase Halal Food From the Commissary.**

188.    The BOP Program Statement on Religious Beliefs and Practices states "[t]he Bureau provides inmates requesting a religious diet reasonable and equitable opportunity to observe their religious dietary practice within the constraints of budget limitations and the secure and orderly running of the institution and the Bureau through a religious diet menu…The other component accommodates dietary needs through nationally recognized, religiously certified processed foods."  BOP Prog. Statement P5360.09.

**i. Defendants Unjustifiably Prevent Mr. Ajaj From Maintaining a Halal Diet.**

189.    Mr. Ajaj is housed in K-Unit at ADX.  BOP staff at ADX deliver individually wrapped meals from an outside vendor to Mr. Ajaj's cell every day.  He may also supplement this food with purchased items from the prison commissary.

190.    ADX offers four meal options to prisoners: a regular diet, no-pork diet, no-meat diet, and the Common Fare diet (a Kosher diet). The regular diet contains many haram

components including, but not limited to, pork and pork by-products.

191.   The no-pork diet contains haram components including, but not limited to: the meat of animals that were fed, raised, and slaughtered in non-halal ways; items prepared by factories or utensils which also process pork and other haram products; and questionable ingredients that may be from pork sources like shortening, certain forms of whey, and gelatin.

192.   Jewish prisoners are able to obtain their religiously mandated Kosher diet through the Common Fare diet.

193.   Kosher food is not necessarily Halal.

194.   The no-meat diet contains haram components including a lack of Halal meats (which the Qu'ran mandates eating), pork and meat by-products, and food prepared by factories, equipment, and utensils in contact with haram products.

195.   Mr. Ajaj was previously on the no-pork diet.  Currently, Mr. Ajaj is on the no-meat diet as he believes it more closely conforms to his religious needs.

196.   The meals Mr. Ajaj has been provided under this dietary program have consistently included haram foods including pork byproducts, haram enzymes, and foods prepared with haram equipment.

197.   Mr. Ajaj is forced to refrain from eating questionable items in order to avoid haram foods and is therefore unable to eat substantial portions of his prison-provided meals.

198.   For years, Mr. Ajaj has repeatedly requested that BOP staff at ADX provide him Halal meals with Halal meats.  He has repeatedly drawn their attention to the religious deficiencies in the Common Fare diet offered by the Food Services Department.

199.   In 2014 and 2015 alone, Mr. Ajaj filed at least six separate grievances on this

issue.

200.     Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, HENDERSON, and KNOX have been informed both verbally and in writing by Mr. Ajaj that their refusal to provide a Halal diet violates the Islamic faith and deprives him of his right to partake in a fundamental tenet of Islam.

201.     In a 2014 response to Mr. Ajaj's Request for an Administrative Remedy asking for a diet that meets his religious needs, Defendant BERKEBILE wrote to Mr. Ajaj that the Common Fare diet meets the Program Statement 4600.06 [Food Service Manual] requirements for a religious diet because it is Kosher.  Defendant BERKEBILE incorrectly told Mr. Ajaj that a Kosher diet meets the standards for Muslims.  He provided no reason why Halal meals with meat could not be served.

202.     In 2015, Defendant OLIVER responded to Mr. Ajaj's Request for Administrative Remedy asking for a diet that meets his religious needs stating that "no item served [by Food Services] during Ramadan is required to be Halal."  He provided no reason why Halal meals with meat could not be served.

203.     In response to Mr. Ajaj's appeal of Defendant BERKEBILE's decision on Mr. Ajaj's request of a diet that meets his religious needs, Paul Laird, Regional Director in the North Central Regional Office and agent of Defendant BOP, said "The religiously certified meals currently being served are adequate to meet the religious dietary requirements and you are being afforded a reasonable and equitable opportunity to observe your religious dietary practice . . . furthermore, inmates [are provided] the ability to purchase through SPO program, Halal certified entries."  He provided no reason why Halal meals with meat could not be served.

204.     In July 2013, in response to an informal resolution by Mr. Ajaj asking for a diet that meets his religious needs, an agent of Defendant BOP told Mr. Ajaj the Food Services Department "is not required to serve Halal meals and Mr. Ajaj must purchase Halal from commissary."

205.     Given that Defendants BOP and TRUE oversee, and Defendant's OLIVER, and BERKEBILE formerly oversaw, all BOP staff members and inmates at ADX and are or were responsible for implementing policies and procedures, their inaction resulted in Mr. Ajaj being served haram food every day for years.  The refusal to provide a Halal diet means Mr. Ajaj is confronted with a Hobson's choice at every meal – he must choose whether to eat or to observe his religion.

### ii. The Items Available at Commissary Also Do Not Meet Mr. Ajaj's Religious Requirements.

206.     The BOP's Trust Fund Department runs the prison commissary, which provides inmates an opportunity to purchase articles or services not issued or delivered as basic care by the institution or of a different quality. BOP Prog. Statement 4500.11.

207.     Prisoners may be able to supplement commissary offerings through a Special Purchase Order (SPO) for certain approved items.  Trust Fund staff coordinate with the Chaplain to identify religious articles that may be purchased through the SPO program.  *Id.*

208.     Jewish prisoners are able to purchase additional Kosher meals through the commissary.

209.     The items available to purchase through SPO at the prison commissary include four vegetarian Halal-certified meals.

210.     Halal meats are not regularly offered through the commissary.

211.    Since 2011, Mr. Ajaj has repeatedly requested that Halal meals with meat be offered in the commissary.

212.    From 2013 to 2015, Mr. Ajaj filed at least thirty grievances and appeals at every level of the BOP asking for the ability to meet his religious needs through commissary.

213.    Defendant HALL, on behalf of Defendant BERKEBILE, told Mr. Ajaj in response to a dietary grievance that "religious requirements are addressed by the religious services department."

214.    Defendants KNOX and HENDERSON, member and head of religious services department respectively, received many requests from Mr. Ajaj for SPO options that would allow him to observe his Halal diet.  The SPO continues to include the same entrees that do not meet his requirements.

215.    Defendant KNOX told Mr. Ajaj that if he has issues with SPO he needs to address them with commissary.

216.    Defendant CRANK, as the individual responsible for ordering all products for the prison commissary, also repeatedly ignored Mr. Ajaj's request for Halal meals with meats. Defendant CRANK did not add a single entrée to the commissary that met Mr. Ajaj's religious requirements even after Mr. Ajaj provided names and contact info of many potential vendors – some of whom ADX currently does business with for other food purchases.

217.    Defendant CRANK repeatedly makes it difficult for Mr. Ajaj to buy food through SPO by ignoring Mr. Ajaj's specific requests, skipping his deliveries, and prohibiting Mr. Ajaj from utilizing the SPO as mandated – for special religious purchases.

218.    Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, HENDERSON,

CRANK, and KNOX have been informed both verbally and in writing by Mr. Ajaj that their refusal to provide Halal meals with Halal meat in the commissary violates the Islamic faith and deprives him of his right to partake in a fundamental tenet of Islam.

219.    In order to ensure the foods he purchases are Halal, Mr. Ajaj must first buy the items and then check the ingredients himself.  He has requested that the Inmate Trust Fund provide a list of what items contain pork by-products.

220.    Defendant OLIVER responded to a request for such a list in 2015 by saying "it is not the role of the Trust Fund department to make that determination for each individual inmate."

221.    Mr. Ajaj has thus, alternatively, requested labels from commissary items prior to purchase, but no labels have ever been provided to him.

222.    Defendant CRANK has refused to provide Mr. Ajaj with either a list or commissary labels for questionable items after repeated requests.

223.    A 2014 response to Mr. Ajaj's Request for Administrative Remedy where he asks for Halal-certified meals with meat, Defendant HALL, responding on behalf of Defendant BERKEBILE, said "when costs are comparable and products meet the needs of the institution, the Commissary elects to sell products that have a reliable kosher certification." She did not provide a reason why the commissary could not sell Halal-certified meals with Halal meats.

224.    In a 2015 response to Mr. Ajaj's request Halal meals and meats to be sold in the commissary, Amber Nelson, Acting Regional Director of the North Central Region of Defendant BOP, provided no reason why the commissary could not sell Halal-certified meals with Halal meats.

225.    In a 2013 note responding to Mr. Ajaj's request that Halal meals with meats be

sold at commissary through the SPO program, Defendant KNOX refused to acknowledge Mr.

Ajaj's stated problems with commissary and provided no reasons why Mr. Ajaj should not be

able to have access to entrees that met his religious requirements.

226.     In response to Mr. Ajaj's repeated requests for commissary items that meet his

Halal dietary restrictions, Defendant BOP officials, including Defendant BERKEBILE, have

repeatedly told Mr. Ajaj that "[c]ommissary items are meant to complement, not supplement,

diet and medical care provided to inmates."

> **iii.  Even if the Commissary Sold Foods That Met His Religious Needs, Mr. Ajaj Is Prohibited By BOP Policy From Meeting His Religious Dietary Needs Via SPO Program.**

227.     Assuming inmates can afford SPO items, they are limited in how often they can

purchase them and how many they may possess.

228.     Inmates are expected to pay for SPO religious items in addition to paying

restitution, purchasing medicine, hygiene products, legal writing and correspondence materials,

and paying for phone calls.

229.     Defendant BOP responded to Mr. Ajaj's Request to Staff Member ("Cop-Out")

requesting religiously-certified meals on his commissary list at USP Marion by stating: "The

placement of food items on the SHU commissary list is decided at each institution. Commissary

is a privilege, not a right . . . for sanitation reasons, food items are limited to the regular meals

provided by Food Service."

230.     In a 2014 response to Mr. Ajaj's request to buy meals that meet his religious diet

at ADX, Defendant BERKEBILE wrote "it is not the role of the commissary to fully

accommodate or meet your dietary and religious needs . . . your religious dietary needs can be

met by electing to participate in the Religious Diet Program offered by the Food Service department."

231.    Every day, Mr. Ajaj is required to either eat meals that violate his religious beliefs or go without eating.  He may purchase meals from the commissary that more closely adhere to his religious beliefs to the exclusion of other vital purchases like writing materials and over-the-counter medical treatments.  His ability to purchase even those items is "a privilege," and, per BOP policy, he is not able to substitute those items for his diet.

232.    Mr. Ajaj sincerely believes that consuming haram food is a flagrant sin that invalidates his acts of worship, inhibits his spiritual development, and weakens his relationship with Allah.

233.    Given that ADX already distributes religious meals to accommodate some religious inmates, Mr. Ajaj has repeatedly provided BOP officials with numerous vendors, including vendors ADX already uses, that offer fully Halal meat entrees to be sold at commissary.

234.    ADX has over 100 Muslim prisoners, all of whom would find their Halal dietary needs met by the Halal meat diet and vendors Mr. Ajaj has repeatedly recommended.

235.    Defendants BOP, TRUE, BERKEBILE, OLIVER, HALL, HENDERSON, CRANK, and KNOX collectively prohibited Mr. Ajaj from meeting his religious dietary needs—needs that 20% of ADX inmates share—through any possible avenue.

236.    Defendants first told Mr. Ajaj that his religious diet would not be accommodated by Food Services.

237.    Then Defendants told Mr. Ajaj he should purchase such religious-certified items

(that only partially meet his needs) from the commissary.

238.    Finally, when Mr. Ajaj attempted to obtain Halal-certified foods from the commissary, Defendants told him that commissary purchase are a privilege, not a right, and that religiously-certified food items may not be allowed on the SHU commissary list at all.

239.    In the face of this dilemma, Mr. Ajaj continued to grieve to all available parties in order to exhaust all reasonable efforts to obtain food that meets his religious dietary needs. Moreover, federal law requires a prisoner to exhaust administrative remedies before he is permitted to try to raise an issue in court.

240.    In a 2015 email asking Defendant KNOX to advise on a BP-8 grievance regarding religious accommodation, Defendant KNOX told Mr. Ajaj's counselor, "Don't give him anymore . . . I mean bp8s."

241.    Defendant BERKEBILE, in a response to a 2014 grievance regarding the Halal food issue, chastised Mr. Ajaj by saying, "You have the responsibility to use the Administrative Remedy Program in good faith and in an honest and straightforward manner."  He provided no reason why the commissary could not provide Mr. Ajaj with Halal meat in his purchased food.

242.    Defendants BERKEBILE and KNOX helped create a systematic barrier to Mr. Ajaj's religious exercise and then proactively endeavored to limit his ability to even grieve about it.

243.    Despite these challenges, Mr. Ajaj has persisted in exhausting his administrative remedies many times over, requesting that Defendants provide food items that would allow him to observe a religious diet consistent with his sincerely held beliefs. In response, Defendants have steadfastly refused to accommodate Mr. Ajaj's need for food items consistent with the

tenets of his religion.

**G.  As a Devout Muslim, Mr. Ajaj Must Meet Regularly With An Imam.**

244.    Islamic law mandates regular consultation with an Imam to ensure compliance with religious values in daily life.

245.    An Imam is the primary Islamic religious leader who leads others in formal prayers, outlines lessons from the Qur'an by explaining its meaning and application in the daily life of Muslims, gives advice and counseling on personal, family, and financial issues, helps Muslims apply the rules of Islam to daily life, and builds Muslim community and fellowship.

246.    Mr. Ajaj sincerely believes that an Imam provides him with much needed religious advice and counseling generally and, in particular, on the complicated spiritual challenges that prison presents.

**H.  In Order to Meet With An Imam, Mr. Ajaj Must Be Granted Such Opportunities by Defendants.**

247.    At ADX, where Mr. Ajaj is incarcerated, all pastoral visits must be coordinated and approved by ADX officials.

248.    BOP policy on Religious Beliefs and Practices states "[i]f requested by an inmate, the chaplain shall facilitate arrangements for pastoral visits by a clergy person or representative of the inmate's faith."  BOP Prog. Statement P5360.09.

249.    It also states "[t]he institution's chaplain may contract with representatives of faith groups in the community to provide specific religious services which the chaplain cannot personally deliver due to, ordinarily, religious prescriptions or ecclesiastical constraints to which the chaplain adheres."  *Id.*

250.     The Florence Correctional Complex's ("FCC") Complex Supplement on Religious Beliefs and Practices states that "[c]ontract religious leaders provide professional leadership for faith groups who have no Chaplain Representative qualified to perform as ministers to the group."  FCC 5360.09E.

251.     The BOP Technical Manual on Ministry of BOP Chaplains states: "Inmates may receive visits from community clergy.  The chaplains will assist in arranging the visits.  These clergy visits provide opportunities for inmates to receive pastoral care and serve to maintain community ties with the inmates' faith traditions." BOP Tech. Man. T5360.02.

252.     It also states "chaplains will recruit and use contractors and volunteers to meet the religious needs of the inmates."  *Id.*

253.     As discussed below, Defendants BOP, BERKEBILE, JOHNSON, and HENDERSON have failed to follow and repeatedly violated BOP's own policies and procedures with respect to provided Mr. Ajaj access to an Imam.

**I.  When It Is Granted, Mr. Ajaj's Access to a Religious Representative Is Substantially Different From that of Other Inmates.**

254.     On information and belief, at least 20% of prisoners, more than 80 people, at ADX alone are Muslim.

255.     In 2013, Defendant BERKEBILE responded to Mr. Ajaj's request for access to an Imam by saying "the contract Imam visits the complex four times a month . . . the contract Imam is responsible for visiting all inmates on the complex who request to see him at each institution." He provided no reason why the huge population of Muslim prisoners were only entitled to so few visits from an Imam.

256.     On information and belief, for almost three years, the entire FCC has operated

without a Muslim Chaplain, a Muslim Religious Counselor, or any full-time Muslim Religious Services Department Staff.

257.    The FCC employs full-time Chaplains for other religious groups including Christian, Seventh-day Adventist, Catholic, and Jewish Chaplains.

258.    For 11 years, from 2002-2010 and 2012-present, there have been no approved religious Muslim volunteers at ADX.

259.    Volunteers of other faiths have been approved as volunteers for Jewish and Native American prisoners.

260.    At the beginning of 2013, the BOP contracted a part-time Imam who visited Mr. Ajaj once a month at best, and usually only once every few months.

261.    When Mr. Ajaj did have a sporadic visit from an Imam, the Imam was prohibited from conducting any prayer with Mr. Ajaj.

262.    Christian and Jewish religious representatives are allowed to perform rituals and prayers with prisoners during visits.

263.    Jewish religious representatives and chaplains interacting with Jewish prisoners are able to read and speak in Hebrew.

264.    During the infrequent Imam visits, Mr. Ajaj was often limited to less than ten minutes for spiritual guidance.

265.    During the few times in 2013 he was permitted visits with the Imam, Mr. Ajaj was required to participate in the religious visit through two prison doors, one of which is solid steel.

266.    Religious visits for Christian and Jewish inmates are not conducted behind the

solid steel cell door.

267.    Due to a serious medical condition, Mr. Ajaj has only one lung. This severely limits his ability to communicate quickly or loudly because it is difficult for him to breathe. Defendants are aware of Mr. Ajaj's medical condition, yet make no effort to accommodate him during religious visits.

268.    In 2013, Defendant HALL, on behalf of Defendant BERKEBILE, responded to Mr. Ajaj's request for Imam visitation and prayer during visits by saying that "[d]ue to security concerns regarding the space, location, and time restraints of Imam visits, it may not be permissible to conduct prayer during his visits."  He provided no reason why such security concerns exist for Muslim religious visits but not for other religious visits.

269.    In 2014, Defendant BERKEBILE responded to Mr. Ajaj's request for Imam visitation, specifically more private visitation access than behind two doors, by stating "[p]rivate visits will be considered contingent on available space and staff to facilitate a different location other than a cell front visit."  He provided no reason why such a visit had never been granted to Mr. Ajaj while other inmates were allowed these kinds of visits.

**J.   Defendants Unjustifiably Prevent Mr. Ajaj From Visitation With An Imam.**

270.    By the end of 2013, Mr. Ajaj had no interactions with an Imam for eight months.

271.    For 13 months, from August 2014 to September 2015, Defendants provided Mr. Ajaj no access to an Imam.

272.    Defendants BOP, BERKEBILE, OLIVER, HALL, HENDERSON, and KNOX ignored repeated cop-outs, informal resolutions, and requests for administrative remedy sent by Mr. Ajaj, pleading for access to an Imam.

273.    From 2013 to 2015, Mr. Ajaj filed at least twenty-nine grievances, at every level of the BOP, asking for regular and meaningful access to an Imam.

274.    In 2014, Defendant KNOX, as a Religious Services Counselor, responded to what Defendant KNOX called Mr. Ajaj's "reminder" that he needed to see the Imam when he visited that day by writing back four days later to inform Mr. Ajaj that "[the Imam] visited as many housing units/inmates as he could."  He did not provide any reasons why Mr. Ajaj's earlier requests for visitation could not be met by another Imam or by increasing the days the Imam visited ADX inmates.

275.    Defendant BERKEBILE responded to Mr. Ajaj's grievances in 2014 on this issue by restating that a contract Imam visits the entire complex four times a month.  He did not tell Mr. Ajaj why he had not been visited by the Imam.

276.    In January 2015, responding to Mr. Ajaj's grievance about the lack of visitation from an Imam, Defendant KNOX said "[t]he Imam is currently ill and is undergoing treatment . . . when he returns and makes rounds I will bring him to visit with you."  Defendant KNOX provided no explanation of how long the contract Imam would be away or what would be done for pastoral care for Mr. Ajaj in the interim.

277.    In May 2015, Defendant OLIVER addressed Mr. Ajaj's grievance about not having access to an Imam since August 2014 by saying "[d]ue to personal reasons, the contract Imam has not been visiting the institution. When the Imam returns to the institution, you will be seen by him."  He did not provide any reasons why another Imam could not be contracted or accessible via telephone during this nine month period.  He did not make arrangements for alternative pastoral care in the interim.

278.     Mr. Ajaj has repeatedly asked for access to an Imam in more convenient ways for the prison – either through video conferences or phone calls – to no avail.

279.

280.     Defendants KNOX and HENDERSON, in charge of Mr. Ajaj's pastoral care, refused to provide Mr. Ajaj with access to an Imam, either in-person or via telephone, for over one year.

281.     They refused to recruit a Muslim volunteer to visit Mr. Ajaj for over one year.

282.     Mr. Ajaj filed at least nine institutional-level grievances on this issue between September 2013 and August 2015. Defendant KNOX, acting as an assistant to Defendant HENDERSON, answered three notes from Mr. Ajaj by reiterating ADX's Imam schedule, but refused to work to provide any access to Ajaj.

283.     During his time without religious guidance or access, Mr. Ajaj has submitted at least two sets of religious questions to Defendant KNOX that have never been answered.

284.     Defendants BERKEBILE, OLIVER, and HALL, in charge of overseeing the religious services department and inmate care at ADX, refused to provide Mr. Ajaj with access to an Imam, either in-person or via telephone, for over one year. They refused to hire or recruit other Muslim representatives for over a year.

285.     Defendant BERKEBILE, and Defendant HALL writing on his behalf, personally responded to eight of Mr. Ajaj's grievances between February 2013 and February 2014 on this issue. They simply quoted ADX policy and eventually started closing his Requests for Administrative Remedy deeming them "repetitive."

286.     Defendant OLIVER, in charge of overseeing the religious services department

and inmate care at ADX, refused to provide Mr. Ajaj with access to an Imam, either in-person or via telephone, for over one year. He refused to hire or recruit other Muslim representatives for over a year.

287.    Defendant OLIVER personally responded to two of Mr. Ajaj's grievances asking for access to an Imam by telling Mr. Ajaj that "when the Imam returns to the institution [he] would be seen by him."  Defendant OLIVER refused to provide Mr. Ajaj any kind of access to an Imam during the yearlong gap in visitation.

288.    As a result of not having any type of access to an Imam for over a year, Mr. Ajaj has been unable to receive Islamic spiritual counseling and guidance during a period of time when his prison conditions have presented serious religious questions and issues.  Mr. Ajaj has been unable to pray with a leader in his religious community and gain the spiritual fellowship that results from the fundamental Islamic relationship a Muslim has with his Imam.

289.    Mr. Ajaj's alienation from a religious leader has drastically inhibited his ability to follow the tenets of his faith and maintain and develop his relationship with Allah.

290.    While other inmates were allowed to pray with their religious representatives, in 2013 Mr. Ajaj was told by the Regional Director of Defendant BOP's North Central Office that "[d]ue to the security concerns regarding the space and location of the Imam visits, it may not be permissible to conduct prayers during his visits."

291.    After more than a year without seeing an Imam, Mr. Ajaj received a visit from an Imam in late September 2015 - a few months after he retained counsel in this suit.  This visit was not behind his two cell doors.  This shows that any security concerns and problems in providing access to an Imam could have been easily overcome.

292.    Defendants BOP, BERKEBILE, OLIVER, HALL, HENDERSON, and KNOX refused to act for over a year while Mr. Ajaj was denied any type of access to the religious counseling of an Imam.

**K.  As a Devout Muslim, Mr. Ajaj Must Pray With Other Muslims Five Times Daily.**

293.    Salaat, or prayer, is one of the Five Pillars of Islam.

294.    Muslims must perform Salaat five times daily.

295.    The Prophet Mohammed rewards those who pray in groups during Salaat.

296.    Mr. Ajaj firmly believes that Allah punishes those who fail to participate in congregational prayers and rewards those who do.

297.    Each prayer takes approximately five to ten minutes to complete.

298.    Each Friday between noon and the mid-afternoon prayer, Muslims are obligated to partake in congregational prayer, or Jum'ah.

299.    Jum'ah is similar to the Saturday services of the Jewish faith, or Sunday services of the Christian faith.

300.    At ADX and in the CMU, prisoners are allowed to interact with one another during recreation time.

301.    Prisoners are allowed to speak with each other while they are in their individual cells, though.  In order to do so, prisoners must yell.

302.    During the times when prisoners are permitted to speak with each other, Mr. Ajaj has asked to pray with other Muslim prisoners.

303.    This request does not interfere with the security concerns of the prison.

304.    Nonetheless, Muslims in ADX are not permitted any opportunity to perform

congregate prayers.

305.    Defendants BOP, BERKEBILE, OLIVER, HALL, KNOX, PARRY, and JOHNSON threatened Mr. Ajaj and other Muslim inmates with disciplinary action if they perform Salaat with any other prisoners.

306.    When Mr. Ajaj asked Defendants BERKEBILE, OLIVER, JOHNSON, and HALL why he was unable to pray for five minutes simultaneously with other Muslim prisoners in their isolation cells, especially when other prisoners cause loud disruptions throughout the night, Defendants BERKEBILE, OLIVER, JOHNSON, and HALL simply reminded Mr. Ajaj that he would receive disciplinary action if he attempted to pray with other Muslim prisoners.

307.    Defendant PARRY threatens disciplinary action against Muslim prisoners who attempt to pray with or at the same time as any other Muslim prisoner.

308.    Defendant PARRY goes so far as to place Muslim prisoners in the SHU who attempt the call to prayer (Ad'han).

309.    Defendant PARRY outwardly mocks and jokes about the Islamic ritual of congregate prayer.

310.    Mr. Ajaj must therefore decide between practicing a fundamental tenet of his religion and being subject to harsh disciplinary actions, which could keep him confined at ADX indefinitely.

311.    When Mr. Ajaj asked Defendant KNOX whether he could ever participate in group prayer, Defendant KNOX explained to Mr. Ajaj that he should already know he may not pray with anyone.

312.    Defendant KNOX's told Mr. Ajaj that the reason Mr. Ajaj was forbidden from

praying with other Muslims or an Imam was a security concern.

313.     Yet, Christian, Jewish, and Native American prisoners are able to pray with their respective clergypersons, demonstrating Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, PARRY, KNOX, and JOHNSON's willingness to allow group prayer for prisoners who practice other religions.

314.     In the K-unit at ADX, where Mr. Ajaj is currently housed, congregational prayers of other religious faiths take place in the open range–outside of a prisoner's cell, indicating a lack of security concerns by Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, PARRY, KNOX, and JOHNSON.

315.     In the more secure units at ADX, prisoners are allowed to pray with clergypersons of other religious faiths within the prisoner's cell.  In K unit, religious groups other than Muslims are allowed to spend hours singing and praying on the range.

316.     Prohibiting Mr. Ajaj from performing congregate prayers constrains his ability to engage in a central and obligatory tenet of Islam.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(First Amendment – Restriction on Free Exercise of Religion Violation)**
**(Against Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, LAMB, CAMACHO, MORROW, MCCOIC, HUDDLESTON, CASTLE, HENDERSON, KNOX, and CRANK)**

**a.     Failure to Accommodate Religious Fasting**
**(Against Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, LAMB, CAMACHO, MORROW, MCCOIC, HUDDLESTON, and CASTLE)**

317.     Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set forth herein.

318.    At all times relevant to the allegations set forth in this Complaint, Defendants acted or failed to act under color of federal law.

319.    At all times relevant to the allegations set forth in this Complaint, Defendants were acting pursuant to federal custom, policy, or practice in their acts and omissions pertaining to their refusal to distribute Mr. Ajaj's medications before dawn and after sunset during Ramadan and Sunnah Fasts.

320.    The First Amendment to the Constitution protects the free exercise of religion.

321.    Under the First Amendment, the government shall not substantially burden a person's exercise of religion, unless the government demonstrates that the burden is in furtherance of a legitimate government interest justifying the burden.

322.    As a devout Muslim, Mr. Ajaj is required to fast during the month of Ramadan and thus has requested that Defendants BOP, BERKEBILE, OLIVER, HALL, LAMB, and CASTLE direct Defendants MORROW, MCCOIC, CAMACHO, and HUDDLESTON at ADX to deliver his prescribed medications before dawn and after sunset.

323.    Defendants CAMACHO, MORROW, MCCOIC, and HUDDLESTON, under the direction and supervision of Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, and LAMB, refused to distribute Mr. Ajaj's prescribed medications before dawn and after sunset during Ramadan 2013 and 2014.

324.    Defendants CAMACHO, MORROW, MCCOIC, and HUDDLESTON could have respected Mr. Ajaj's faith by delivering his medications at the appropriate time, but they deliberately decided not to do so.

325.    Mr. Ajaj believes the Prophet Mohammed's teaching dictates that Mr. Ajaj should

partake in the Sunnah Fasts.

326.     Defendants BOP, BERKEBILE and OLIVER have refused, and Defendants BOP, TRUE, CASTLE, MORROW, and HUDDLESTON continue to refuse, to distribute Mr. Ajaj's prescribed medications before dawn and after sunset during Sunnah Fasts.

327.     Defendants BOP, BERKEBILE, OLIVER, HALL, LAMB, CASTLE, MORROW, MCCOIC, HUDDLESTON, and TRUE's refusal has no rational connection to a legitimate government interest.  In their responses to Mr. Ajaj's grievances about fasting, Defendants BOP, BERKEBILE, HALL, and OLIVER provided no justification at all for their refusal to deliver Mr. Ajaj's medications before dawn and after sunset during religiously required fasting days.

328.      As an incarcerated person in solitary confinement with no other access to his prescription medications or meals, Mr. Ajaj has no feasible alternative means of exercising his right to fast during Ramadan and Sunnah Fasts.

329.     Accommodating Mr. Ajaj's religiously-mandated fasts would have minimal effect on correctional staff, other prisoners, and prisoner resources generally.

330.     An easy-to-implement alternative that would accommodate Mr. Ajaj's rights exists: delivering his prescribed medications and meals before dawn and after sunset during religiously required fasting days.

331.     As a result of Defendants' acts or omissions, Mr. Ajaj has suffered harm and remains at risk of suffering harm during future fasting days.

332.     The acts or omissions of Defendants BOP, BERKEBILE, OLIVER, HALL, LAMB, CASTLE, CAMACHO, MORROW, MCCOIC, and HUDDLESTON caused Mr. Ajaj

severe pain that was more than *de minimus*.

333.    Defendants BOP, BERKEBILE, OLIVER, HALL, LAMB, CASTLE,

CAMACHO, MORROW, MCCOIC, and HUDDLESTON's comments and conduct were

malicious, and/or evinced a reckless or callous indifference to Mr. Ajaj's federally protected

rights.

**b.    Failure to Provide Religious Diet**
**(Against Defendants BOP, TRUE, OLIVER, BERKEBILE, HALL, CRANK,**
**HENDERSON, and KNOX)**

334.    Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set

forth herein.

335.    At all times relevant to the allegations set forth in this Complaint, Defendants

were acting pursuant to federal custom, policy, or practice in their acts and omissions pertaining

to their refusal to provide Mr. Ajaj a fully Halal diet with meat and fully Halal foods in the

commissary.

336.    As a devout Muslim, Mr. Ajaj is required to consume only Halal foods that meet

the requirements of Islamic dietary law.

337.    Defendants HENDERSON, and KNOX, under the direction and supervision of

Defendants BOP, TRUE, OLIVER, BERKEBILE, and HALL, refused to provide Mr. Ajaj with

meals that comply with his religious mandate.  Defendant HENDERSON, as coordinator of

religious diets, refused to act even when Mr. Ajaj repeatedly brought his concerns to him.

338.    Defendants BOP, BERKEBILE, OLIVER, and HALL refused, and Defendants

BOP, TRUE, HENDERSON, CRANK and KNOX continue to refuse, to accommodate Mr.

Ajaj's dietary requirements in either regular meals or commissary offerings.  Defendants TRUE,

47

OLIVER, and BERKEBILE, as wardens who are the ultimate decision makers on commissary items made available to prisoners like Mr. Ajaj, refused Mr. Ajaj's repeated requests for entrees that met his religious requirements.

339.    Defendants' refusal has no rational connection to a legitimate government interest.  In their responses to Mr. Ajaj's grievances regarding his religious dietary needs, Defendants provided no justification at all for their refusal to provide him with Halal meals or their refusal to use vendors in the commissary that offer Halal meals with Halal meats.

340.    As an incarcerated person with no independent access to food, Mr. Ajaj has no feasible alternative means of exercising his right to follow such a Halal diet.

341.    Mr. Ajaj has conducted thorough research and informed Defendants of alternative vendors and meal programs that would meet his and other Muslims' strict dietary requirements.

342.    Granting Mr. Ajaj's request for Halal meals would have minimal effects on correctional staff, other prisoners, and prison resources generally as many prisoners at ADX are Muslim and religious foods are already accommodated for inmates of other religions in the existing system.

343.    An easy-to-implement alternative that would accommodate Mr. Ajaj's rights exists: providing a religious diet option that is fully Halal with Halal meats and/or offering the same vendor that other prisons use to provide prisoners with fully Halal meals for purchase at the commissary instead of a vendor who does not offer fully Halal meals.

344.    As a result of Defendants' acts or omissions, Mr. Ajaj has suffered harm and remains at risk of suffering harm because he is unable to consume meals that meet the requirements of his religious beliefs.

### c.      Failure to Provide Meaningful Access to Imam
### (Against Defendants BOP, BERKEBILE, OLIVER, HALL, HENDERSON, and KNOX)

345.    Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set forth herein.

346.    At all times relevant to the allegations set forth in this Complaint, Defendants were acting pursuant to federal custom, policy, or practice in their acts and omissions pertaining to their refusal to allow Mr. Ajaj access to an Imam.

347.    As a devout Muslim, Mr. Ajaj is required to regularly consult with leaders of his religion and develop a more personal relationship with Allah through prayers and consultation with an Imam.

348.    Defendants HENDERSON, KNOX, and HALL, under direction and supervision of Defendants BOP, BERKEBILE and OLIVER, refused to allow Mr. Ajaj any kind of access to an Imam for over a year.  These Defendants denied him such access as agents of Defendant BOP.

349.    Defendants' refusal has no rational connection to a legitimate government interest.  In their responses to Mr. Ajaj's grievances, Defendants provided no justification at all for their refusal to allow him such visitation.

350.    As an incarcerated person with tightly restricted access to religious services, Mr. Ajaj has no feasible alternative means of exercising his right to consult regularly with a pastoral individual of his faith.

351.    Granting Mr. Ajaj's request would have minimal effects on guards, other prisoners, and prison resources generally.

352.    An easy-to-implement alternative that would accommodate Mr. Ajaj's rights

exists: allowing Mr. Ajaj to either be visited in-person by an Imam or helping to facilitate his

access via internet or phone conference.

353.   Mr. Ajaj has repeatedly proposed these alternatives to in-person visits to

Defendants, who have refused to grant his requests.

354.   As a result of Defendants' acts or omissions, Mr. Ajaj has suffered harm and

remains at risk of suffering harm during future fasting days.

## SECOND CLAIM FOR RELIEF

**(RFRA, 42 U.S.C. § 2000bb Violation)**
**(Against Defendants BOP BERKEBILE, OLIVER, TRUE, HALL, LAMB, CAMACHO,
MORROW, MCCOIC, HUDDLESTON, CASTLE, CRANK, HENDERSON, KNOX,
JOHNSON, and PARRY)**

**a.     Failure to Accommodate Religious Fasting**
**(Against Defendants BOP, BERKEBILE, OLIVER, HALL, LAMB, CAMACHO,
MORROW, MCCOIC, HUDDLESTON, and CASTLE)**

355.   Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set

forth herein.

356.   Defendant BOP is an agency of the federal government and therefore falls within

the definition of "government" provided in 42 U.S.C. § 2000bb-2(1).

357.   As wardens, associate wardens, and employees of ADX, Defendants are

"official[s]" of the United States and therefore fall under the definition of "government"

provided in 42 U.S.C. § 2000bb-2(1).

358.   As a devout Muslim, Mr. Ajaj is required to fast during the month of Ramadan

and Sunnah Fasts, and thus has requested that Defendants BOP, BERKEBILE, HALL, LAMB,

OLIVER, MCCOIC, MORROW, CAMACHO, and HUDDLESTON distribute his prescribed

medications before dawn and after sunset.

359. Defendants CAMACHO, MORROW, MCCOIC, and HUDDLESTON, under the direction and supervision of Defendants BOP, BERKEBILE, OLIVER, HALL, and LAMB, refused to distribute Mr. Ajaj's prescribed medications before dawn and after sunset during Ramadan 2013 and 2014.

360. This refusal substantially burdened Mr. Ajaj's right to exercise his sincere religious belief by forcing Mr. Ajaj to choose between taking his prescribed medications and participating in Ramadan.

361. In their responses to Mr. Ajaj's grievances about Defendants failure to accommodate the fasts, Defendants BOP, OLIVER, BERKEBILE, HALL, and LAMB have not provided any compelling government interest for the policy of refusing to accommodate fasting during Ramadan and Sunnah Fasts by adjusting the medication distribution schedule.

362. Defendants BOP, OLIVER, BERKEBILE, HALL, LAMB, CAMACHO, MORROW, MCCOIC, and HUDDLESTON's acts and omissions are the proximate cause of the deprivation of Mr. Ajaj's rights under RFRA.

363. The acts or omissions of Defendants BOP, OLIVER, BERKEBILE, HALL, LAMB, CAMACHO, MORROW, MCCOIC, and HUDDLESTON were conducted within the scope of their official duties and employment.

364. The acts or omissions of Defendants BOP, BERKEBILE, OLIVER, HALL, LAMB, CAMACHO, MORROW, MCCOIC, and HUDDLESTON caused Mr. Ajaj severe pain that was more than *de minimis*.

365. The acts or omissions of Defendants BOP, BERKEBILE, OLIVER, HALL, LAMB, CAMACHO, MORROW, MCCOIC, and HUDDLESTON were malicious and/or

evinced reckless or callous disregard for Mr. Ajaj's federally protected rights.

366.    As a result of Defendants BOP, BERKEBILE, OLIVER, HALL, LAMB,

CAMACHO, MORROW, MCCOIC, and HUDDLESTON's acts or omissions, Mr. Ajaj has

suffered harm and remains at risk of suffering harm during future Ramadans and Sunnah Fasts.

### b.      Failure to Provide Religious Diet
### (Against Defendants BOP, TRUE, OLIVER, BERKEBILE, HALL, CRANK, HENDERSON, and KNOX)

367.    Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set

forth herein.

368.    As wardens, chaplain, counselor, and employees of ADX, Defendants are

"official[s]" of the United States and therefore fall under the definition of "government"

provided in 42 U.S.C. § 2000bb-2(1).

369.    As a devout Muslim, Mr. Ajaj is required to consume Halal foods that meet

guidelines established by Islamic law.

370.    Defendants CRANK, HENDERSON, and KNOX, under the direction and

supervision of Defendants BOP, TRUE, OLIVER, BERKEBILE, and HALL, have refused for

years to provide Mr. Ajaj with meals that comply with his religious dietary requirements.  After

Mr. Ajaj repeatedly told Trust Fund and Religious Services staff that both the Food Service

meals and commissary meals violated his religious beliefs, all Defendants told Mr. Ajaj that they

are not required to ensure his access to Halal meals with meat.  None of these Defendants

worked to provide Mr. Ajaj access to Halal meals with meat.  This refusal substantially burdens

Mr. Ajaj's right to exercise his sincere religious belief.

371.    In their responses to Mr. Ajaj's grievances about access to Halal meals,

Defendants have not provided any compelling government interest for the policy of refusing to accommodate the well-known mandate of Islamic law.

372.     Defendants' acts and omissions are the proximate cause of the deprivation of Mr. Ajaj's rights under RFRA.

373.     The acts or omissions of Defendants were conducted within the scope of their official duties and employment.

374.     As a result of Defendants' acts or omissions, Mr. Ajaj has suffered daily harm and remains at risk of suffering harm into the future.

**c.     Failure to Provide Meaningful Access to Imam**
**(Against Defendants BOP, BERKEBILE, OLIVER, HALL, HENDERSON, and KNOX)**

375.     Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set forth herein.

376.     As a devout Muslim, Mr. Ajaj is required to consult with leaders of his religion and develop a more personal relationship with Allah through regular prayers and consultation with an Imam.

377.     Defendants HENDERSON, KNOX, and HALL, under direction and supervision of Defendant BOP, OLIVER, and BERKEBILE, refused to allow Mr. Ajaj any access to an Imam.  This refusal substantially burdens Mr. Ajaj's right to exercise his sincere religious belief.

378.     In their responses to Mr. Ajaj's grievances about these matters, Defendants BOP, OLIVER, BERKEBILE, HALL, HENDERSON, and KNOX have not provided any compelling government interest for the policy of refusing to allow Mr. Ajaj any form of access to an Imam for months at a time.

379.     Defendants' acts and omissions are the proximate cause of the deprivation of Mr.

Ajaj's rights under RFRA.

380.    The acts or omissions of Defendants were conducted within the scope of their official duties and employment.

381.    As a result of Defendants' acts or omissions for several years, Mr. Ajaj has suffered harm and remains at risk of suffering harm into the future.

### d.    Failure to Accommodate Religiously Mandated Group Prayer
### (Against Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, JOHNSON, KNOX, and PARRY)

382.    Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set forth herein.

383.    As a devout Muslim, Mr. Ajaj is obligated to perform prayer five times daily and participate in Jum'ah services.

384.    Mr. Ajaj sincerely believes he will receive punishment from Allah should he not participate in group prayer and Jum'ah.

385.    Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, JOHNSON, KNOX, and PARRY substantially burdened Mr. Ajaj's practice of congregational prayer by forcing him to choose between disciplinary action and congregational prayers.

386.     Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, JOHNSON, KNOX, and PARRY have not provided any legitimate governmental interest that would warrant burdening Mr. Ajaj's religious practice by prohibiting him from participating in all congregational prayer.

387.    Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, JOHNSON, KNOX, and PARRY's affirmative decision not to accommodate Mr. Ajaj's congregational prayers

demonstrates malicious or callous indifference to Mr. Ajaj's federally protected rights.

388.    Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, JOHNSON, KNOX,

and PARRY's acts and omissions are the proximate cause of the deprivation of Mr. Ajaj's rights

under RFRA.

389.    The acts or omissions of Defendants BOP, BERKEBILE, OLIVER, TRUE,

HALL, JOHNSON, KNOX, and PARRY were conducted within the scope of their official duties

and employment.

390.    As a result of Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL,

JOHNSON, KNOX, and PARRY's acts or omissions for several years, Mr. Ajaj has suffered

harm and remains at risk of suffering harm into the future.

**THIRD CLAIM FOR RELIEF**

**(Federal Tort Claims Act claim)**
**(Against UNITED STATES OF AMERICA)**

391.    While at ADX in 2014, Mr. Ajaj was in the care and custody of Defendant

UNITED STATES through its employees, Defendants CAMACHO, MCCOIC, BERKEBILE,

HALL, and LAMB.

392.    Defendant UNITED STATES, through its agency BOP, has a duty to provide for

the care and well-being of the prisoners in its custody, including Mr. Ajaj.

393.    Defendant BOP employs Defendants CAMACHO, MCCOIC, BERKEBILE,

HALL, and LAMB, who act as agents for Defendant BOP. As agents of Defendant BOP,

Defendants CAMACHO, MCCOIC, BERKEBILE, HALL, and LAMB also have a duty of care

to provide for the well-being of the prisoners in Defendant BOP custody, including Mr. Ajaj.

394.    Mr. Ajaj's medical records establish Defendant BOP prescribed Mr. Ajaj

medications to treat pain and depression.

395.     Defendant UNITED STATES, through its agents, knew of Mr. Ajaj's medical

conditions and need for prescription medications.

396.     Despite this knowledge, Defendant UNITED STATES, through its agents,

breached its duty of care when it failed to provide Mr. Ajaj with his prescribed medications

during Ramadan 2014 because of the arbitrarily set pill line times at the ADX.

397.     Defendant UNITED STATES caused Mr. Ajaj to go without his prescribed

medications for Ramadan 2014.

398.     Defendant UNITED STATES caused Mr. Ajaj's physical injuries, including

severe pain, numbness, weakness, stiffness, severe night sweating, restlessness, deep depression,

irritability, agitation, dizziness, mood and emotional problems, and other related symptoms

caused by depriving Mr. Ajaj of his prescription medications.

399.     As a direct and proximate result of the tortious acts and omissions of Defendant

UNITED STATES, Mr. Ajaj suffered damages in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF

**(Fifth Amendment – Equal Protection Violation)**
**(Against Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, JOHNSON, PARRY,**
**and KNOX)**

400.     Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set

forth herein.

401.     The Fifth Amendment to the United States Constitution protects the right to equal

protection of the laws.

402.     Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, JOHNSON, have

deprived, and continue to deprive, Mr. Ajaj of his right to equal protection of the law, by treating Mr. Ajaj differently from other prisoners in similarly situated religious groups.

403.    Defendant BOP and TRUE have not provided Muslims at ADX with Halal-certified food through the regular menus available to prisoners, and have not provided Halal meats for years.

404.    Defendants BOP and TRUE provide similarly situated Jewish inmates with Kosher food via the Common Fare diet and commissary.

405.    Except for one visit from an Imam in September 2015, Defendants BOP and TRUE have not given Mr. Ajaj access to an Imam for over a year.

406.    In 2013, on the rare occasions Mr. Ajaj was afforded the opportunity to meet with an Imam, Defendants BERKEBILE and HALL mandated that the Imam speak with him outside the double cell doors.

407.    Defendants BOP and TRUE provide similarly situated Jewish, Catholic, Seventh-day Adventist, and Christian prisoners with full time chaplains who meet with those prisoners on a regular basis.

408.    Defendants BOP and TRUE permit similarly situated Jewish, Christian, Catholic, Seventh-day Adventist, and Native American prisoners to regularly meet with their respective religious leaders within their cells and for a meaningful amount of time.

409.    Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, KNOX, PARRY, and JOHNSON allow other prisoners to perform group prayers of their respective faiths, while expressly denying Muslims the same opportunity.

410.    Defendants BOP, TRUE, PARRY, KNOX, BERKEBILE, HALL, JOHNSON,

and OLIVER, permit similarly situated prisoners of other faiths to participate in group prayer without repercussions.

411.    Defendants PARRY, KNOX, BERKEBILE, HALL, JOHNSON, and OLIVER maliciously deprived Mr. Ajaj of his right to equal protection of the laws when they threatened to punish him for participating in group prayer.

412.    Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, KNOX, PARRY and JOHNSON have deprived, and continue to deprive, Mr. Ajaj of his Fifth Amendment rights by treating him differently from similarly situated religious groups.

413.    Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, KNOX, PARRY, and JOHNSON's disparate treatment of Mr. Ajaj is based on Mr. Ajaj's religion and is motivated by unlawful discrimination.

414.    Defendants BOP, BERKEBILE, OLIVER, TRUE, HALL, KNOX, PARRY, and JOHNSON's discriminatory treatment is not reasonably related to legitimate penological interests.

## VI. PRAYER FOR RELIEF

Plaintiff requests that this Court enter judgment for him and against each of the Defendants, and award Plaintiff all relief allowed by law, including but not limited to the following:

(a)  in order to accommodate Mr. Ajaj's constitutional and statutory right to the free exercise of his sincere religious belief, an injunction against all Defendants in their official capacities requiring BOP staff at all facilities BOP places Mr. Ajaj in to:

   a.  distribute Mr. Ajaj's prescribed medication before dawn and after sunset during all religiously required fasting holidays;

    b.   provide Mr. Ajaj with a Halal diet in accordance with his religious beliefs;

    c.   provide Mr. Ajaj with meaningful access to an Imam on a weekly basis; and

    d.   allow Mr. Ajaj to pray five times daily with at least one other Muslim inmate;

(b) a declaration that Mr. Ajaj has been deprived by Defendants of his right to freely exercise his religion under the First Amendment to the Constitution;

(c) a declaration that Mr. Ajaj has been deprived by Defendants of his right to freely exercise his religion under the Religious Freedom Restoration Act of 1993;

(d) compensatory, nominal, and punitive damages against Defendants named in their individual capacities;

(e) attorney's fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

(f) any further relief that this Court deems just and proper.

DATED: October 9, 2015

                                 Respectfully submitted,

                                   STUDENT LAW OFFICE

                                 *s/ Nicole Godfrey*
                                 Nicole Godfrey

                                 *s/ Ellen Giarratana*
                                 Ellen Giarratana
                                 University of Denver College of Law
                                 2255 E. Evans Ave., Suite 335
                                 Denver, CO 80208
                                 Phone: 303.871.6574
                                 Email: ngodfrey@law.du.edu

                                 Counsel for Plaintiff Ahmad Ajaj

**CERTIFICATE OF SERVICE**

I hereby certify that on October 9, 2015, I filed the foregoing Amended Complaint using the Court's CM/ECF system, which will send notice of the filing via electronic mail to the following:

Amy.Padden@usdoj.gov
Michelle.bennett@usdoj.gov


*s/ Nicole Godfrey*
Nicole Godfrey