**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-00992-RBJ-KLM

AHMAD AJAJ,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

      Defendant.

---

## DEFENDANT'S TRIAL BRIEF

---

The Federal Bureau of Prisons submits this trial brief to note recent factual developments relating to the case's two main issues (Plaintiff's religious dietary demands and his access to an imam), to set forth the legal standards applicable to the claims, and to respond to the issues raised in Plaintiff's Trial Brief with respect to mootness and witnesses.

## I.     STATUS OF IMAM AND DIET

*Imam*.  USP Terre Haute has been in the process of hiring an imam and has recently had success.  In April 2018, the BOP informed the Court that "Since May 1, 2017, USP Terre Haute has had a contract with a company that has been searching for an imam for the [Life Connections Program ("LCP")]," where Plaintiff is housed.  ECF No. 209 at 12.  In July 2018, the BOP explained that by trial, USP Terre Haute "expects to have hired an imam to serve Ajaj and the other inmates" in his unit.  ECF No. 232 at 1.  That imam withdrew, but on August 20, 2018, the BOP informed the Court that as a replacement, it had "secured a temporary contract imam to start this week, and is reposting the contract for a longer-term imam position in the unit."  ECF

No. 263 at 3.  The contract imam started in Plaintiff's unit on Wednesday, August 22, 2018.

That imam will be in Plaintiff's unit two days each week, and is available to Plaintiff (and others in the unit) for spiritual instruction and counseling.  He has experience serving as an imam at USP Terre Haute for several years in the past.  He is serving on a renewable month-to-month contract and is expected to hold that position until the longer-term contract (a one-year contract with a multi-year option) can be filled.

*Diet*.  The BOP has also taken steps as to Plaintiff's request for a special religious diet. As the BOP's counsel explained on August 9, 2018, at the Trial Preparation Conference, the BOP had in the past viewed its certified food diet as meeting halal standards, but Plaintiff had identified various additional dietary specifications, and the BOP had taken steps to try to find a vendor to satisfy his requirements.  On August 17, 2018, the BOP informed the Court that it had received no complete bids that could meet all the specifications, including requirements for hand-slaughtering, which Plaintiff stated he required in his November 2017 deposition, so the BOP was taking a different approach.  ECF No. 261 at 2-3.  Plaintiff indicated that he was "appreciative" of the BOP's actions.  ECF No. 262 at 8.

Last week, the BOP purchased meals for Plaintiff from a vendor with a halal certification. The BOP is hopeful that Plaintiff views these halal-certified meals as acceptable to him in light of his desired specifications.  Those meals arrived at the end of last week.

In addition, a BOP directive was issued last week specifically as to Mr. Ajaj's diet.  As the directive (which will be offered into evidence at trial) explains in more detail, these halal-certified meals will be purchased for Plaintiff going forward.

2

## II.    RFRA CLAIMS (DIET AND IMAM)

Plaintiff's initial burden under the Religious Freedom Restoration Act is to "prov[e] the following three elements: (1) a substantial burden imposed by the federal government on a (2) sincere (3) exercise of religion." *Kikumura v. Hurley*, 242 F.2d 950, 960 (10th Cir. 2001).  If he meets that burden, the government has the burden to show that "application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling government interest."  42 U.S.C. § 2000bb-1(b).

Here, Plaintiff's request is for the BOP to obtain meals for him fitting his particularized religious dietary requirements and to guarantee him weekly access to an imam.  The evidence at trial will show that as to these requests, Plaintiff does not currently have any substantial burden on his religious exercise, and that the BOP's actions are the least restrictive means of furthering its compelling interests.  In its analysis, the Court should consider the following legal principles.

*First*, the proper focus is on the individual request.  The court must look to the "particular context" of "granting specific exemptions to particular religious claimants."  *Holt v. Hobbs*, 135 S. Ct. 853, 863 (2015).   "Put simply, we must examine both sides of the ledger on the same case-specific level of generality: asking whether the government's particular interest in burdening this plaintiff's particular religious exercise is justified in light of the record in this case."  *Yellowbear v. Lampert*, 741 F.3d 48, 57 (10th Cir 2014).  "[T]he feasibility of requested exceptions usually should be assessed on a 'case-by-case' basis, taking each request as it comes…"  *Id.* at 62.

*Second*, "context matters."  *Yellowbear v. Lampert*, 741 F.3d 48, 57 (10th Cir 2014).  For example, the Court must take into account factors that affect the ability to satisfy an individual

inmate's particular request.  *See, e.g., United States v. Wilgus*, 638 F.3d 1274, 1291 (10th Cir.

2011) (in assessing a party's request for eagle feathers, the court had to accept "as a given" the

"current level of supply of eagle parts"),

The Court also must take into account the prison setting.  "[I]n applying RLUIPA's

statutory standard [which is the same here as under RFRA], courts should not blind themselves

to the fact that the analysis is conducted in the prison setting."  *Holt*, 135 S. Ct. at 866-67; *Cutter*

*v. Wilkinson*, 544 U.S. 709, 722-23 (2005) (explaining that under RLUIPA, "due deference" may

be given to prison administrators).  It is well recognized that prison administrators often have

compelling interests, such as the need to maintain order and safety.  *Cutter*, 544 U.S. at 722.

In the prison context, not every denial of every religiously based request is enough to

show a substantial burden.  In *Abdulsaheeb v. Calbone*, 600 F.3d 1301 (10th Cir. 2010), the

Tenth Circuit held that a prison did not violate RLUIPA "by failing to provide a full-time paid

Muslim spiritual leader" or by "failing to host an Islamic revival."  *Id.* at 1321.  As to the

inmate's diet claim, the court commented, "[w]e are not willing to conclude, however, that every

single presentation of a meal an inmate considers impermissible constitutes a substantial burden

on an inmate's religious exercise."  *Id.*

*Third*, to show that the government's burden on the person is the least restrictive means

of achieving its compelling interests, the government only "must refute the alternative schemes

offered by the challenger…."  *Wilgus*, 638 F.3d at 1289.

## IV.    EQUAL PROTECTION CLAIM (DIET AND IMAM)

*Scope*.  Plaintiff's equal protection claim seeks injunctive relief and is limited to two

specific issues:  he claims he is being denied his religious diet and his access to an imam based

on his religion.[1]

***Elements.*** "[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). Religion is a suspect classification. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). Plaintiff has the burden to prove several elements to maintain his equal protection claim.

*First*, Plaintiff must show that there is different treatment of other individuals who are similarly situated to him. *Lollis v. City of Eufaula*, 249 F. App'x 20, 25-26 (10th Cir. 2007). For example, in *Robinson v. Jackson*, 615 F. App'x 310, 314-15 (6th Cir. 2015) (unpublished), the court ruled that the Muslim plaintiff's observation that Jewish inmates receive Kosher meals was insufficient, without more, to show that the plaintiff was similarly situated to those groups.

*Second*, Plaintiff must show that the different treatment was motivated by an intent to discriminate against his religion—that is, purposeful discrimination. *Harris v. McRae*, 448 U.S. 297, 323 n.26 (1980). "Congress is of course free to supplement the Constitution's equal protection guarantee (and sometimes has) with statutes aimed at rooting out merely foreseen or even unintended discriminations. But for a constitutional violation to take place, an intent to

---

[1]     In its Order on the motion to dismiss, the Court explained that "plaintiff asserts Fifth Amendment Equal Protection causes of action based on defendants' alleged failures to: (1) provide access to an imam; (2) provide a Halal diet; and (3) allow Muslims to participate in group prayer. ECF No. 29 at ¶¶400–414. Doc. 111 at 11. After Plaintiff was transferred to USP Terre Haute and gained access to group prayer there, the Court dismissed his claims relating to group prayer: "Mr. Ajaj no longer has standing to challenge BOP policies regarding communal prayer." Doc 243 at 7. Plaintiff has now limited the substantive relief he is seeking to the diet and imam issues. Specifically, in his Trial Brief, he requests that BOP staff "at all facilities BOP places Mr. Ajaj … to … provide Mr. Ajaj with a [h]alal diet in accordance with his religious belief' and 'provide Mr. Ajaj with meaning access to an [i]mam on a weekly basis.'" ECF No. 272 at 2 (ellipses in original).

discriminate must be present." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012).

A showing of a discriminatory purpose generally requires more than mere proof of different treatment or disparate impact. *McCleskey v. Kemp,* 481 U.S. 279, 293 & n. 12 (1987). Courts have thus rejected equal protection claims when those claims are based on the mere ground that a halal diet is not provided, but other religious diets are. *See, e.g., Robinson*, 615 F. App'x at 314-15 (rejecting an equal protection claim challenging the absence of a halal diet, and holding that alleging that some other inmates received special diets was not enough to allege intentional discrimination); *Hearn v. Kennell*, 433 F. App'x 483, 484 (7th Cir. 2011) (rejecting an equal protection claim based on just the fact that the prison was not serving halal meat).

One circuit has specifically addressed a claim that the BOP's "common fare" diet discriminates against Muslims. *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807 (8th Cir. 2008). The court in *Patel* rejected the claim, observing that the common fare diet was intended to serve inmates of numerous faiths, including Muslims. *Id.* at 815–16 (holding that the decision to serve kosher entrées but not *halal* entrées was not motivated by intentional discrimination, as BOP officials believed that they had accommodated the needs of a *halal* diet through a common diet). The court observed that when the BOP designed its common fare diet, it consulted with various religious leaders, including Muslims, researched the beliefs of numerous faiths, and developed a menu designed to accommodate all of the estimated thirty-one religious groups. *Id.* at 809-10.

*Third*, if the Court were to find that Plaintiff's equal protection rights were violated, there would be still another step to the inquiry, which in turn requires a multi-part analysis. The analysis of a prisoner's equal protection claim is guided by the framework established in *Turner v. Safley*, 482 U.S. 78 (1987). *Washington v. Harper*, 494 U.S. 210, 223-24 (1990) ("We made

quite clear that the standard of review we adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights."); *accord Riley v. DeCarlo*, 532 F. App'x 23, 28 (3d Cir. 2013) (unpublished) (applying the four *Turner* factors in rejecting an inmate's equal protection challenge to a denial of a halal diet).

## II.     MOOTNESS

As Plaintiff anticipates in his trial brief, the recent factual developments present the issue of mootness.  Plaintiff now has access to an imam, and the evidence at trial will show that this is expected to continue.  He also has a diet from a vendor with a halal certification, and the evidence at trial will be that this is expected to continue as well.  These developments raise the issue of mootness because courts are disinclined to opine on important issues "based upon the speculative suggestion that a plaintiff might be returned to a setting where he would be subject to allegedly unconstitutional practices."  *Jordan v. Sosa*, 654 F.3d 101 (10th Cir. 2011) (discussing mootness).  The BOP sets forth below a brief discussion of the applicable mootness standards.

*First*, in assessing whether a case is moot, the Court must take into account the limits on the relief it could provide.  A provision in the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1),[2] provides that a court cannot provide "prospective relief" unless such relief is "necessary to correct the violation" of a federal right:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs.  The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and

---

[2]      Section 3626(a)(1) applies to prisoner claims brought under RFRA or RLUIPA.  *See, e.g., Lindh v. Warden*, 2013 WL 139699, **15-16 (S.D. Ind. Jan. 11, 2013) (applying § 3626(a)(1)); *accord Mayweather v. Terhune*, 328 F. Supp. 2d 1086, 1102 (E.D. Cal. 2004); *James v. Lash*, 949 F. Supp. 691 (N.D. Ind. 1996).

is the least intrusive means necessary to correct the violation of the Federal right.
The court shall give substantial weight to any adverse impact on public safety or
the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1); *see also* § 3626(b)(3) (providing that when a court does issue an

injunction, it later must terminate it unless it finds "prospective relief remains necessary to

correct a current and ongoing violation").  As one court discussing § 3626(a)(1) observed, "[i]n

other words, if a violation no longer exists, the statute does not permit the court to order

prospective relief."  *Hallett v. Morgan*, 296 F.3d 732 (9th Cir. 2002).

This limitation—that "prospective relief" can be granted in such cases only where there is

a current violation—is significant here because the *only* relief Plaintiff seeks is "prospective

relief," as that term is defined in § 3626.  The statute says "the term 'prospective relief' means all

relief other than compensatory monetary damages."  18 U.S.C. § 3626(g)(7). Here, the only

relief Plaintiff seeks is injunctive and declaratory, not monetary damages.  Thus, if there is no

violation to correct, then there is no relief the Court can award here.  This special limitation for

suits covered by § 3626(a)(1) is relevant to the Court's analysis of the mootness issue.[3]

*Second*, Plaintiff raises a concern that the BOP will start up the challenged conduct after

the litigation ends.  ECF No. 272 at 4-5.  "The heavy burden of persuading the court that the

challenged conduct cannot reasonably be expected to start up again lies with the party asserting

mootness."  *Friends of the Earth v. Laidlaw Envt'l Svcs.*, 528 U.S. 167, 189 (2000).

But "[i]n practice, however, *Laidlaw*'s heavy burden frequently has not prevented

---

[3]      The Court also may take into account that in this Circuit, injunctions directed to extra-circuit prison officials are discouraged.  *Jordan v. Sosa*, 654 F.3d 101 (10th Cir. 2011) (in deciding that a challenge to BOP policy was prudentially moot, the court took into account that any order "would seek to bind non-party, extra-circuit BOP officials in the very manner that our case law discourages," as those prison officials "could be subject to conflicting advisements").

government officials from discontinuing challenged practices and mooting a case." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1116 (10th Cir. 2010) (citing cases). A court "may decline to grant relief when the government … has already changed or is in the process of changing its positions or where it appears that any repeat of the actions in question is otherwise highly unlikely." *Citizen Ctr. v. Gessler*, 770 F.3d 900, 909 (10th Cir. 2014); *see also Rio Grande*, 601 F.3d at 1117 ("The "[w]ithdrawal or alteration of administrative policies can moot an attack on those policies.") (internal quotation marks omitted).

"Self-correction" by the government can serve as a proper basis for mootness.  The Tenth Circuit has explained that "courts are more apt to trust public officials than private defendants to desist from future violations."  *Ghailani v. Sessions*, 859 F.3d 1295, 1302 (10th Cir. 2017); *see also Rio Grande*, 701 F.3d at 1118 (citing with approval the observation in 13C Wright *et al.*, Federal Practice and Procedure, § 3533.7, "that although governmental defendants may take action as a direct response to litigation, 'at any rate, self-correction again provides a secure foundation for mootness as long as it seems genuine'").

It is not enough to speculate that the government might reverse course.  The Tenth Circuit made this point clear in *Rio Grande*, explaining that "the mere possibility that an agency might rescind amendments to its actions or regulations does not enliven a moot controversy….  A case ceases to be a live controversy if the possibility of recurrence of the challenged conduct is only a speculative contingency." *Id.* at 1117 (internal marks omitted).  Instead, the Court must focus on whether the evidence shows a reasonable expectation that the government will revert to past conduct.  The Court may consider, for example, whether there is evidence that the government's change in position was a sham, where the government may simply re-start the challenged

conduct once the litigation is over. *See Rio Grande*, 601 F.3d 1096 (quoting with approval the

statement in *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), that "We

will not require some physical or logical possibility that the challenged policy will be reenacted

absent evidence that the voluntary cessation is a sham for continuing possibly unlawful

conduct"); *Rio Grande*, 601 F.3d at 1117, 1119 (concluding that there was "*some* possibility that

[the BLM] would revert" to its prior approach but that there was "no reasonable expectation that

[it] will revert") (emphasis in original).

   *Third*, Plaintiff suggests that the conduct at issue may fit into the narrow exception of

controversies that are "capable of repetition but evading review."  ECF No. 272 at 5-6.  This

exception is extraordinarily hard to meet, and requires an evidentiary showing that any future

violation could not be litigated.  A "bare speculation" that a future violation might be too brief to

litigate "cannot substitute for actual evidence from which we might infer that this governmental

behavior is *necessarily* of short duration."  *Front Range Equine Rescue v. Vilsack*, 782 F.3d 565

(10th Cir. 2015) (emphasis in original).  *See, e.g., Jordan*, 654 F.3d at1036 (10th Cir. 2011)

(rejecting an inmate's argument that the possibility that he might be transferred in the future

showed that "claims such as his would consistently evade review").

   *Fourth*, Plaintiff suggests that the BOP acted improperly by making these changes with

respect to him.  He cites cases that criticize parties for "manipulation" of a court's jurisdiction,

ECF No. 272 at 4 & n.3, but those cases addressed a different scenario, where a party won at the

district court, then tried to preserve that win by mooting the case on appeal.  *See Seneca-Cayuga

Tribe of Oklahoma v. National Indian Gaming Comm'n*, 327 F.3d 1019, 1029 (10th Cir. 2003)

("We, however, read *City of Erie* as expressing a generalized concern about manipulation of an

appellate court's jurisdiction to seal a favorable decision from review.").

Moreover, in a case seeking prospective injunctive relief, it is appropriate for prison officials to point to the actual circumstances at the time of trial, including any recent changes to the conduct being challenged.  A court deciding whether to award prospective relief against a prison must focus, at trial, on "the prison authorities' current attitudes and conduct."  *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (observing that in an Eighth Amendment case seeking injunctive relief, "to establish eligibility for an injunction, the inmate must demonstrate the continuance" of the violation "into the future").  The Court explained that prison officials may rely at trial on "developments that postdate the pleadings … to establish that the inmate is not entitled to an injunction, and that "a district court … may, for example, exercise its discretion if appropriate by giving prison officials time to rectify the situation before issuing an injunction."  *Id.* at 846.

## V.   FORMER WARDEN OLIVER AND CHAPLAIN CASTLE

Plaintiff suggests that testimony from former Warden John Oliver and Chaplain Michael Castle will be improper.  ECF No. 272 at 7-10.  It won't be.

Former Warden Oliver was designated by the BOP as an expert.  Plaintiff suggests his opinions should be excluded because his original expert report referred to the ADX, where Plaintiff was housed at the time.  Plaintiff's brief acknowledges that Mr. Oliver was disclosed as to opinions in his report relating to Mr. Ajaj's background and as to "general principles of sound correctional management."  ECF No. 272 at 9.  After Plaintiff was transferred to USP Terre Haute, the BOP further disclosed that the BOP still intended to rely on those opinions as to Mr. Ajaj's background and general principles of sound correctional management.  Plaintiff argues

that Mr. Oliver should not be permitted to testify on those issues at trial because Mr. Oliver's

original expert designation referred to the "ADX Step-Down program" (where Plaintiff was

housed at the time).   But the original report and the later confirmation adequately disclosed that

Mr. Oliver would opine on matters in his report relating to Mr. Ajaj's background and principles

of sound correctional management.

Chaplain Castle's testimony will be proper.   He will testify properly to areas within his

personal knowledge.   The scope of his testimony is well known to Plaintiff, as Chaplain Castle

was the deponent for a broad set of topics determined by Plaintiff under a Rule 30(b)(6) notice.

Respectfully submitted this 26th day of August, 2018.

ROBERT C. TROYER
United States Attorney

*s/ Kevin Traskos*
Kevin Traskos
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, CO  80202
Telephone:  303-454-0100
Email:  kevin.traskos @usdoj.gov

Counsel for the Federal Bureau of Prisons

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2018, I electronically filed the foregoing document and attached exhibits with the Clerk of Court using the CM/ECF system, which will send electronic notification to the following email addresses:

lrovner@law.du.edu
ngodfrey@law.du.edu
djefferis@law.du.edu

Clay Cook: c2cook@bop.gov (agency counsel for Defendant Bureau of Prisons)

s/ *Kevin Traskos*
United States Attorney's Office