**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-00992-RBJ-KLM

AHMAD AJAJ,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

      Defendant.

---

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Pursuant to this Court's Practice Standards, Plaintiff Ahmad Ajaj, through counsel, submits the following Proposed Findings of Fact and Conclusions of Law with respect to his claim against the Federal Bureau of Prisons ("BOP") under the Religious Freedom Restoration Act ("RFRA"). 42 U.S.C. § 2000bb-1.

### FINDINGS OF FACT

#### Background

1. Plaintiff Ahmad Ajaj is incarcerated by BOP and currently resides in the United States Penitentiary in Terre Haute, Indiana ("USP-Terre Haute"). Defendant's Ex. C-9;[1] Testimony of Ahmad Ajaj.

2. Defendant BOP is a federal law enforcement agency subdivision of the United States

---

[1] On Monday, August 27, 2018, Mr. Ajaj, through counsel, moved to admit all stipulated exhibits. The Court granted the motion. Doc. 285 at 1. The exhibits cited herein were admitted in evidence or are BOP Program Statements of which the Court may take judicial notice pursuant to Fed. R. Evid. 201. *See* fn. 3.

Department of Justice and is responsible for the administration of federal prisons. *See* 28 C.F.R. § 511.10.

3. Mr. Ajaj is a Sunni Muslim. Testimony of Ahmad Ajaj.

4. Mr. Ajaj views the Qur'an and hadith as the primary sources of his beliefs. Testimony of Ahmad Ajaj; *see also* Testimony of Dr. Seth Ward; Testimony of Ammar Amonette.

5. The Qur'an is the Islamic sacred book, believed to be the word of Allah (God) as dictated to the prophet Muhammad. Testimony of Dr. Seth Ward; Testimony of Ammar Amonette.

6. The hadith is a collection of traditions containing sayings of the prophet Muhammad that, with accounts of his daily practice (the sunnah), constitute the second major source of Islamic law. Testimony of Dr. Seth Ward; Testimony of Ammar Amonette.

7. Muhammad was the founder of Islam. According to Islamic doctrine, he was a prophet and Allah's messenger. Sunni Muslims often use the hadith and sunnah to determine what actions are required, commended, neutral, reprehensible, and prohibited in various contexts. Testimony of Dr. Seth Ward; Testimony of Ammar Amonette.

8. There are five pillars of Islamic practice: declaration, prayer, charity, fasting, and pilgrimage. Testimony of Dr. Seth Ward; *see also* Plaintiff's Ex. 25 at BOP_12123-26.

9. Islamic prayer includes both a weekly congregate service (Jumu'ah) and five daily prayers (salat). Testimony of Dr. Seth Ward; Testimony of Ammar Amonette; Plaintiff's Ex. 25 at BOP_12124.

10. Some pious Muslims, including Mr. Ajaj, believe they must pray the five daily salat prayers with at least one other Muslim, as the spiritual reward for prayer is increased

when performed in a group. Testimony of Dr. Seth Ward; Testimony of Ammar

Amonette; Testimony of Ahmad Ajaj; Plaintiff's Ex. 4 at BOP_1269.

11. Mr. Ajaj has used the BOP's Administrative Remedy Program (also known as the BOP's

grievance procedure) to formally request accommodation of his religious beliefs.

Testimony of Ahmad Ajaj.

12. Defendant BOP conceded that Mr. Ajaj's religious beliefs are sincerely held. Defendant

Opening Statement.[2]

**BOP Policy[3]**

13. Defendant BOP's national policies, called "Program Statements," govern each of its

institutions. They are "'permanent' Bureau policies and procedures." Attachment 2 at §

2.1. These policies are implemented through formal directives known as "Complex" and

"Institution Supplements." Testimony of Chaplain Castle. *See also* Attachment 2 at §§

1.2.1, 1.2.3.

14. "Generally, it is preferable that Bureau-wide instructions and requirements be

communicated by formal directives rather than by such means as memoranda . . . since

these less formal documents are not authenticated, numbered, annually reviewed, or

---

[2] During its opening statement, Defendant BOP conceded that it did not contest the sincerity of Mr. Ajaj's beliefs. The citations to the opening statement throughout these factual findings are references to this concession and should not be construed as an attempt to cite to the opening statement as evidence.

[3] Federal Rule of Evidence 201 allows courts to take judicial notice of adjudicative facts that are "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Both parties agree that the Court can take judicial notice of BOP Program Statements. Attachment 1 at 3 n.5 (Letter from Defendant Counsel stating "…the Court can take judicial notice of Program Statements").

historically traced." Attachment 2 at § 1.1.

15. "Requirements issued by persons without such delegated authority or policy not issued in conformity with [Attachment 2] are **not enforceable as policy** and may not be cited, relied upon, or otherwise used to carry out any Bureau policy or procedure unless an exception is made by the Director in writing." *Id.* (emphasis in original).

16. "It is vital that staff, including those who have authority to issue formal directives, not attempt to use less formal communications to change or replace a formal directive." *Id.*

**Halal**

17. Certain foods are lawful and others are unlawful in Islam, and there are many specifications regarding the consumption of animal-based products. Lawful foods are referred to as "halal," and unlawful foods are referred to as "haram." Testimony of Dr. Seth Ward; Testimony of Ammar Amonette.

18. The BOP offers four menus to all prisoners in its custody through Food Services: a Certified Religious Diet menu, a no-flesh menu, a no-pork menu, and the main line menu. Testimony of Michael Castle; *see also* Defendant's Ex. A-10 at § 18(a).

19. Items on the Certified Religious Diet menu are certified kosher and are intended to meet kosher specifications. Defendant's Ex. A-5 at § 4(1)(d).

20. In order to receive a religious diet, prisoners must complete a six-question "religious diet interview." Testimony of Chaplain Castle; Defendant's Ex. A-10 at § 18(a)(2).

21. After completing the interview, a Chaplain reviews the prisoner's answers and determines which diet will best meet his religious dietary needs. *Id.*

22. The BOP does not offer a halal certified menu through Food Services. Testimony of

Michael Castle.

23. Prisoners at USP-Terre Haute are able to purchase through commissary consumable items approved by the Warden and designated staff. Consumable items sold through commissary are meant "to complement, not supplement, [the] diet . . . provided to the inmate population." Testimony of Jeffrey Cheeks; Defendant's Ex. A-3 at § 3.3(a).

24. The BOP also offers a Special Purpose Order ("SPO") program through its Trust Fund department. "An SPO is an inmate request to purchase an approved item or items not routinely sold in the Commissary." Defendant's Ex. A-3 at § 3.5.

25. According to national BOP policy, the Commissary must make available for purchase, or sell through the SPO Program, a minimum of four kosher/halal-certified entrees. *Id.* at § 3.3(f)(3).

26. The four Kosher/Halal-certified entrees USP-Terre Haute has made available through SPO prior to Friday, August 24, 2018, are made by J&M/My Own Meals. *See* Testimony of Jeffrey Cheeks; Plaintiff's Ex. 39.

27. Mr. Ajaj sincerely believes that Islam prohibits him from consuming alcohol, pork products, blood and carrion, and meat that has not been slaughtered according to halal standards. The prohibition against pork and alcohol extends to any products derived from swine or alcohol, including gelatin, lard, and various additives. Defendant's Opening Statement; Testimony of Dr. Seth Ward; Testimony of Ahmad Ajaj.

28. Most Islamic authorities prohibit the consumption of halal foods that have been cross-contaminated by haram ingredients. Cross-contamination occurs if alcohol, pork by-products, or other prohibited ingredients are added to an otherwise halal food. Halal

foods can also be cross-contaminated if they come into contact with haram ingredients. Testimony of Dr. Seth Ward.

29. Mr. Ajaj sincerely believes that in order to observe a halal diet, he must eat foods that are permitted, and must abstain from foods that are forbidden by Islamic law. Defendant's Opening Statement; Testimony of Ahmad Ajaj.

30. Mr. Ajaj sincerely believes that he must eat halal meat and not maintain a vegetarian diet according to the teachings and practices of the Prophet Muhammad. *Id.*

31. Mr. Ajaj's understanding of halal standards relies upon Islamic text and tradition and comports with the requirements of several halal certifying agencies, including the Islamic Food & Nutrition Council of America ("IFANCA") and the Halal Food Standards Alliance of America (HFSAA).  Testimony of Dr. Seth Ward; Testimony of Ammar Amonette; Testimony of Ahmad Ajaj.

32. For years, Mr. Ajaj has asked the BOP to provide him with a diet that comports with his religious beliefs about food through grievances, "cop-outs" (written requests to staff members), and verbal requests. Testimony of Ahmad Ajaj.

33. Until Friday, August 24, 2018, the last business day before trial, Mr. Ajaj did not have access to a certified halal diet that comports with his religious beliefs. Defendant's Ex. C-9 at BOP_00019441; Testimony of Ismael Oliver; Testimony of Ahmad Ajaj.

34. On Wednesday, August 22, 2018, Defendant BOP purchased a short-term supply (170 trays) of halal meals from My Own Meals (also known as "J&M"). Defendant's Ex. C-8 at BOP_00019434-36.

35. Defendant BOP has been aware of the availability of pre-packaged halal-certified meals

sold by J&M because it previously sold those J&M entrees to prisoners through its Special Purpose Order ("SPO") program in the Trust Fund department. Plaintiff's Exhibit 39; Testimony of Jeffrey Cheeks.

36. On Friday, August 24, 2018, Defendant BOP received the halal meal trays it had purchased two days earlier at USP-Terre Haute. Defendant's Ex. C-8 at BOP_00019433; Testimony of Ismael Oliver.

37. Defendant BOP, through Ismael Oliver, also purchased frozen halal-certified entrees from the Saffron Road company. Testimony of Ismael Oliver; Testimony of Ahmad Ajaj.

38. On Friday, August 24, 2018—the last business day before the start of trial—Defendant BOP, through Warden Jeffrey Krueger, also issued a memorandum ("Krueger memo") stating that it will provide Mr. Ajaj with these halal meals three times per day "until a longer-term solution is reached." Defendant's Ex. C-9 at BOP_00019441; Testimony of Jeffrey Krueger.

39. The Krueger memo may be rescinded or otherwise abrogated by the Warden or other authorized party. Testimony of Jeffrey Krueger.

40. The BOP may stop providing the halal-certified meals described in the Krueger memo if those meals are not approved by the BOP's Chief Dietitian. Defendant's Ex. C-9 at BOP_00019441; Testimony of Jeffrey Krueger.

41. The BOP presented no evidence that its Chief Dietician has approved the meals that the BOP began providing to Mr. Ajaj on August 24, 2018. *See* Testimony of Jeffrey Krueger. (implying Chief Dietician had not completed review as of August 27, 2018).

42. The BOP may stop providing the halal-certified menu outlined in the Krueger memo if

Mr. Ajaj is transferred from USP-Terre Haute. Testimony of Jeffrey Krueger;

Defendant's Ex. C-9 at BOP_00019441 (stating that if Mr. Ajaj is transferred the meals

will be subject to review by the Bureau's Central Office).

43. The BOP may stop providing the halal-certified menu outlined in the Krueger memo if

allowed or required by the guidelines set out in Bureau Program Statement 5360.09 and

4700.06. Testimony of Jeffrey Krueger; Defendant's Ex. C-9 at BOP_00019441; *see also*

Defendant's Ex. A-5 at § 4(1)(e) ("Inmates participating in the Certified Food

Component are not authorized to consume mainline or hot bar food items . . . . Violations

will be reported as required by the Program Statement Religious Beliefs and Practices.");

Defendant's Ex. A-10 at § 18(a)(5)(b) ("Approval for an inmate's religious diet may be

withdrawn by the chaplain if the inmate is documented as being in violation of the terms

of the religious diet program to which the inmate has agreed in writing . . . . Those who

are observed eating from the main line may be removed temporarily from that

component. In addition, those who purchase and/or consume non-certified foods from the

commissary may also be temporarily removed from that component.").

44. Since Friday, August 24, 2018, through the end of trial on August 28, 2018, Defendant

BOP served Mr. Ajaj the halal-certified shelf-stable meals purchased from J&M and

Saffron Road twice daily. Testimony of Ismael Oliver; Testimony of Ahmad Ajaj.

45. Mr. Ajaj is satisfied with the halal-certified shelf stable meals Defendant BOP has

provided him. Testimony of Ahmad Ajaj.

46. However, Mr. Ajaj's diet is still not completely halal-certified, or in compliance with the

Krueger memo, because he continues to receive uncertified foods for breakfast and as

side dishes, including bread and condiments. Testimony of Ahmad Ajaj.

47. As of Friday, August 24, 2018, other Muslim prisoners, besides Mr. Ajaj, who wish to eat a halal diet may only do so if they purchase the shelf-stable halal-certified J&M meals at their own expense through SPO at commissary. Defendant's Ex. A-17 at BOP_00019440; *see also* Defendant's Ex. C-9 (indicating that the accommodation is specific and limited to Mr. Ajaj).

**Imam**

48. Mr. Ajaj has also requested that the BOP provide him meaningful access to an imam. Testimony of Ahmad Ajaj; *see also* Doc. 29.

49. An imam is a leader in the Islamic faith. Imams are often selected by the Muslim communities they serve, and Islam does not require that an imam have the formal ordination or training that is frequently required in other religious traditions. Imams are most often chosen because they possess the most extensive knowledge of authoritative Islamic sources such as the Qur'an and hadith. Testimony of Dr. Seth Ward; Testimony of Ammar Amonette.

50. Mr. Ajaj sincerely believes he is religiously required to study Islam and to seek guidance when he has questions about how to live or act in accordance with Islamic law. Defendant's Opening Statement; Testimony of Ahmad Ajaj.

51. Mr. Ajaj sincerely believes that in order to obtain the information and guidance he is religiously required to pursue, he must be able to speak with someone with extensive knowledge of Islamic law and authority, including the Qur'an, hadith, and sunnah. *Id.*

52. The BOP provides spiritual leaders to prisoners through various means including full-

time chaplains, contractors, and volunteers. All full-time religious leaders employed by the BOP are called "chaplain," regardless of the religious tradition to which they adhere. Defendant's Ex. A-10 at §§ 10, 12.

53. At USP-Terre Haute "Institution chaplains provide pastoral care, counseling, religious instruction; [and] administer sacraments, rites, and rituals to inmates and institution staff . . . ." Plaintiff's Ex. 49 at BOP_00015395.

54. Full-time chaplains at USP-Terre Haute "provide supervision seven days a week and are available upon request to provide pastoral care, counseling, religious education, and religious instruction to [prisoners] and staff." Defendant's Ex. A-11 at § VI.

55. Contractors are supposed to provide pastoral care for those prisoners who do not have access to a chaplain of their own tradition. An "institution's chaplain may contract with representatives of faith groups in the community to provide specific religious services which the chaplain cannot personally deliver, due to, ordinarily, religious prescriptions or ecclesiastical constraints to which the chaplain adheres. The term 'representatives of faith groups' includes both clergy and spiritual advisors." Defendant's Ex. A-10 at § 12.

56. Similarly, volunteers are meant to assist prisoners "in observing their religious beliefs." *Id.*

57. The Religious Services Department at USP-Terre Haute is tasked with establishing and maintaining contact with diverse clergy, spiritual advisors, teachers, and other representatives of various religious groups within the community. Defendant's Ex. A-11 at § IX(A).

58. Chaplains are statutorily required to arrange pastoral visits with a representative of a

prisoner's faith if requested. 28 C.F.R. § 548.19 ("If requested by an inmate, the chaplain *shall* facilitate arrangements for pastoral visits by a clergyperson or representative of the inmate's faith.") (emphasis added).

59. The BOP allows prisoners to request to designate a "minister of record." A minister of record is "defined as that spiritual leader, clergy person, or official representative, whom the inmate identifies and the chaplain verifies, as a minster of the inmate's religion of record." Defendant's Ex. A-10 at § 17(b)(1).

60. A prisoner's "religion of record" or "religious preference" is maintained in the BOP's electronic filing system, called SENTRY. Defendant's Ex. A-11 at § V.

61. In order to meet with an imam through the minister of record option, a prisoner's SENTRY designation must be "Muslim." *See* Defendant's Ex. A-10 at § 17(b)(1) (indicating that to be designated as a minister of record, the prisoner must identify, and the chaplain verify that the individual is "a minister of the inmate's religion of record.").

62. Prisoners are required to identify their own minister of record. *Id.* ("An inmate will identify a minister of record by submitting a written request to the chaplain. The clergy person the inmate identifies will also submit a request for consideration as the minister of record to the chaplain.").

63. Visits between a prisoner and his minister of record are treated the same as other social visits. *Id.* "Visits with the minister of record . . . [are] accommodated in the visiting room during regularly scheduled visiting hours . . . ." *Id.* at § 17(b)(3).

64. Prisoners at USP-Terre Haute are required to submit to a strip-search that exposes their private parts in order to enter the visiting room. Testimony of Ajaj.

11

65. Defendant BOP trains its staff that "Muslim men and women must dress modestly and that Islam prohibits Muslims from uncovering or viewing others' private parts in public. . . . They should be allowed to remain covered from the navel to the knee." Plaintiff's Ex. 42 BOP_00015111.

66. Mr. Ajaj did not know any imams in the United States prior to being incarcerated and does not have contact with any American imams now. Testimony of Ahmad Ajaj.

67. Mr. Ajaj requested that the BOP allow him to contact his family imam in Palestine. That request was denied. Testimony of Ahmad Ajaj.

68. Mr. Ajaj requested that the BOP allow him to contact mosques and Islamic Centers in Indiana in order to recruit Islamic volunteers to serve the Muslim population at USP-Terre Haute. That request was also denied. Testimony of Ahmad Ajaj.

69. Mr. Shnewer, a Muslim prisoner housed in a different unit at USP-Terre Haute, has attempted to arrange for a local volunteer imam to meet with him at USP-Terre Haute. When that imam contacted the institution to arrange a visit, nobody responded. Testimony of Mohamad Shnewer.

70. Since arriving at USP-Terre Haute, Mr. Shnewer was able to talk by phone with his family imam, located in New Jersey, on one occasion because his mother happened to be at the mosque at the time Mr. Shnewer called her, and she handed her cell phone to the imam. Testimony of Mohamad Shnewer.

71. In 2002, Defendant BOP arranged for Mr. Ajaj to speak on the phone with a BOP imam at another institution for one hour each week when no imam was available at the institution where he was housed. Testimony of Ahmad Ajaj.

72. The BOP also arranged for Mr. Ajaj to speak with a BOP imam over the phone one time in 2017. Testimony of Ahmad Ajaj.

73. The BOP currently employs thirteen full-time Islamic chaplains (imams) in various institutions across the country. Testimony of Michael Castle.

74. The BOP can make its chaplains available in person to prisoners at institutions other than their primary institution for short periods via "temporary duty assignments." *Id.*

75. Temporary duty assignments can be used to triage chaplaincy service-gap areas at an institution. *Id.*

76. The BOP transferred Mr. Ajaj from USP-Florence to USP-Terre Haute in January 2018. Following his transfer, the BOP hired a full-time imam at USP-Florence. *Id.*; Testimony of Ahmad Ajaj.

77. Defendant BOP has not hired a full-time imam at USP-Terre Haute. Testimony of Michael Castle.

78. At USP-Terre Haute, there are four full-time chaplains, all of whom are Christian. *Id.*

79. Mr. Ajaj is currently participating in the Life Connections Program (LCP) at USP-Terre Haute. Testimony of Ahmad Ajaj.

80. The LCP is a residential pre-release program offered in multiple BOP institutions. Defendant's Ex. B-2 at § 1.

81. The LCP uses a prisoner's personal belief system to change behavior, improve institutional adjustment, and reduce recidivism rates. *Id.*

82. Because the LCP is an 18-month residential pre-release program, Mr. Ajaj is currently housed in a unit at USP-Terre Haute exclusively for LCP participants. *Id.* at §§ 1, 3(c), 8.

13

83. To be selected for participation in the LCP, prisoners must (1) apply voluntarily; (2) not

    have a written deportation order;[4] (3) receive a recommendation from relevant

    components (Unit Team, Associate Warden, and Chaplaincy Team); (4) be approved by

    the sending institution's Warden; (5) not be in Financial Responsibility Program ("FRP")

    refuse status; (6) be meeting General Educational Development ("GED") obligations; (7)

    have met English as a Second Language ("ESL") obligations; (8) be willing to be

    designated to the LCP site; and (9) participate in a three-session orientation. *Id.* at § 3(a).

84. LCP participants may choose between a secular and spiritual curricular track. *Id.* at §

    5(a)(1)-(2). The spirituality track offers opportunities "for spiritual reflection (whether

    secular or religious), direction and counseling" and participation "in institution worship

    services consistent with boundaries of faith or secular beliefs." *Id.* at § 5.

85. LCP participants are further divided into cohorts organized by prisoners' belief systems.

    Each cohort participates in LCP programming as a group. Activities are conducted with a

    view toward catering to each cohort's shared belief system. Testimony of Jonathan

    Sutter; Defendant's Ex. B-2 at § 3(b)(2).

86. The BOP employs contract "Spiritual Guides" to serve the LCP unit at USP-Terre Haute.

    Testimony of Jonathan Sutter; Plaintiff's Ex. 47 at BOP_18318; Defendant's Ex. B-17 at

    BOP_19263-65.

87. Until August 20, 2018, seven days before trial, Mr. Ajaj had no access to an imam at

    USP-Terre Haute. Testimony of Ahmad Ajaj; Defendant's Ex. B-17 at BOP_19243

---

[4] Mr. Ajaj did not list the second criterion listed in Defendant's Exhibit B-2 as he is excepted from this requirement since he is a high security prisoner with at least 30 months remaining before release. *See* Defendant's Ex. B-2 at §3(a).

(reflecting an award/effective date of August 20, 2018).

88. On August 16, 2018, 11 days before trial, Mr. Bashar Murad signed a 30-day renewable contract with the BOP to provide temporary services as an Islamic Spiritual Guide to Muslim prisoners in the LCP unit at USP-Terre Haute. Testimony of Chaplain Jonathan Sutter; see also Defendant's Ex. B-17 at BOP_19261-62 (authorizing the utilization of Mr. Murad's services on August 17, 2018).

89. Mr. Murad has previously been employed as a contract imam and Islamic Spiritual Guide for the LCP at USP-Terre Haute. In 2017, his contracts were not renewed. Testimony of Johnathan Sutter.

90. The BOP deviated from normal hiring procedures in hiring Mr. Murad in August 2018. The BOP justified its deviation "[d]ue to the urgent need of the facility and expense related to court litigation . . . ." Defendant's Exhibit B-17 at 19261; Testimony of Jeffrey Cheeks.

91. Mr. Murad has espoused views contrary to those sincerely-held by Sunni Muslims like Mr. Ajaj. Testimony of Ahmad Ajaj; Testimony of Mohamad Shnewer; Testimony of Raheem Hankerson. Specifically, Mr. Murad told Muslim inmates they may drink alcohol—something that is prohibited in the Qu'ran. Testimony of Raheem Hankerson; Testimony of Dr. Seth Ward. Mr. Murad has also taught about reincarnation, which is contrary to Sunni Muslim beliefs about the afterlife. Testimony of Mohamad Shnewer; Testimony of Dr. Seth Ward.

92. Sunni Muslims view a Muslim who espouses views that are contrary to the central tenets of Islam as an "apostate." Testimony of Dr. Seth Ward.

93. Similarly, disavowing one's status as a Muslim is considered apostasy. Mr. Ajaj sincerely believes that disavowing Islam makes him an apostate. Testimony of Dr. Seth Ward; Testimony of Ahmad Ajaj.

94. When faced with teachings that are blasphemous, offered by someone who purports to be Muslim, Sunni Muslims believe they must either prevent themselves from hearing the teachings or speak out against them. Testimony of Dr. Seth Ward.

95. Because Mr. Murad, as the BOP's designated Islamic Spiritual Guide for the LCP, has espoused views that are directly contrary to the religious beliefs of Sunni Muslims, Mr. Ajaj sincerely believes he is required to avoid Mr. Murad's teachings because Mr. Murad invokes those views in his teachings. Testimony of Ahmad Ajaj; *see also* Testimony of Dr. Seth Ward.

96. There is no other imam provided by the BOP at USP-Terre Haute. Accordingly, Mr. Ajaj remains unable to access the spiritual guidance he sincerely believes he is required to seek. Testimony of Ahmad Ajaj.

**Hobson's Choice**

97. Prisoners' cohort assignments in the LCP program are based on their religious designation in SENTRY. Accordingly, the BOP requires those prisoners designated as "Muslim" in SENTRY to attend the "Islamic Spiritual Guide" classes that have been taught by Mr. Murad since his arrival at the prison on August 22, 2018. Testimony of Michael Castle; Testimony of Jonathan Sutter.

98. The BOP is statutorily prohibited from requiring prisoners to attend religious activities. 28 C.F.R. § 548.15. However, the LCP Chaplain, Mr. Sutter, has directed various Muslim

LCP participants that they will be removed from the LCP if they do not attend the Spiritual Guide classes taught by Mr. Murad. Testimony of Jonathan Sutter; Testimony of Raheem Hankerson; Testimony of Ahmad Ajaj.

99. "LCP participants who do not perform adequately in Spiritual Guide classes, have four unexcused absences from LCP activities, fail to turn in a passing essay or Word of the Day, or in any other way do not adequately fulfill LCP program requirements will [] be recommended for expulsion . . . . An accumulated total of four unexcused absences from [a prisoner's] Spiritual Guide Class warrant expulsion." Defendant's Ex. B-5 at BOP_18320.

100. "LCP is a residential program. Ordinarily, all inmates living in the assigned housing unit will be waiting to participate, engaged in LCP, or have completed the program . . . . Upon successfully completing LCP, participants are ordinarily moved from the program unit to another unit or institution to make room for new participants." Defendant's Ex. B-2 at § 8.

101. Prisoners in the LCP unit are permitted to perform some of their daily (salat) prayers with others in a designated area in the unit. This is an exception to the BOP's general rule prohibiting group prayer in all general population housing units and common areas besides the chapel at USP-Terre Haute. The BOP prohibits Muslims from praying the daily (salat) prayers in the chapel. Testimony of Ahmad Ajaj; Testimony of Mohamad Shnewer.

102. Muslims at USP-Terre Haute are only able to access the chapel for the weekly Jumu'ah service. Defendant's Ex. A-21 (allowing "Islam Jumu'ah Service" from 1:00-2:00 pm on

Fridays).

103. A warden "may limit participation in a particular religious activity or practice to the members of that religious group. Ordinarily, when the nature of the activity or practice (e.g., religious fasts, wearing of headwear, work proscription, ceremonial meals) indicates a need for such a limitation, only those inmates whose files reflect the pertinent religious preference will be included." Defendant's Ex. A-10 at § 7.

104. "In determining whether to allow an inmate to participate in a specific religious activity… staff may wish to refer to the information reported on the intake screening form and the inmate's religious preference history. Inmates showing "No Preference" or indicating membership in a different faith group may be restricted from participating in activities deemed appropriate for members only." *Id.* at § 8.

105.  If Mr. Ajaj refuses to attend Mr. Murad's classes, he will be expelled from LCP. Testimony of Jonathan Sutter; *see also* ¶¶ 99 & 100.

106.  If Mr. Ajaj attends Mr. Murad's classes, he will either violate his sincerely held religious beliefs by listening to teachings he considers blasphemous or risk being sanctioned for speaking up against the blasphemous teachings. Testimony of Ahmad Ajaj; *see also* ¶¶ 88-96.

107. If Mr. Ajaj is expelled from LCP, he will lose his ability to pray the daily salat prayers in a group with other Muslims, thereby foregoing a practice required by his sincerely held beliefs.[5] Testimony of Ahmad Ajaj; *see also* ¶¶ 102 & 103.

---

[5] Mr. Ajaj respectfully requests that the Court take judicial notice of the record in this case, which in pertinent part, reflects that prisoners are only able to participate in congregate *salat* prayers in the LCP unit. Doc. 228-22 (BOP 30(b)(6) designee's deposition testimony stating that

108. If Mr. Ajaj voluntarily withdraws from the LCP, there is no guarantee he will be readmitted to the program if he reapplies after a new imam is hired. Testimony of Chaplain Sutter; *see also* ¶ 84 (noting that admission requirements include lack of deportation order).[6]

109. If Mr. Ajaj wishes to stay in the LCP, but not attend Mr. Murad's classes, he will be required to change his religious designation in SENTRY in order to attend the Values & Responsibilities classes offered to those individuals not of the Christian or Islamic faith. To change his religious designation in SENTRY in this manner requires Mr. Ajaj to disavow his religion and status as a Muslim, thereby engaging in apostasy in violation of his sincerely-held religious beliefs. Testimony of Ahmad Ajaj; *see also* Testimony of Dr. Seth Ward; ¶ 95.

110. Additionally, if Mr. Ajaj changes his religious designation in SENTRY, he risks losing access to his halal diet and other accommodations limited to members of the religious group including religious fasts, wearing of headwear, work proscription, ceremonial meals. *See* ¶¶ 104 & 105.

## CONCLUSIONS OF LAW

### I.   RFRA Elements and Burdens of Proof

111. Mr. Ajaj's claims arise under RFRA. Congress enacted RFRA, 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.,* "in order to provide very broad protection for religious liberty."

---

group prayer is not authorized in any open population setting in any facility in the BOP); Doc. 228-23 (clarifying that no BOP policy allows for congregational prayers outside of chapel areas); Doc. 228-26 (stating that LCP classroom 5 may be used for group prayer daily *if possible*).
[6] Mr. Ajaj is technically ineligible for the LCP as he has a written deportation detainer. *See* Doc. 234 at 2, n.2; Doc. 234-2 at 1 (noting a deportation detainer).

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2760 (2014); *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015).

112. A plaintiff makes a *prima facie* case under RFRA by showing that the government substantially burdens his sincerely-held religious exercise. *Holt v. Hobbs*, 135 S. Ct. 853, 863 (2015); *Ghailani v. Sessions*, 859 F.3d 1295, 1305-06 (10th Cir. 2017); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013), *aff'd sub nom. Burwell*, 134 S. Ct. 2751 (quoting *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001)).

113. Once a plaintiff establishes a *prima facie* case, the burden shifts to the government to show that it has a compelling interest in burdening the plaintiff's religious exercise and that it is employing the least restrictive means necessary to serve that interest. 42 U.S.C. § 2000bb-1(b); *Holt*, 135 S. Ct. at 863; *Ghailani*, 859 F.3d at 1305-06; *Kikumura*, 242 F.3d at 962.

114. Under RFRA, a sweeping assertion of a compelling government interest is insufficient, and courts "look[] beyond broadly formulated interests" and "scrutinize[] the asserted harm of granting specific exemptions to a particular religious claimant." *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 431 (2006).

115. The government bears the burden of demonstrating "its policy is the least restrictive means of furthering [its articulated] interest, a standard that is 'exceptionally demanding' and requires the government to 'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].'" *Holt*, 135 S. Ct. at 858 (quoting *Hobby Lobby*, 134 S.Ct. at 2780).

116. Each party must meet its burden by a preponderance of the evidence. *See, e.g.,* O'Malley, Grenig & Lee, Federal Jury Practice & Instructions (5th ed.), § 104.01; *see also* 42 U.S.C. § 2000bb–2(3) ("[T]he term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion").

II. **Halal**

    **A. Mr. Ajaj's claim for a halal diet is not moot.**

117. The BOP claims that its issuance of the Krueger memo on the eve of trial authorizing the provision of "3 halal meals per day for [Mr. Ajaj] . . .until a longer-term solution is reached" eliminates any substantial burden placed on Mr. Ajaj's religious exercise. Accordingly, Defendant BOP argues, the Krueger memo renders any relief the Court may grant unnecessary.

118. The Krueger memo expressly contemplates that the provision of halal-certified shelf-stable meals to Mr. Ajaj is a stop-gap solution to a long-term problem. *See* Defendant's Exhibit C-9.

119. Despite the directive issued by Warden Krueger, however, Mr. Ajaj continues to be served foods that are not certified halal each day for breakfast and as side dishes to lunch and dinner. *See* testimony of Ismael Oliver; Testimony of Ahmad Ajaj.

120. Because Mr. Ajaj is not receiving a halal-certified diet for all three meals, there is still relief this Court can grant, and his claim is not moot. *See Rezaq v. Nalley*, 677 F.3d 1001, 1010 (10th Cir. 2012) ("A case is not moot when there is some possible remedy, even a partial remedy or one not requested by the plaintiff.")

121. Mr. Ajaj's halal claim remains live. The BOP's provision of some halal-certified meals to Mr. Ajaj has not "completely and irrevocably eradicate[d] [ ] the effects of the alleged violation," because he is still receiving haram (forbidden) breakfast foods and sides (such as bread and condiments). *See Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979).

> **1.   Mr. Ajaj met his *prima facie* burden to demonstrate that he has a sincerely-held religious belief in observing a halal diet.**

122. In assessing religious sincerity, courts do not inquire "whether a particular belief or practice is 'central' to a prisoner's religion," *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1314 (10th Cir. 2010) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 725 n. 13 (2005)), or whether other members of the same faith share the plaintiff's beliefs. *See Burwell.*, 134 S. Ct. at 2779 (emphasizing that courts' "narrow function" is not to decide whether religious beliefs are "mistaken or insubstantial," but to determine only whether the beliefs reflect "an honest conviction") (internal quotations omitted); *Abdulhaseeb*, 600 F.3d at 1322 n.7 ("neither this court nor defendants are qualified to determine that a non-pork or vegetarian diet *should* satisfy Mr. Abdulhaseeb's religious beliefs") (emphasis in original).

123. Mr. Ajaj's belief is religious in nature because he believes is a dictate of his religious faith. Moreover, Mr. Ajaj's belief that he must observe halal is well-founded in religious texts and tradition.

124. Defendant BOP has conceded that Mr. Ajaj's belief that he must observe a halal diet is sincerely-held.

> **2.   Mr. Ajaj met his *prima facie* burden to demonstrate that his sincerely held religious belief that he must observe a halal diet is substantially burdened by Defendant BOP.**

125. "[A] religious exercise is substantially burdened under [42 U.S.C. § 2000bb-1] when a government (1) requires participation in an activity prohibited by a sincerely held religious belief, or (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief, such as where the government presents the plaintiff with a Hobson's choice—an illusory choice where the only realistically possible course of action trenches on an adherent's sincerely held religious belief." *Abdulhaseeb*, 600 F.3d at 1315.

126. Mr. Ajaj has sought to eat a diet that comports with his religious beliefs as a Sunni Muslim. Failing to provide Mr. Ajaj with a halal-certified diet that includes meat substantially burdens his religious exercise by "preventing participation in conduct motivated by a sincerely held religious belief." *Id.*

127. The Supreme Court said in upholding RLUIPA, RFRA's sister-statute, *see* 42 U.S.C. § 2000cc-5(4), that courts "must be satisfied that the Acts proscriptions are and will be administered neutrally among different faiths," and cited the provision of kosher food for Jews but not halal food for Muslims as an example of the kind of restriction RLUIPA was intended to correct. *Cutter*, 544 at 716 n.5 (citing legislative history).

128. Mr. Ajaj was completely precluded from observing a halal-diet until the eve of trial, as Defendant BOP did not offer Mr. Ajaj a halal-certified diet through Food Services until Friday, August 24, 2018. Mr. Ajaj's sincerely-held religious belief that he must consume a fully halal diet remains substantially burdened because he still receives breakfast foods

and side dishes, such as bread and condiments, that are not halal.

### 3. The Court can still provide Mr. Ajaj meaningful relief.

129. Because the BOP is not providing Mr. Ajaj a fully halal diet, prospective relief remains available. The central question in any mootness inquiry is whether the court remains able to afford meaningful relief. *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997). "[A] case is not moot when there is some possible remedy, even a partial remedy or one not requested by the plaintiff." *Rezaq*, 677 F.3d at 1010.

130. This Court can still grant meaningful relief in the form of a declaratory judgment, which will legally establish that Defendant BOP has violated Mr. Ajaj's rights by failing to provide him a fully halal diet.

131. Further, this Court can award meaningful relief in the form of an injunction. "[T]he question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be any effective relief." *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001) (internal quotations omitted).

132. Mr. Ajaj remains in need of injunctive relief from this Court because he continues to be served forbidden (haram) foods, and because the partial relief granted via the Krueger memo is expressly temporary.

### B. Even if Mr. Ajaj's claim is moot because Defendant BOP's last-minute conduct alleviated the burden, the voluntary cessation exception to mootness applies, and Defendant BOP has not met its burden to prove otherwise.

199. The voluntary cessation exception to mootness applies to Mr. Ajaj's halal claim. It is

well-settled that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of a practice." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).

200. "[T]he court's power to grant injunctive relief survives discontinuance of the illegal conduct." *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 897 (1953). Otherwise, the defendant would be "free to return to his old ways." *Id.* at 632.

201. A defendant's voluntary cessation of a challenged practice cannot moot a claim "unless subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189 (internal quotations omitted).

202. Moreover, defendants have the "'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again." *Id.* (citations omitted; alteration in original).

203. Reforms undertaken under pressure of litigation generally do not moot injunctive claims unless they involve a very convincing indication that the change of position is permanent. *Akers v. McGinnis*, 352 F.3d 1030, 1035-36 (6th Cir. 2003) (where the promulgation of rules is within the sole discretion of prison system, there is no guarantee prison system will not change back to other rules when the action terminates); *Sasnett v. Litscher*, 197 F.3d 290, 291 (7th Cir. 1999) (rule change did not moot case where prison officials said they had no intention of going back to the old rule but refused to concede that the old rule was unlawful).

204. "The possibility that [the defendant] may change its mind in the future is sufficient to preclude a finding of mootness." *United States v. Generix Drug Corp.*, 460 U.S. 453, 456 n.6 (1983).

205. Ultimately, "[i]t is no small matter to deprive a litigant of the rewards of its efforts. . . . Such action on grounds of mootness would be justified only if it were absolutely clear that the litigant no longer had any need of the judicial protection that is sought." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 224 (2000).

206. Indeed, the Supreme Court has cautioned that "[i]t is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952).

207. Until August 24, 2018, Defendant BOP asserted that its "Certified Religious Diet" menu, which carries only a kosher certification, was sufficient for Muslims' dietary obligations. After three years of litigation, Defendant BOP abruptly changed course and is now providing a partially halal-certified diet to Mr. Ajaj. Defendant argues that its delay in providing Mr. Ajaj with halal-certified meals was due to the inherent slow pace of bureaucracy. Yet on the eve of trial, it was able to accomplish in 48 hours what it would not do for the three years this litigation has been pending and for the decades Mr. Ajaj has been requesting halal meals.

208. For years, Defendant BOP had knowledge of, and access to, the very meals it began providing Mr. Ajaj on the eve of trial. *See* ¶¶ 9 & 10. Despite the fact that Defendant BOP made some these shelf-stable meals available to prisoners through the SPO process

throughout the duration of this litigation, the BOP refused to serve Mr. Ajaj these meals until the last business day before trial.

209. But that which can be expediently created can also be expediently retracted. *See Aladdin's Castle*, 455 U.S. at 1074-75 (city's repeal of objectionable language in its ordinance does not preclude city from reenacting same provision again if District Court's order were vacated); *see also Generix Drug Corp.* 460 U.S at 456 n. 6 ("The possibility that respondent may change its mind in the future is sufficient to preclude a finding of mootness") (internal citations omitted); *Mack v. Suffolk County*, 191 F.R.D. 16, 21 (D. Mass. 2000) (although new policy diminished chances that plaintiff detainees would be strip searched without reasonable individualized suspicion, it did not eliminate that possibility; consequently, absent the imperative imposed by an injunction, defendants would be free to reinstate the objectionable practice at any time) (citing *Aladdin's Castle*, 455 U.S. at 288).

210. Defendant BOP's own policy-making directive demonstrates the impermanence of the Krueger memo. Attachment 2 at 13. The BOP Directives Management Manual, which "prescribe[s] policy, standards, and implementing procedures for Bureau directives," states: "Generally, it is preferable that Bureau-wide instructions and requirements be communicated by formal directives rather than by such means as memoranda . . . since these less formal documents are not authenticated, numbered, annually reviewed, or historically traced." *Id*. at 13. It goes on to say that, "[i]t is vital that staff, including those who have authority to issue formal directives, not attempt to use less formal communications to change or replace a formal directive." *Id*. at 14. In direct

contravention of its own "policy on policy," the BOP has chosen an informal, easily

retractable memorandum through which to announce its provision of a halal-certified

diet to Mr. Ajaj.

211. The timing of Defendant BOP's provision of halal-certified meals to Mr. Ajaj also calls

into question whether those changes are merely tactical attempts to manipulate this

Court's jurisdiction. It is not plausible that Defendant BOP was unable to provide these

meals earlier because the BOP already sold meals from the same halal vendor through its

SPO program.  Plaintiff's Ex. 39; Testimony of David Floyd. The judiciary has an

"interest in preventing litigants from attempting to manipulate the Court's jurisdiction."

*City of Erie v. Pap's A.M.*, 529 U.S. 277, 288 (2000). As a consequence, courts do not

allow a party's "strategic manipulation" to divest them of their jurisdiction to resolve

cases. *Seneca-Cayuga Tribe v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1029 (10th

Cir. 2003).[7]

212. Because Defendant BOP has not met its burden to demonstrate that its partial provision

of halal-certified meals to Mr. Ajaj on the eve of trial is a permanent change, the

voluntary cessation exception to the mootness doctrine applies here. The timing and

---

[7] District courts "possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. That authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1182 (2017). There is nothing that restricts a court's ability to find for a plaintiff who has been unduly prejudiced by a defendant's misconduct — conduct that has undermined the judicial process and the judiciary's role and wasted its, and in turn other litigants', time and resources. *See, e.g.*, *Eash v. Riggins Trucking Inc.*, 757 F.2d 557, 568 (3d Cir. 1985) (recognizing "the importance and necessity of some kind of sanction as one of the reasonable and flexible instruments for curbing abuse of the judicial process" and vesting the district court with "discretion and sound judgment in dealing with the myriad methods in which [parties and] lawyers may abuse the judicial process").

manner in which Defendant BOP has begun providing Mr. Ajaj halal-certified meals is unambiguously in response to litigation, and Defendant has failed to show the requisite guarantee of permanency. *See Keohane v. Jones*, 4:15cv511-MW/CAS, 2018 WL4006798, at *6-8 (N.D. Fla. Aug. 22, 2018) (finding, after bench trial, defendant prison official did not meet burden to demonstrate inapplicability of voluntary cessation exception to mootness where changes were "too little too late to moot" prisoner's claims and "an attempt to manipulate jurisdiction" when defendant "chose to right some wrongs only *after* it was faced with a lawsuit in federal court") (emphasis in original).

213. Defendant BOP retains sole discretion in determining whether the partial relief it has granted should continue. In the absence of an injunction, Defendant BOP remains "free to return to [its] old ways," *Friends of the Earth*, 528 U.S. at 189, at any time by rescinding or otherwise abrogating the memo Warden Krueger authored.

214. Defendant BOP accomplished, on the afternoon of the last business day before trial, what it had been unable or unwilling to do for three years. Its abandonment of its former policy on the eve of trial points towards the probability of resumption, and its last-minute decision to provide Mr. Ajaj with a diet not offered to anyone else directly contradicts the putative compelling interest Defendant BOP asserts regarding Mr. Ajaj's imam claim.

**C. Defendant BOPs conduct demonstrates that the agency lacks a compelling government interest in preventing Mr. Ajaj from maintaining a halal diet.**

215. After a plaintiff satisfies his *prima facie* burden under RFRA by showing that the government has substantially burdened a sincerely-held religious belief, "the burden of proof shifts to the defendants to show the substantial burden results from a 'compelling governmental interest' and that the government has employed the 'least restrictive means' of accomplishing its interest. 42 U.S.C. § 2000cc-l(a)." *Abdulhaseeb*, 600 F.3d at 1318.

216. Defendant BOP has neither articulated nor demonstrated a compelling government interest in denying Mr. Ajaj a halal-certified diet. In fact, it has demonstrated it does ***not*** have a compelling interest in denying Mr. Ajaj a halal-certified diet by providing him one on the eve of trial. The BOP has presumably concluded that the risk of treating Mr. Ajaj differently than others is not so great as to preclude it from providing him alone a halal-certified diet through Food Services. Thus, Defendant BOP has no compelling governmental interest in refusing to continue doing so.

## III.    Imam

### A.  Mr. Ajaj's claim for meaningful access to an imam is not moot.

217. As with his request for halal meals, Mr. Ajaj's request for meaningful access to an imam is not moot because this Court can still grant meaningful relief. "The burden of demonstrating mootness 'is a heavy one,' *Davis,* 440 U.S. at 631 (quoting *W.T. Grant Co.,* 345 U.S. at 632–33), and it falls upon the BOP to carry that burden in this case." *Rezaq*, 677 F.3d at 1008.

218. Defendant BOP has failed to carry that burden because it continues to impose a substantial burden on Mr. Ajaj's religious practice by continuing to deny him meaningful access to an imam.

> **1.   Mr. Ajaj met his *prima facie* burden to demonstrate that he has a sincerely-held religious belief in requiring regular, meaningful access to an imam for religious guidance.**

219. Mr. Ajaj sincerely believes he is religiously obligated to seek spiritual guidance from an imam who is well-versed in sources of Islamic law. Testimony of Ahmad Ajaj.

220. In Islam, religion pervades every action a person takes. Testimony of Dr. Seth Ward. When evaluating the divine impact of actions or inactions, Muslims often turn to imams for guidance based upon their extensive knowledge of Islamic religious authorities such the Qur'an, hadith, sunnah, and other sources of Islamic law. Testimony of Ahmad Ajaj; Testimony of Mohammed Shnewer; Testimony of Dr. Seth Ward; Testimony of Ammar Amonette.

221. Mr. Ajaj seeks regular and meaningful access to an imam in order to obtain the guidance, founded in established sources of Islamic law, he sincerely believes he is required to seek.

222. Neither Islamic expert in this case contested that Mr. Ajaj's beliefs are religious in nature, and courts routinely hold that accessing pastoral care is a religious exercise. *See, e.g.*, *Saleem v. Evans*, 866 F.2d 1313, 1314 (11th Cir. 1989) (recognizing constitutional claim where member of the Nation of Islam complained that the only Muslim minister authorized to enter the prison was from the American Muslim Mission); *Rowe v. Davis*, 373 F. Supp. 2d 822, 826–27 (N.D. Ind. 2005) (holding that "[m]eeting with a religious

leader of his own faith may not be compelled by or central to Mr. Rowe's system of religious belief, but he alleges that it is a part of his exercise of religion. That is to say that meeting with a religious leader of his own faith is a part of the way Mr. Rowe practices and expresses his religious beliefs. Therefore, meeting with a religious leader of his own faith is a religious exercise").

223. Because "the threshold for establishing the religious nature of his beliefs is low," and the "external signs" of Mr. Ajaj's requests rest squarely upon an Islamic foundation, his beliefs are religious in nature. *United States v. Meyers*, 95 F.3d 1475, 1482–83 (10th Cir. 1996).

224. Moreover, Defendant BOP has conceded the sincerity of Mr. Ajaj's belief. Defendant BOP opening statement.

> **2.      Mr. Ajaj met his *prima facie* burden to demonstrate that his religious belief has been and continues to be burdened by Defendant BOP.**

225. "[A] religious exercise is substantially burdened under [42 U.S.C. § 2000bb-1] when a government (1) requires participation in an activity prohibited by a sincerely held religious belief, or (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent either not to engage in conduct motivated by a sincerely held religious belief or to engage in conduct contrary to a sincerely held religious belief, such as where the government presents the plaintiff with a Hobson's choice—an illusory choice where the only realistically possible course of action trenches on an adherent's sincerely held religious belief." *Abdulhaseeb*, 600 F.3d at 1315.

226.Until a mere five days before trial, Mr. Ajaj had no access to an imam.

227.On August 16, 2018, Defendant BOP signed a one-month contract with Mr. Bashar

Murad, an Islamic Spiritual Guide it had previously contracted with but whose contract it

declined to renew in 2017.

228.Mr. Murad has espoused various views considered to be apostacy by several members of

the Sunni Muslim community in USP-Terre Haute. Testimony of Dr. Seth Ward;

Testimony of Ahmad Ajaj; Testimony of Raheem Hankerson; Testimony of Mohamad

Shnewer.

229.By hiring an Islamic Spiritual Guide for the LCP who espouses these views, and

requiring Mr. Ajaj to attend his classes as a condition of continuing in the LCP,

Defendant BOP has not only failed to alleviate the substantial burden it places on Mr.

Ajaj's religious exercise, it has further infringed upon the "beliefs that [Mr. Ajaj] hold[s]

dear." *Cancel v. Mazzuca*, 205 F. Supp. 2d 128, 133 (S.D.N.Y. 2002).

230.Mr. Ajaj continues to suffer a substantial burden on his religious exercise because

"differences between the historical and doctrinal beliefs, as well as the religious

practices, of [Mr. Murad and Sunni Muslims] are significant. The nature of these

differences mandates the conclusion that [Defendant BOP]'s determination that the

spiritual needs of the inmates of the [Sunni Muslim] faith can be met in religious

services led by chaplains of [a different sect] is arbitrary and capricious." *Cancel*, 205 F.

Supp. 2d at 135 (internal quotations omitted).

231. Further, Mr. Murad is now teaching the LCP classes that Mr. Ajaj is required to attend should he wish to continue in the LCP and live in the LCP unit – the only unit where he is able to perform some of his daily *salat* prayers with other Muslims.

232. As a result, Defendant BOP has forced Mr. Ajaj to make a "Hobson's choice" wherein he must choose between options, each of which "trenches on [his] sincerely held religious belief[s]." *Id.* at 1315.

233. Specifically, Mr. Ajaj sincerely believes that he must not listen to blasphemy from or associate with apostates who profess to be Muslim. In order to abstain from being confronted with such statements made by Mr. Murad, a self-identified Muslim and the Islamic Spiritual Guide in the LCP, Mr. Ajaj has several choices, all of which trample on his sincerely-held beliefs in one way or another.

234. First, he could choose to skip the LCP classes. Should he do so, however, he risks being expelled from LCP as nonattendance constitutes an unexcused absence. If he is expelled from the program, Mr. Ajaj will no longer be able to pray any of his daily *salat* prayers in a group—something that only LCP participants are allowed to do. Additionally, Chaplain Sutter testified that expulsion from the LCP program prevents Mr. Ajaj from ever re-enrolling.

235. Second, Mr. Ajaj could remain enrolled in the LCP and remain able to access some daily group prayer opportunities by attending Mr. Murad's classes. Doing so, however, would require Mr. Ajaj to violate his sincerely-held religious belief that he must avoid or confront apostasy.

236. Third, Mr. Ajaj could voluntarily withdraw from the LCP. Because the LCP is a

residential program, Mr. Ajaj risks being removed from the housing unit and suffering the consequent inability to engage in group prayer for any of the daily *salat* prayers. It is also probable that he would never regain the ability to perform some of his daily *salat* prayers with others since this privilege is only extended to residents in the LCP unit, housing in the unit is typically limited to those persons enrolled in the program, and Mr. Ajaj does not meet the stated criteria for the LCP – although an apparent exception was made for him this time around.

237. Finally, Mr. Ajaj could change his religious preference in SENTRY so that he could remain enrolled in LCP and attend the "Values & Responsibilities" (secular) class rather than the "Islamic" class taught by Mr. Murad. If Mr. Ajaj were to do so, he would risk losing access to other religious accommodations the BOP provides to Muslims, including the ability to pray some of the five daily *salat* prayers in congregation in the LCP unit, accommodations for fasting during Ramadan, his halal diet, Muslim burial rites, and other religious accommodations limited to those prisoners designated as "Muslim" in SENTRY.

238. Furthermore, if Mr. Ajaj were to change his religious preference in the BOP's system, he would be violating his religious beliefs by disavowing his religion and committing apostasy. Testimony of Dr. Seth Ward. For many Muslims, including Mr. Ajaj, religious identity is an integral component of religious practice. *Id.*

239. Thus, Defendant BOP's last-ditch effort to moot this case by temporarily hiring a month-to-month contract Islamic Spiritual Guide has not only failed to alleviate the substantial burden placed on Mr. Ajaj's religious exercise, but also has presented Mr. Ajaj with new

illusory choices wherein he must violate or risk violating his sincerely-held religious

beliefs. These choices amount to the exact type of Hobson's choice the Tenth Circuit

found created a substantial burden in *Abdulhaseeb*.

### 3. The Court can still provide Mr. Ajaj meaningful relief.

240. Mr. Ajaj continues to suffer a substantial burden on his sincerely held religious belief

that he must regularly and meaningfully consult with a learned imam, and this Court

remains able to grant meaningful declaratory and injunctive relief.

241. Because the BOP is not providing Mr. Ajaj meaningful access to any imam with whom

consultation would not require Mr. Ajaj to violate his sincerely-held religious beliefs,

prospective relief remains available. The central question in any mootness inquiry is

whether the court remains able to afford meaningful relief. *S. Utah Wilderness All.*, 110

F.3d at 727. "[A] case is not moot when there is some possible remedy, even a partial

remedy or one not requested by the plaintiff." *Rezaq*, 677 F.3d at 1010.

242. This Court can still grant meaningful relief in the form of a declaratory judgment, which

will legally establish that Mr. Ajaj's rights are violated. Further, this Court can award

meaningful relief in the form of an injunction.  "[T]he question is not whether the precise

relief sought at the time the application for an injunction was filed is still available. The

question is whether there can be any effective relief." *Cantrell*, 241 F.3d at 678 (internal

quotations omitted).

243. Moreover, injunctive relief remains available as Mr. Ajaj remains unable to access

appropriate pastoral care in the form of meaningful access to an imam.

**B. Even if Mr. Ajaj's claim is moot because of Defendant BOP's last-minute conduct, the voluntary cessation exception to mootness applies, and Defendant BOP has not met its burden to prove otherwise.**

244. "Voluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1115 (10th Cir. 2010).

245. Defendant BOP argues that its expedited hire of an Islamic Spiritual Guide on a 30-day renewable contract basis moots Mr. Ajaj's claim. But the formerly-terminated Islamic Spiritual Guide was expressly hired "[d]ue to the urgent need of the facility and expense *related to court litigation . . . .*" Defendant's Exhibit B-17 at 19261; *see also* Testimony of Cheeks.

246. Defendant BOP's last-minute hire of a previously undesirable Islamic Spiritual Guide smacks of classic voluntary cessation. The Supreme Court has made clear "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth,* 528 U.S. at 189 (quoting *Aladdin's Castle*, 455 U.S. at 289). "[I]f it did, the '[t]he courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" *Friends of the Earth*, 528 U.S. at 189.

247. That precise risk exists here. In the days leading up to trial, Defendant BOP proved just how quickly it can implement changes in its practices when motivated to do so in order to elude a judicial determination about its conduct. This raises the serious concern that the accommodation implemented on the eve of trial could be taken away just as abruptly

as it was provided. There is no guarantee that the Islamic Spiritual Guide whose services

Defendant BOP has contracted for until September 19, 2018—or *any* imam—will be

made available to Mr. Ajaj for more than a month.

248. Accordingly, given the BOP's burden of proof, the month-to-month hire of an Islamic

Spiritual Guide to serve one unit in USP-Terre Haute "cannot be viewed as a statement

of current policy, but must instead be understood as a mid-litigation change of course."

*Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 220 (4th Cir. 2017).

249. "A change of activity by a defendant under the threat of judicial scrutiny is insufficient

to negate the existence of an otherwise ripe case or controversy [under the voluntary

cessation exception to mootness]." *Armster v. United States Dist. Court*, 806 F.2d 1347,

1357 (9th Cir. 1986).

   **C. Defendant BOP's conduct demonstrates that the agency lacks a compelling
   government interest in preventing Mr. Ajaj from regular, meaningful access
   to an imam.**

250. Pursuant to the BOP's own regulations, "[i]f requested by an inmate, the chaplain *shall*

facilitate arrangements for pastoral visits by a clergyperson or representative of the

inmate's faith." 28 C.F.R. 548.19 (emphasis added).

251. "RFRA[] makes clear that it is the obligation of the courts to consider whether

exceptions [to rules of general applicability] are required under the test set forth by

Congress. That test requires the [prison] not merely to explain why it denied the

exemption but to *prove* that denying the exemption is the least restrictive means of

furthering a compelling governmental interest. Prison officials are experts in running

prisons and evaluating the likely effects of altering prison rules, and courts should

respect that expertise. But that respect does not justify the abdication of the responsibility, conferred by Congress, to apply [RFRA's] rigorous standard." *Holt*, 135 S. Ct. at 864 (internal quotations omitted) (emphasis added).

252. ". . . [I]nadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements." *Abdulhaseeb*, 600 F.3d at 1318 (internal quotations omitted).

253. RFRA "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Hobby Lobby*, 134 S. Ct. at 2779 (quoting *Gonzales*, 546 U.S. at 430-31).

254. RFRA requires the Court to "'scrutinize the asserted harm of granting specific exemptions to particular religious claimants' and 'to look to the marginal interest in enforcing' the challenged government action in that particular context. *Holt v. Hobbs*, 135 S. Ct. 853, 863 (2015) (quoting *Hobby Lobby* at 2779) (internal alterations omitted).

255. "Requiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Defendant BOP must sufficiently *demonstrate* its compelling interest; it cannot merely assert "broadly formulated interests" that generally sound compelling. *Holt*, 135 S. Ct. at 863.

256. Defendant BOP has stated that it cannot provide Mr. Ajaj meaningful access to a BOP imam from a different institution via telephone because it would create a security risk due to "special treatment." This argument is unavailing.

257. Defendant BOP has demonstrated the exact opposite by creating, at the direction of the Director of the BOP, a halal-certified diet solely provided to Mr. Ajaj.

258. Defendant BOP cannot use "special treatment" both as a sword and as a shield, and its attempt to do so demonstrates that the risks associated with the perception of special treatment can be effectively mitigated and are therefore not compelling.

259. Moreover, to the extent the BOP's interest in avoiding "special treatment" is a compelling one, Defendant BOP has failed to carry its burden of persuasion. "Even if it can easily accommodate Mr. [Ajaj], the prison insists that granting his request will lead other [ ] inmates to flood it with similar requests . . . . And avoiding a slippery slope down to submerged troubles just out of present view, the prison suggests, amounts to a compelling interest all its own." *Yellowbear v. Lampert*, 741 F.3d 48, 62 (10th Cir. 2014).

260. But "the whole point of RFRA and RLUIPA *is to make exceptions* for those sincerely seeking to exercise religion. ("RFRA operates by mandating consideration, under the compelling interest test, of exceptions to rules of general applicability."). *Id.*

261. "It can't be the case that the speculative possibility that one exception conceivably might lead to others is *always* reason enough to reject a request for the first exception. Instead, the Court tells us, the feasibility of requested exceptions usually should be assessed on a 'case-by-case' basis, taking each request as it comes: accommodations to avoid substantial burdens must be made until and unless they impinge on a demonstrated compelling interest." *Id.*

262. "The Court has recognized the possibility that there may be cases where that approach is inappropriate and the 'need for uniformity precludes the recognition' of *any* exceptions to *anyone,* or where a well-documented slippery slope argument could support such a uniform rule. But one thing is certain. To warrant any of that, the law requires considerably more than milquetoast musing that granting one request might lead to others." *Id.*

263. Defendant BOP did not present *any evidence* that providing Mr. Ajaj with meaningful access to an imam will "lead other inmates to flood it with similar requests" (*Yellowbear*, 741 F.3d at 62), nor has it presented any evidence demonstrating that providing this exception to Mr. Ajaj alone is infeasible.

264. Moreover, Chaplain Castle testified that he has spoken on the phone with prisoners to provide spiritual guidance. Mr. Ajaj testified that he has spoken with BOP imams from other institutions on the phone. The testimony at trial demonstrates the BOP can overcome any interest it has in denying Mr. Ajaj, at the very least, to speak by telephone with one of the BOP imams on staff at other institutions.

265. Defendant went on to loosely style its compelling interests as an administrative burden. Both Chaplain Castle and Chaplain Sutter testified that they are very busy and likely would not have time to regularly speak with a prisoner to provide spiritual guidance. Yet both also testified that they give spiritual guidance to prisoners from the same faith traditions on a regular basis seemingly without issue, demonstrating that this Court could order the BOP to provide Mr. Ajaj regular access to an imam over the telephone on a regular basis. Simply put, Defendant BOP has failed to show a compelling interest in

refusing Mr. Ajaj access to a BOP imam.

**D. Even if its "preferential treatment" interest is compelling, Defendant BOP has not met its burden to demonstrate that the Minister of Record is the least restrictive means of meeting its interest because it has utilized other tools to allow Mr. Ajaj to meet or speak with an imam in the past.**

266. Defendant also argues that Mr. Ajaj can utilize a "minister of record" to meet his religious needs.

267. In order to meet with an imam through the minister of record option, a prisoner's SENTRY designation must be "Muslim."

268. Appointing a minister of record allows prisoners to speak on the phone and have standard visits with a faith leader of their own choosing from the community. Pursuant to BOP policy, the faith leader is selected by the inmate and approved by the Religious Services Department. Visits with a minister of record occur in the visiting room, and they also may speak on the phone.

269. The minister of record option is not the least restrictive means of accommodating Mr. Ajaj's religious exercise. Because minister of record visits occur in the visiting room, in order to meet with a minister of record in person, Mr. Ajaj would be required to violate his sincerely-held religious belief by submitting to a strip search which exposes his entire body. Moreover, he would be precluded from performing salat prayers with any such imam and would remain without a qualified leader of jumu'ah.

270. Identifying and speaking with a minister of record over the phone is similarly problematic. Mr. Ajaj's contact with the outside world is severely limited, and ultimately, dictated by the BOP. Mr. Ajaj has sought assistance from the BOP in working to identify a minister of record. His requests have been denied.

271. Mr. Ajaj testified that he asked the BOP to allow him to contact his family imam in Palestine. That request was denied.

272. Mr. Ajaj requested that the BOP allow him to contact mosques and Islamic Centers in Indiana in order to recruit Islamic volunteers to serve the Muslim population at USP-Terre Haute. That request was also denied.

273. Even Mr. Shnewer, another Muslim prisoner at USP-Terre Haute who was able to make contact with an interested local imam was unable to secure his services as a minister of record because the BOP failed to return his calls.

274. Mr. Shnewer was once able to speak with an imam over the phone because when he called his mother on her cell phone, she happened to be inside his family's mosque and she put the imam on the phone to speak with him. Not even this imam, who was Mr. Shnewer's religious leader before he was incarcerated, became an official "minister of record" for Mr. Shnewer.

275. The minister of record option presents yet another substantial burden on Mr. Ajaj's sincerely held religious beliefs, and is merely an illusory choice presented to him by Defendant BOP.

276. The BOP has available, and has utilized in the past, less restrictive alternatives including sending a BOP imam to an institution on a temporary duty assignment and arranging regular weekly calls between a BOP imam and Mr. Ajaj. It has not met its burden of demonstrating that it could not do so again here until it hires a permanent, full-time imam at USP-Terre Haute.

## CONCLUSION AND JUDGMENT

Defendant BOP has substantially burdened Mr. Ajaj's religious rights by

Accordingly, it is therefore ordered that judgment shall enter in favor of the Plaintiff,

Ahmad Ajaj, and against Defendant Federal Bureau of Prisons:

(1)     declaring that Defendant has violated Plaintiff's rights under RFRA by failing to

provide him access to a halal diet and meaningful access to an imam, and it has not demonstrated

a compelling government interest justifying those burdens; and

(2)     enjoining the Federal Bureau of Prisons to: (a) comply with the terms of the

Krueger memo and to provide Mr. Ajaj with halal-certified meals from the same vendors it is

now using in the event Defendant BOP transfers Mr. Ajaj to a new institution, until and unless

Defendant BOP institutes a halal-certified menu nationwide; and (b) provide Mr. Ajaj weekly

access to a BOP imam over the telephone when in-person access is unavailable.

Pursuant to and as required by 18 U.S.C. § 3626(a)(1), the Court specifically finds and

concludes that the prospective relief granted herein is narrowly drawn, extends no further than

necessary to correct the violations of the federal statutory rights asserted by Mr. Ajaj, and is the

least intrusive means necessary to correct the violation of those rights.

Pursuant to RFRA, Mr. Ajaj is entitled to his costs and reasonable attorneys' fees.

Respectfully submitted this 6th day of September 2018,

STUDENT LAW OFFICE

_s/ Michael Bishop_
Michael Bishop, Student Attorney

_s/ Rachel Kennedy_
Rachel Kennedy, Student Attorney

*s/ Elizabeth Othmer*
Elizabeth Othmer, Student Attorney

*s/ Laura Rovner*
Laura Rovner
Nicole B. Godfrey
Sturm College of Law| Civil Rights Clinic
2255 E. Evans Ave., Suite 335
Denver, CO 80208
P: (303) 871-6780 | E: lrovner@law.du.edu
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2018 I electronically filed the foregoing **PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** with the Clerk of Court using the CM/ECF system, which will send electronic notification via e-mail to the following:

| | | |
|---|---|---|
| Susan Prose | Lauren Dickey | Clay Cook |
| Susan.Prose@usdoj.gov | Lauren.Dickey2@usdoj.gov | c2cook@bop.gov |
| | | |
| Kevin Traskos | Marcy Cook | |
| Kevin.Traskos@usdoj.gov | marcy.cook@usdoj.gov | |

*Counsel for Defendants*

*s/ Laura Rovner*
Laura Rovner