IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 15-cv-00992-RBJ-KLM

AHMAD AJAJ,

    Plaintiff,

v.

FEDERAL BUREAU OF PRISONS

    Defendant.

---

## FINDINGS, CONCLUSIONS and ORDER OF JUDGMENT

---

Ahmad Ajaj, represented by law students and professors from the Civil Rights Clinic of the University of Denver Sturm College of Law, filed this lawsuit on May 11, 2015. At that time he was an inmate incarcerated in solitary confinement at the United States Penitentiary Administrative Maximum Security facility in Florence, Colorado. Mr. Ajaj is a devout Muslim. In his original Complaint he alleged that his rights under the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb, and the First Amendment to the United States Constitution were being violated because he was not allowed to consume food and drink, and take medications, outside the fasting hours of dawn to dusk during the holy month of Ramadan. ECF No. 1.

Over the years that followed the case has gone through numerous changes. In an Amended Complaint filed on October 9, 2015 plaintiff added claims under the Fifth Amendment and the Federal Tort Claims Act ("FTCA"), 28 U.S.C § 1346(b). He also named 15 individual defendants in addition to the Bureau of Prisons. His claims were expanded to include Sunnah

1

fasts. He also alleged failure to honor his requirement of a halal diet, lack of meaningful access to an Imam, and inability to participate in group prayer. ECF No. 29.

On October 25, 2016 the Court after a *de novo* review adopted the recommendations of United States Magistrate Judge Kristin L. Mix to dismiss plaintiff's FTCA claims and to dismiss in part his official capacity and individual capacity claims. ECF No. 111. On December 7, 2016 the Court issued a Scheduling Order. ECF No. 124. The case was set for a Trial Preparation Conference on December 19, 2017 and a two-week jury trial beginning January 8, 2018. ECF No. 122. On January 17, 2017 the Court denied the parties' respective motions to reconsider portions of the Court's order on defendants' motions to dismiss. ECF No. 135. In August, 2017, at the request of the parties, several pretrial deadlines were reset. ECF No. 160.

On May 9, 2017 the Court, at the request of the parties, referred the case to Magistrate Judge Mix for a settlement conference. Unfortunately, a settlement was never achieved. On December 4, 2017 the parties jointly asked the Court to reopen discovery and to vacate and reset the trial. Among other things the parties reported that the BOP had posted a position for a full-time Islamic Chaplain at the Federal Correctional Complex in Florence, Colorado. ECF No. 189. The trial was reset for August 27, 2018 with a Trial Preparation Conference on August 9, 2018. ECF No. 193.

On January 29, 2018 the sole remaining defendant, Federal Bureau of Prisons, informed the Court that Mr. Ajaj had been transferred to the United States Penitentiary in Terre Haute, Indiana. ECF No. 199.[1] The next day plaintiff's counsel informed the Court that they were attempting to obtain information as to how the conditions at the new facility might affect Mr.

---

[1] The United States Penitentiary in Terre Haute, often referred to as "USP Terre Haute," is one of two facilities which together comprise the Federal Correctional Complex, Terre Haute ("FCC Terre Haute"). The other facility is the Federal Correctional Institution, Terre Haute ("FCI Terre Haute). USP Terre Haute is a high-security facility. FCI Terre Haute is a medium security facility.

Ajaj's claims. ECF No. 200. Counsel expressed concern that the transfer might have been motivated by an attempt to render this case moot.

During a status hearing on March 2, 2018 the Court informed the parties that it did not consider that the transfer necessarily mooted the claims, and that it would not consider the case to be moot unless Mr. Ajaj were provided a halal diet, some sort of meaningful access to an Imam, and the ability to participate in group prayer in the Indiana facility. ECF No. 206 at 5-7. The Court also informed the parties that it would not require Mr. Ajaj to go through the process of exhausting his administrative remedies again just because he was transferred. *Id.* at 7-8. Government counsel informed the Court that she understood that group prayer is available to Mr. Ajaj at USP Terre Haute. *Id.* at 8. However, the facility did not have a contract Imam or a certified halal diet available at that time. *Id.* at 9, 11-12.

On April 18, 2018 the parties stipulated to the dismissal of plaintiff's First Amendment claim, leaving (1) the RFRA claim related to Mr. Ajaj's ability to observe Sunnah fasts, to have access to an halal diet, to have access to an Imam, and to have the ability to engage in congregate prayer, and (2) an equal protection claim under the Fifth Amendment. ECF No. 211. In May plaintiff filed a motion for a partial summary judgment on the Imam issue. ECF No. 219. The BOP likewise filed a motion for summary judgment in which it argued (1) that plaintiff did not exhaust his administrative remedies with respect to conditions at USP Terre Haute; (2) plaintiff's claims about the ADX were moot; and (3) this Court is not an appropriate forum to resolve claims concerning conditions at an out-of-district facility. ECF No. 222.

On August 21, 2018 this Court issued an order (1) denying plaintiff's motion for summary judgment; (2) granting in part and denying in part defendant's motion for summary judgment; (3) reiterating an earlier order denying plaintiff's request that he be transported to

Colorado for trial; (4) denying without prejudice plaintiff's motion to exclude certain testimony; and (5) denying a motion in limine filed by the plaintiff. ECF No. 243. Essentially, I agreed that the claims concerning conditions at the ADX were now moot. However I found that Mr. Ajaj's claims concerning violation of his religious rights could be decided by this Court in this case to the extent that the same conditions about which he complained at the ADX (and as to which he had exhausted his administrative remedies there) existed at USP Terre Haute. I also found that Mr. Ajaj no longer had standing to challenge BOP policies regarding communal prayer because he now had the ability to do so through USP Terre Haute's "Life Connections Program" in which he had enrolled.

Both parties sought reconsideration of that order for different reasons. *See* ECF Nos. 250 and 251. The Court modified its summary judgment order only to the extent that it found that Mr. Ajaj's claim concerning delivery of his medications had not been sufficiently raised and preserved. ECF No. 265. The Court on August 20, 2018 denied the BOP's motion to continue the trial (by then just one week away) based on the illness of one of the defense attorneys on the case. ECF No 267.

When all the dust settled, two issues remained for trial: Mr. Ajaj's alleged entitlement to (1) a certified halal diet; and (2) meaningful access to an Imam. Only equitable remedies were sought.

Then, two significant events occurred shortly before trial. First, on either August 20 or 21, 2018 Hugh Hurwitz, the Acting Director of the Bureau of Prisons, contacted Jeffrey E. Krueger, the Complex Warden at FCC Terre Haute, and asked him to see if he could obtain certified halal meals for Mr. Ajaj in a short timeframe. According to Warden Krueger, this was an effort to get the diet issue resolved before the trial as well as to accommodate Mr. Ajaj's

4

religious needs. Almost overnight FCC Terre Haute was able to contract to purchase a supply of halal-certified meals for Mr. Ajaj from a relatively nearby Illinois vendor as well as a microwave dedicated to heating only the halal meals. On August 24, 2018, the last business day before trial, Complex Warden Krueger issued a memorandum to Ismail Oliver, the Food Service Administrator for FCC Terre Haute, confirming the new policy. Defendant Ex. C-9. That same day Mr. Ajaj began receiving certified halal meals with the noon meal. The meals are prepackaged and are reviewed by the prison's Chief Dietician to assure nutritional values.

Warden Krueger testified that delivery of these meals to Mr. Ajaj will continue (subject to abuse of the privilege such as selling food to others or an institutional emergency such as a lockdown) until a long-term solution such as a national contract or national vendor is implemented. Although Warden Krueger is moving up to a regional position, it oversees Terre Haute and several other BOP facilities, and he will make sure that the policy will not be rescinded by his successor. If a national solution is not implemented the policy will continue potentially indefinitely.

There are no current plans to transfer Mr. Ajaj again. However, if he is transferred before a national policy is implemented, his meals at the new institution will be reviewed by the BOP's central office. Warden Krueger testified that most of the 200 to 300 Muslim inmates at FCC Terre Haute are on a kosher diet, but if others want what Mr. Ajaj is now getting they will be accommodated as well.

Although the new policy provides for three meals a day, the vendor is only providing prepackaged lunch and dinner meals. However, the word "halal" means "permitted." Fruits and vegetables are always permitted. Items that are not permitted included pork, meat not slaughtered in an approved manner, carrion and alcohol. Mr. Oliver testified that Mr. Ajaj's

breakfasts include dry cereals certified by General Mills as halal, boiled eggs that are naturally halal, fruit, dairy and tea. He is trying to expand the menus so that Mr. Ajaj will not be eating the same things all the time. Mr. Ajaj has not expressed any concerns to Mr. Oliver about his breakfasts or about the lunches and dinners he is now receiving.

Second, as indicated earlier in this order, the BOP had been soliciting applications for a full-time Imam for Terre Haute. The basic requirements, according to Mike Castle, the Correctional Chaplain Coordinator for the BOP's western and north central regions, are that the individual have either a degree in theology or graduate level equivalency (the same qualifications as chaplains in other religious faiths); pass a security check; and, of course, be willing to move to Terre Haute. The BOP did find a qualified Imam who agreed to take the position and was in the process of moving from Houston to Terre Haute, but changed his mind about two weeks before the trial. The BOP then reached out to Bashar Murad, an Imam who had worked as a part-time Imam at Terre Haute in the past, and agreed to hire him on a month to month contract to provide not more than 30 hours of service per week while the BOP continues to try to find a full-time Imam for the facility.

Imam Murad is the only on-site Imam available to Mr. Ajaj and other Muslim inmates at USP Terre Haute the present time. However, another option is what is called the Minister of Record program. That permits an inmate to communicate by telephone, mail or email with essentially any Imam in the country of the inmate's choosing (excluding the 13 Imams presently working full time in other BOP institutions). An outside Imam may also visit an inmate, although there was no evidence about other Imams in the vicinity of Terre Haute who would be likely to visit as a practical matter. Chaplain Castle acknowledged that talking with an Imam on the telephone is not the same as talking to an Imam in person, but it is an available option. In

6

addition, there is a library in the C-1 unit, where participants in the Life Connections Program are housed. It contains books and videos of a religious nature that may be checked out.

As described by Jonathan Sutter, a staff chaplain at USP Terre Haute, the Life Connections Program is a faith-based life skills program in which participants are taught to take their basic faith teachings and integrate them into their lives so they can make healthy connections to their family and their community. Life skills would include physical and mental wellness, emotional management, conflict management, moral compass and decision-making. There are four different faith groups in the Life Connections Program, one of which is the Islamic group. Chaplain Sutter testified that the leader or "spiritual guide" of each group teaches classes using a template based upon the 14 interactive work books which draw from multiple faith traditions. Mr. Ajaj applied for the Life Connections Program, was accepted, and was placed in the C-1 housing unit (housing for Life Connections Program participants), in February 2018. He began "active programming" (active participation) in May 2018.

Mr. Ajaj is a Sunni Muslim as are approximately 90% of Muslims in the world. According to plaintiff's expert Dr. Seth Ward, Sunni Muslims follow the practices of the Prophet Muhammad whose teachings are revealed in the Quran. The other main branch of Islam, Shia, gives greater weight to the pronouncements of Ali, a cousin of Muhammad, and his descendants. Dr. Ward testified that in the Sunni world Imams, though not ordained as such, have functions that are similar to a minister, priest, rabbi or other cleric such as to lead prayers, give a Friday sermon, and provide advice on Islamic law and spiritual guidance.

According to Chaplain Castle and Chaplain Sutter, Imam Murad is Sunni. Chaplain Sutter testified that Imam Murad has served as an Imam in various Sunni mosques since about 1997, and that he also served inmates in various BOP facilities during that same period of time.

He has been with the Life Connections Program for about ten years. His primary responsibilities in that program are to lead the classes in which participants receive life skills training grounded in Islamic teaching. He is also available for about two hours a week for meetings with participants on either a one-on-one or a small group basis. Chaplain Sutter has observed Imam Murad doing rounds and meeting with Islamic inmates and says that he seemed well received by the inmates who were putting into practice in their conversations some of the teachings and advice he had given them.

However, Mr. Ajaj believes that Imam Murad is Sufi, which is an aspect of Islam that can be found in Sunni or Shia groups. Mr. Ajaj has made it clear that his beliefs are different than those of Imam Murad. He has informed personnel at USP Terre Haute that because of Imam Murad's beliefs, it would go against his religious principles to attend Imam Murad's classes. Therefore, he has declined to attend the classes.

Chaplain Sutter has discussed the situation with Imam Murad and has emphasized to him that the class must be a general Islamic class, meaning that the class should focus on core principles that apply to the different strands of Islam. This is analogous to a Christian chaplain who must teach core teachings of Christianity; there can then be discussion, often raised by participants, of different perspectives within Christianity. Imam Murad responded that this is how he has taught his classes in the past and how he will continue to teach his classes in the future. Chaplain Sutter testified that he is satisfied that that is in fact what is happening. He plans to monitor the classes from time to time to confirm this.

Inmates enrolled in the Life Connections Program are expected to attend classes in the faith group to which they ascribe (or they may attend classes given to inmates who do not designate a religious preference). An inmate cannot continue in the Life Connections Program if

he refuses to attend classes. He may withdraw from the Program and be eligible to reenroll in the future, such as, for example, when an Imam whose beliefs more closely mirror the inmate's beliefs is hired. Otherwise, he will be involuntarily transferred out of the Life Connections Program and, in that event, will not be readmitted later. Two other Muslim inmates testified that they share Mr. Ajaj's concerns about Imam Murad. However, other Muslim inmates apparently do not share all of his concerns as they have been attending Imam Murad's classes.

## FURTHER FINDINGS AND CONCLUSIONS

### A. **RFRA**.[2]

RFRA provides that government may not "substantially burden a person's exercise of religion" unless it demonstrates that doing so "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. The BOP has stipulated, and the Court finds, that Mr. Ajaj's religious beliefs are sincerely held. The questions presented are whether his religious beliefs at issue in this case are being substantially burdened, and if so, has the BOP demonstrated a compelling governmental interest without a less restrictive alternative that justifies the burden.

### B. **Certified Halal Diet**.

I find that there is no substantial burden on Mr. Ajaj's belief that he must follow a certified halal diet, indeed, no burden at all. Mr. Ajaj is now receiving halal certified meals. He has expressed no dissatisfaction with the new policy. BOP witnesses have testified that this will continue until a solution is implemented at the national level of the BOP. I found their testimony in this regard, which was confirmed in writing, to be credible.

That does not deprive the Court of jurisdiction. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to

---

[2] The plaintiff dropped his remaining constitutional claim during the course of the trial.

determine the legality of the practice." *City of Mesquite v. Alladin's Castle, Inc.,* 455 U.S. 283, 289 (1982). However, the Court may determine that the dispute has become moot "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Association,* 393 U.S. 199, 203 (1968).

A determination of whether the halal diet issue has now become moot is a close call. The evidence that the certified halal meals will continue to be provided to Mr. Ajaj until the BOP implements a national solution was credible and undisputed. The fact remains, however, that the new program was implemented on the eve of trial after more than three years of litigation. There likely will be changes in the occupants of the positions held by Mr. Krueger and Mr. Hurwitz. Also, while there is no current plan to transfer Mr. Ajaj to another institution, Mr. Ajaj testified that he has been in nine different BOP facilities since he was first imprisoned in 1993. The evidence is that if he is transferred before a long-term solution is implemented at the national level, his diet will be reviewed by BOP's central office, not that the decision will necessarily be to provide certified halal meals to him in the new institution.

In an attempt to strike an equitable balance, I enjoin the BOP from discontinuing Mr. Ajaj's certified halal diet unless that is required to serve a compelling governmental interest and no reasonable alternative exists. Put more simply, the BOP may not discontinue providing halal certified meals to Mr. Ajaj absent a very good penological reason. Good cause could include, as the Krueger memo states, abuse of the privilege. It could include a temporary cessation due to an institutional emergency such as a lockdown. It could include the absence of an available source of halal meat in a particular geographic location, although in that situation the Court

would expect the BOP to use its best efforts to develop a source. The cost of providing certified halal meals will not constitute a compelling government interest.

The Court recognizes and appreciates the effort at the highest level of the BOP to get this matter resolved, and it finds that the solution described in Defendant's Ex. C-9 is an effective means of resolving it. The Court simply requires that the solution continue past the end of this lawsuit and anticipates that it will be difficult for the BOP to meet the heavy burden of proving a compelling governmental interest for not adhering to the spirit of the memo in the future.

**C. Imam.**

What constitutes "meaningful access" to an Imam is subjective. The BOP has tried to hire a full-time Imam for FCC Terre Haute. It thought it had been successful, only to have the gentleman change his mind about taking the position two weeks before trial. The BOP is continuing to try to locate and hire a full-time Imam for the facility. Meanwhile, it hired Imam Murad, who formerly was a contract Imam at the facility, to resume that work on a month to month contract. The evidence is that Imam Murad is required to teach classes on a general level of Islam, leaving to students the ability to ask questions about their individual beliefs if they wish. His classes are to be monitored to see that he does reach out to all Muslim inmates.

Nevertheless, Mr. Ajaj disputes that Imam Murad provides meaningful access to an Imam due to differences in their religious beliefs. Without diminishing the sincerity of his beliefs, including his belief that attending his classes goes against his beliefs, I note that attending the Imam's classes does not compel him to modify his own beliefs at all. But if Mr. Ajaj will not attend Imam Murad's classes, then he has the option of withdrawing from the Life Connections Program and waiting until an Imam whose beliefs more closely mirror his is hired. That will not deprive him of access to an Imam because the Minister of Record Program permits regular

access to any Imam in the United States (other than the 13 full-time Imams working in other BOP institutions) who is willing to communicate with him by telephone, mail or email. Plaintiff's own correctional expert, Emmitt Sparkman, testified that it is difficult to recruit Imams and to keep them on a prison's staff, and that talking with an Imam on the phone is a reasonable interim solution in the absence of an Imam who is available for visits in person.

Mr. Ajaj does not regard that as a good option, at least in part because he says he does not know other Imams. However, there is no evidence that Imam Murad would refuse to give him names and contact information for other Imams. There is no evidence that Imam Ammar Amonette, who testified at trial, would be unwilling to talk with him or refer him to other Imams. One of the other Muslim inmates at Terre Haute, Mohammed Shnewer, testified that his mother arranged for him to speak to an Imam in New Jersey on the phone, and that she would be willing to help Mr. Ajaj get in touch with that Imam. There are many ways to find Imams, and I have no reason to believe that someone as resourceful as Mr. Ajaj (who was able to compile a long list of brands of halal foods) cannot find one with some effort.

The Court frankly does not know what else can reasonably be expected of the BOP. The BOP cannot be expected to hire a full-time Imam who does not meet the educational requirements applicable to all Imams and chaplains in other faiths. The BOP cannot be expected to hire an Imam who does not pass a security check. The BOP cannot hire an Imam who is not willing to take a job in Terre Haute, Indiana. The BOP cannot reasonably be expected to screen applicants to make sure that their views match the specific views of Mr. Ajaj, who is just one of many Muslim inmates.

It is true that if Mr. Ajaj refuses to attend the classes of Imam Murad it will limit somewhat his opportunity to pray in a group. In that event he will have to withdraw (or be

removed) from the Life Connections Program and will not have the same opportunities for group prayer that he presently enjoys in the C-1 housing unit which is for Life Connections Program participants. Chaplain Sutter testified, however, that Mr. Ajaj would still be able to participate in a group for the Jumu'ah, an important congregational prayer that Muslims hold every Friday.

Plaintiff's counsel urged the Court not to give Mr. Ajaj a "Hobson's Choice." I do not regard the choice between having everything exactly as Mr. Ajaj would like it to be and the menu of opportunities he has at USP Terre Haute to be a Hobson's choice. Mr. Ajaj has the opportunity to engage in group prayer every day; and to have direct in-person contact with an Imam; and to attend "non-denominational" Islamic classes taught by an Imam; and to consult with other Imams by telephone, mail and email; and to maintain at all times his own, personal religious beliefs and values even though they might not entirely match those of the Imams. He is, after all, one of many Muslim inmates. And he is, after all, in a prison – a prison that, while dragging its feet to a degree, is making what I regard as a sincere effort to respect and honor his religious rights.

Accordingly, I do not find that Mr. Ajaj's religious belief that he must have regular and "meaningful" access to an Imam has been substantially burdened. However, to the extent that there is not at the present time an Imam at FCC Terre Haute who shares Mr. Ajaj's religious views could be deemed to be a substantial burden, I find that there are compelling governmental interests that permit the burden. First, despite the BOP's efforts, it has to date been unable to find and hire a full-time Imam for that facility. It cannot do what it cannot do, and so long as it continues to make the effort, that is all that one can reasonably expect. Second, it may well be impossible to find any Imam whose views are precisely in line with those of Mr. Ajaj or any

13

other Muslim inmate. The BOP's obligation is to do what it can to respect and serve the religious beliefs of all inmates, not just those that might be unique to one individual.

   D. **Attorney's Fees.**

There is no attorney's fee clause in RFRA, but fees can be awarded to the prevailing party under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. *See, e.g., DiLaura v. Township of Ann Arbor,* 471 F.3d 666, 670 (6th Cir. 2006); *Jama v. Esmore Correctional Services, Inc.,* 549 F. Supp. 2d 602, 605 (D. N. J. 2008). Here, the plaintiff did not incur fees, as representation was provided by the law school's civil rights clinic. However, fees may be awarded to public interest lawyers, including those associated with a legal aid type agency, just as they are to private lawyers. *See Ramos v. Lamm,* 713 F.2d 546, 551-52 (10th Cir. 1983).

A number of plaintiff's claims were dismissed. Moreover, by the time of trial his two remaining claims – certified halal diet and meaningful access to an Imam – were largely satisfied. Those developments are relevant to what is reasonable, because "[i]f a plaintiff does not prevail on all claims for relief, the court must determine whether an adjustment is necessary." *Ramos,* 713 F.2d at 556. In making such an adjustment, however, I also must consider the contribution of counsel to the outcome. I do not believe that the policies at FCC Terre Haute concerning provision of certified halal meals and access to an Imam would have occurred to the same degree or certainly at the same time had it not been for the high quality, zealousness and persistence of the advocacy provided by the Civil Rights Clinic of the University of Denver Sturm College of Law. Largely as a result of the Clinic's representation of Mr. Ajaj, he was the prevailing party.

14

Accordingly, I award to the plaintiff a reasonable attorney's fee to be provided to the Clinic. Guidance can be found in the factors originally set out in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717-19 (5th Cir. 1974) and in The Colorado Rules of Professional Conduct are found as an Appendix to Chapters 18 to 20, COLORADO COURT RULES – STATE (2015). Guidance can also be found in common sense and good judgment. I urge the parties to confer and to attempt in good faith to agree upon a reasonable award. Failing that, however, the parties may set an evidentiary hearing.

## ORDER of JUDGMENT

The United States Bureau of Prisons is enjoined from discontinuing Mr. Ajaj's certified halal diet unless that is required to serve a compelling governmental interest and no reasonable alternative exists, as further explained in this order. The Court awards the plaintiff Ahmad Ajaj reasonable attorney's fees, also as further explained in this order. As the prevailing party, plaintiff is also awarded costs to be taxed by the Clerk of Court pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54(a). Judgment will enter accordingly.

DATED this 13th day of September, 2018.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge