# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-0992-RBJ-KLM

AHMAD AJAJ,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,
WARDEN BILL TRUE, in his official capacity,
WARDEN JOHN OLIVER, in his individual capacity,
WARDEN DAVID BERKEBILE, in his individual capacity,
ASSOCIATE WARDEN TARA HALL, in her individual capacity,
ASSOCIATE WARDEN CHRIS LAMB, in his official and individual capacity,
ASSOCIATE WARDEN CALVIN JOHNSON, in his individual capacity,
PHYSICIAN ASSISTANT RONALD CAMACHO, in his individual capacity,
MEDICAL STAFF SAMANTHA MCCOIC, in her individual capacity,
MEDICAL STAFF K. MORROW, in her official and individual capacity,
CHAPLAIN MICHAEL CASTLE, in his official and individual capacity,
CHAPLAIN JASON HENDERSON, in his official and individual capacity,
RELIGIOUS COUNSELOR GEORGE KNOX, in his official and individual capacity,
INMATE TRUST FUND SUPERVISOR KENNETH CRANK, in his official and individual capacity,
NURSE ROGER HUDDLESTON, in his official and individual capacity, and
OFFICER D. PARRY, in his official and individual capacity,

      Defendants.

---

## INDIVIDUAL DEFENDANTS' MOTION TO DISMISS RFRA DAMAGES CLAIMS IN AMENDED COMPLAINT (ECF No. 29)

---

The individual defendants are entitled to qualified immunity on Plaintiff Ajaj's damages claims under the Religious Freedom Restoration Act because they did not personally violate any clearly established federal right. Ajaj cannot overcome qualified immunity.

## BACKGROUND

The individual defendants worked at the United States Penitentiary – Administrative Maximum ("ADX") between 2012 and 2015, when Ajaj was incarcerated there. "ADX is the most

restrictive and secure prison operated by the BOP," *Rezaq v. Nalley*, 677 F.3d 1001, 1005 (10th

Cir. 2012), and houses "the most violent, dangerous, and disruptive inmates in the federal prison

system." *Hall v. Oliver*, No. 15-cv-01949-RBJ-MJW, 2017 WL 3723250, at *3 (Aug. 29, 2017).

Inmates lives in single cells, but even that does not eliminate the risk of attacks on ADX staff and

inmates. *United States v. Petty*, 856 F.3d 1306, 1308 (10th Cir. 2017) (inmate assaulted three ADX

officers); *Cuevas v. United States*, No. 16-cv-00299-MSK-KMT, 2018 WL 1399910, at *9 (D.

Colo. Mar. 19, 2018) (finding "ample evidence that, despite ADX's security protocols, there are

opportunities for inmates to assault one another during routine operations"). ADX "is reserved for

inmates who require 'the highest custody level that can be assigned to an inmate.'" *Rezaq*, 677

F.3d at 1005. That unique group includes inmates who have "been convicted of terrorist-related

offenses and who 'present *national security* management concerns." *Chesser v. Director Fed.*

*Bureau of Prisons*, No. 15-cv-01930-NYW, 2018 WL 3729511, at *12 (D. Colo. Aug. 6, 2018)

(emphasis in original).

Ajaj was "convicted on multiple felony counts in connection with the 1993 World Trade

Center bombing in which six people were killed and more than a thousand injured, and in which

the bombers caused millions of dollars in damage." *Ajaj v. United States*, No. 16-cv-5013 (LAK),

2021 WL 51456, at *1 (S.D.N.Y. Jan. 6, 2021); *United States v. Salameh*, 261 F.3d 271, 274-75

(2d Cir. 2001).[1] Ajaj hatched the plot while he was at a terrorist training camp on the Afghanistan-

---

[1] The Court may take judicial notice of court records concerning Ajaj's crimes, a part of the context in which the Court evaluates whether he has overcome qualified immunity. *See St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979)."Nowhere in the law does context have greater relevance to the validity of a claim than prisoner civil-rights claims," *Gee v. Pacheco*, 627 F.3d 1178, 1185 (10th Cir. 2010), and the justification for that standard is particularly compelling when assessing claims about ADX, the conditions of which are not replicated elsewhere in the Bureau of Prisons.

Pakistan border, where he "learned how to construct homemade explosive devices" and plotted with his co-conspirator, Ramzi Yousef, "to use their newly acquired skills to bomb targets in the United States." *United States v. Salameh*, 152 F.3d 88, 107 (2d Cir. 1998); *id.* (Ajaj caught with "terrorist kit" assembled in Pakistan, including "manuals containing formulae and instructions for manufacturing bombs, materials describing how to carry-off a successful terrorist operation, [and] videotapes advocating terrorist action against the United States").

Ajaj claims that, in the unique ADX environment where he was housed in the 2012 to 2015 timeframe, the individual defendants were obligated to provide him expansive religious privileges designed to accommodate four religious beliefs he claims to hold. His RFRA claims are[2]:

(1) <u>Adjustment of medication-administration times half the calendar year</u>.[3] Wardens Berkebile and Oliver, Associate Wardens Hall and Lamb, Physician Assistant Camacho, "Medical Staff" Morrow and McCoic, "Nurse" Huddleston, and Chaplain Castle were required to ensure the delivery of Ajaj's prescription medications to his cell "before dawn and after sunset" during the "Sunnah Fasts"— some 130 days per year—as well as the 30-day period of Ramadan fasting, ECF No. 29 ¶¶ 355-366.

(2) <u>Halal-certified meals with meat slaughtered in accordance with Ajaj's intricate and highly particularized beliefs</u>. Berkebile, Oliver, Hall, Chaplain Henderson, Religious Counselor Knox, and Inmate Trust Fund Supervisor Crank were required to ensure that Ajaj received a "certified Halal diet" and commissary options curated to his preferences, including that the halal meat he is allegedly mandated to eat be slaughtered in a specified way, *id.* ¶¶ 367-374.

(3) <u>Weekly meetings with an imam that Ajaj would deem "meaningful."</u> Berkebile, Oliver, Hall, Henderson, and Knox were required to ensure that Ajaj had access to "meaningful meetings" with an imam once a week, *id.* ¶¶ 375-381.

---

[2] On this Rule 12(b)(6) motion, the individual defendants do not admit the accuracy of Ajaj's allegations.

[3] As detailed below, the Court already dismissed this claim for failure to exhaust, so it need not address that the individual defendants are also entitled to qualified immunity. The individual defendants, however, present such arguments to preserve them for any potential appeal.

> (4)     <u>Five daily congregate prayers, plus Jumu'ah, with other ADX inmates</u>. Berkebile, Oliver, Hall, Associate Warden Johnson, Knox, and Officer Parry were required to ensure (a) that Ajaj was able to participate in congregate prayer with other Muslim inmates at shifting times five times a day, 365 days a year (including at times very early in the morning and late in the evening, as dictated by the Islamic calendar), and (b) that Ajaj was able to participate in Friday, or Jumu'ah, congregate services, *id.* ¶¶ 382-390.

Ajaj seeks "compensatory, nominal, and punitive damages" from each individual. *Id.* at 59.

No claim should proceed because Ajaj has alleged no violation of clearly established law, and he also falls short of meeting his burden to allege the personal participation of each individual defendant for every claim. Both omissions entitle the individual defendants to qualified immunity. In addition, the Court has already ruled that the medication-administration fasting claim is dismissed for failure to exhaust.

## THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Qualified immunity shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This immunity recognizes the "social costs [of litigation against public officials, which] include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Id.* at 814. Qualified immunity represents "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1986). It allows "ample room for mistaken judgments." *Malley v. Briggs*, 475 U.S. 335, 343 (1986).

**Ajaj's bears a heavy two-part burden to overcome qualified immunity.** Ajaj must meet the "heavy two-part burden" to show that: (1) each defendant violated a statutory right (here,

RFRA), and (2) the right violated was clearly established at the time of the conduct. *Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018). The Court can address the two parts of the qualified immunity test in either order. *Id.* It need not decide whether Ajaj has sufficiently alleged a violation of his statutory right if that right was not clearly established. *Leiser v. Moore*, 903 F.3d 1137, 1139-40 (10th Cir. 2018). Nor does the Court need to decide whether Ajaj's rights were violated if "the complaint does not plausibly allege facts attributing the potential constitutional violation" to the conduct of each individual defendant. *Moya v. Garcia*, 895 F.3d 1229, 1232 (10th Cir. 2018).

The cardinal rule in evaluating qualified immunity is that clearly established law must be particularized to the facts of the case with a high degree of specificity. *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 552 (2017). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (clearly established right must be "defined with specificity" and not at "a high level of generality"); *Estate of Smart v. City of Wichita*, 951 F.3d 1161, 1168, 1172 (10th Cir. 2020) (same).

To meet this burden, Ajaj must point to "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts," in existence at the time of the conduct in question. *Estate of Smart*, 951 F.3d at 1168-69. The contours of the right must be "sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up). Existing precedent must have placed the question "beyond debate." *Id.* Thus, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 743.

**Ajaj bears the burden to allege each individual defendant's personal participation.** In order to overcome qualified immunity Ajaj also must plausibly allege that each defendant violated his rights through his or her "own individual actions." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013) (incorporating personal participation requirement into qualified immunity analysis). It is not enough for Ajaj to allege generally that his rights "were violated" or to make an "undifferentiated contention" that "defendants" infringed his rights. *Pahls*, 718 F.3d at 1225-26. Rather, Ajaj must make individualized allegations against each defendant that allow for "an individual assessment of each defendant's conduct and culpability." *Id.* at 1233; *see also Brown v. Montoya*, 662 F.3d 1152, 1165 (10th Cir. 2011).

This pleading standard takes on added importance when a claim seeks to impose personal liability on government officials—especially in lawsuits involving multiple defendants. *Pahls*, 718 F.3d at 1225. In this context, "it is particularly important . . . that the complaint makes clear exactly *who* is alleged to have done *what* to *whom*" to distinguish the basis for claims against individuals from collective allegations against the government. *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (emphasis in original). Those allegations must plausibly attribute the alleged violation to the specific actions of each individual defendant. *Moya*, 895 F.3d at 1232; *Pahls*, 718 F.3d at 1226.

**Under these standards, Ajaj's claims fail.** Ajaj cannot identify any case law, existing when his claims arose, establishing "beyond debate" that any of the challenged restrictions violated RFRA—especially in the "specific context" at issue here: the highly restrictive and unusually dangerous environment of ADX, which is unique among all BOP institutions. *See al-Kidd*, 563 U.S. at 741; *Mullenix*, 577 U.S. at 12; *Gee*, 627 F.3d at 1185. Ajaj's inability to point to any clearly established law requiring a different approach in the distinctive ADX context entitles the individual

defendants to qualified immunity. Further, Ajaj has not alleged the individual defendants' personal involvement in the claimed violations in every instance.

**I.   The medication-administration fasting claim fails because it is unexhausted and because the individual defendants are entitled to qualified immunity.**

In Ajaj's medication fasting claim, ECF No. 29 ¶¶ 355-366, he attempts to hold nine BOP employees—Wardens Berkebile and Oliver, Associate Wardens Hall and Lamb, Physician Assistant Camacho, "Medical Staff" members Morrow and McCoic, Nurse Huddleston, all of whom worked at ADX, and Chaplain Castle, who was the chaplain for BOP's North Central Region beginning in 2013, *id.* ¶ 19—to the extraordinary obligation of delivering his prescribed medications before dawn and after sunset half the calendar year: the 30 days of the Ramadan fast and the approximately 130 days of the Sunnah fasts, which he believes occur every Monday and Thursday of the calendar year, six days during the month of Shawwal, most of the month of Sha'ban, and two additional days. *Id.* ¶¶ 66, 74, 358-361. He asserts that these officials, during the 2012 to 2015 timeframe, were required to adjust the normal medication distribution schedule during Ramadan and on the 130 days of the Sunnah fasts, delivering his medications to him in the pre-dawn and post-sunset hours.

The claim fails for multiple reasons.

**A.   The Court has ruled that the claim is unexhausted.**

At the Trial Preparation Conference on August 9, 2018, the Court dismissed the medication-administration claim against BOP for failure to exhaust. *See* ECF No. 258 (transcript excerpt) at 5-6, attached at Exhibit 1 ("We've looked back to see whether we could find that the medication issue had been exhausted. We could not . . . . Accordingly, any issue concerning the medication is out for failure to exhaust . . ."); *see also* ECF No. 265 (stating, in granting Motion for

Reconsideration on exhaustion, "[a]s indicated during the trial preparation conference, the Court on reconsideration found and still finds that the medication issue was not raised, either independently or as part of the issue concerning meals"). When the Court asked Ajaj's counsel if they had any exhaustion evidence "specifically referring to medication," his counsel admitted that they did not. Ex. 1 at 5-6.

The Court should dispose of the medication-administration claim against the individual defendants because Ajaj failed to exhaust it. While the individual defendants raise qualified immunity here to preserve the argument for the record, the Court need not reach the issue. But if it does, it is clear that the individual defendants are entitled to qualified immunity on this claim, the likes of which have not been seen in any other case.

> **B.      No clearly established law required ADX officials to change medication distribution to accommodate Ajaj's fasting 160 days a year.**

There was no clearly established law in 2012 to 2015 requiring prison officials to accommodate Ajaj's half-year fasting requirements by delivering his medications to him before sunrise and after sunset.

In one case, the Tenth Circuit held that prison officials violated the First Amendment by failing to accommodate the plaintiff's "*meal requirements* during Ramadan." *Makin v. Colorado Department of Corrections*, 183 F.3d 1205, 1215 (10th Cir. 1999) (emphasis added). That case was solely about meals and said nothing about the administration of medication. *Id.* at 1211-13. And it said nothing at all about the period of Sunnah fasting. *See id.* at 1211 (limiting Court's "focus to the observance of Ramadan").[4] As for Sunnah fasting, even today—ten years after Ajaj claims

---

[4] In one unpublished case from outside the Tenth Circuit, an inmate claimed that prison officials refused to provide him medication in accordance with his Ramadan fasting obligations. *Mincy v. Deparlos*, 497 F. App'x 234, 240 (3d Cir. 2012). However, the court did not rule on the issue

ADX officials should have known they were obligated to hand-carry his medications to his cell before dawn every morning and after sunset 160 days a year—a Westlaw search shows only one case that mentions the issue of altering medication times to accommodate the lengthy Sunnah fasts: *this case*, the current litigation brought by Ajaj.

In earlier briefing, Ajaj failed to identify any clearly established law compelling the individual defendants to alter his medication-administration times during the Ramadan and Sunnah fasts. He pointed to *Holland v. Goord*, 758 F.3d 215, 223-24 (2d Cir. 2014). ECF No. 17 at 19. But that case, involving a prison policy that compelled an inmate to provide a urine sample while he fasted during Ramadan, did not find even find that prison officials had violated the inmate's rights. *Holland*, 758 F.3d at 223-24 (remanding to consider whether prison officials violated inmate's rights by enforcing policy). Neither did *Lovelace v. Lee*, 472 F.3d 174 (4th Cir. 2006), which Ajaj also cited. ECF No. 17 at 19. Like *Holland*, *Lovelace* had nothing to do with medication administration, and also like *Holland*, *Lovelace* did not hold that prison officials violated the inmate's rights. *Lovelace*, 472 F.3d at 187-88 (concluding that inmate who was prohibited from participating in group prayer in an open-population prison during Ramadan because he violated prison policy potentially might be able to show a RLUIPA violation). If a case does not even find a violation, it certainly cannot clearly establish, beyond debate, that the conduct of the individual defendants here violated Ajaj's rights.

Thus, there was no existing law, particularized to the circumstances here, that would have put "every reasonable official" on notice, "beyond debate," in 2012 to 2015, that not delivering

---

because there was no evidence that the named defendants were involved or that the inmate was even prescribed medication at the time, *id.*, nor would this unpublished case clearly establish the law in any event.

Ajaj's medication before dawn and after sunset during Ramadan and the many days of Sunnah fasting would violate RFRA. *al-Kidd*, 563 U.S. at 741. Berkebile, Oliver, Hall, Lamb, Camacho, Morrow, McCoic, Huddleston, and Castle are entitled to qualified immunity on the medication-administration RFRA claim.

### C. Ajaj failed to allege defendants' personal participation in the alleged violation.

Ajaj has not alleged that line medical personnel (Camacho, Morrow, McCoic, and Huddleston), or the Regional Chaplain (Castle), had any control over setting the ADX schedule for hand-delivering medications to hundreds of ADX inmates. Nor has Ajaj alleged that these individuals would have been authorized to approve overtime, or to amend the ADX budget, to ensure that medical personnel were present in the institution and available to Ajaj well before and long after normal business hours.

It is an obvious point that deciding how to allocate ADX staff resources, and determining the schedule on which the institution will operate, are not issues in which a Regional chaplain plays a role. Neither are these matters within the purview of line medical staff at the prison, whose assigned duties happen to include carrying medications to ADX inmates. If Ajaj's RFRA claims are countenanced, staff members unlucky enough to be assigned to his housing unit would be compelled to pay him money damages for institution policies over which they have no control. The requirement of personal participation guards against that unfair result, affording Camacho, Morrow, McCoic, Huddleston, and Castle qualified immunity.

Finally, additional personal participation flaws doom Ajaj's claim against Wardens Berkebile and Oliver, Associate Warden Hall, and Chaplain Castle. Chaplain Castle's *only* involvement in this case is that he allegedly prepared responses to Ajaj's grievances about the timing of medication distribution at the Regional level of the administrative remedy process. ECF

No. 29 ¶¶ 116-117, 119-120, 127, 146. And Berkebile, Oliver, Hall, and Lamb also allegedly responded to Ajaj's grievances on the issue. *Id.* ¶¶ 115, 327, 361. But the alleged denial of a grievance does not suffice to establish an official's personal participation in the alleged violation. *Sherratt v. Utah Dep't of Corr.*, 545 F. App'x 744, 747 (10th Cir. 2013) ("Denial of a grievance or failure to properly investigate or process grievances . . . is not sufficient to establish personal participation . . ."); *Requena v. Roberts*, 893 F.3d 1195, 1216 (10th Cir. 2018) ("mere response and denial of [inmate's] grievance are insufficient to establish the requisite personal participation under § 1983").

Thus, there are personal participation defects as to each individual defendant, entitling Berkebile, Oliver, Hall, Lamb, Camacho, Morrow, McCoic, Huddleston, and Castle to qualified immunity on that basis as well.

## II.  Ajaj had no clearly established right to the highly specific religious diet he requested when kosher and no-meat diets were available.

### A.  No clearly established law required that Ajaj receive the food he desired.

In this claim, Ajaj contends that Wardens Berkebile and Oliver, Associate Warden Hall, Chaplain Henderson, Religious Counselor Knox, and Inmate Trust Fund Supervisor Crank were required to ensure that he received a "certified Halal diet," including commissary options, curated to his very specific preferences. ECF No. 29 ¶¶ 367-374. Ajaj can point to no clearly established law demonstrating that the individual defendants had to comply with his request or violate the law.

When Ajaj filed this lawsuit, he alleges that BOP offered no menu that he personally considered halal. He acknowledges that, at the time his claim arose, BOP offered three menus designed to accommodate inmates' religious dietary requirements: a no-pork diet (which Ajaj was on before he filed the lawsuit), a no-meat diet (which he was on at the time he filed the lawsuit),

and a kosher diet. *Id.* ¶¶ 190, 195. But he asserts that the kosher diet was "not necessarily halal," *id.* ¶ 193, and the other two options sometimes included foods he deemed prohibited. The no-pork menu was "haram" because it contained "the meat of animals that were fed, raised, and slaughtered in non-halal ways; items prepared by factories or utensils which also process pork and other haram products; and questionable ingredients that may be from pork sources like shortening, certain forms of whey, and gelatin." *Id.* ¶ 191. The no-meat menu was unacceptable to Ajaj because it lacked halal meat and allegedly contained "pork and meat by-products, and food prepared by factories, equipment, and utensils in contact with haram products." *Id.* ¶ 194.

Even if Ajaj holds a sincere belief about these many rules for defining what is and is not halal, no clearly established law would have placed every reasonable prison official on notice that they would violate Ajaj's rights by not precisely fulfilling his exacting demands where he could select a kosher menu. While "prisoners have a constitutional right to a diet conforming to their religious beliefs," *Beerheide v. Suthers*, 286 F.3d 1179, 1185 (10th Cir. 2002), that defines the right at too high a level of generality. *White*, 137 S.Ct. at 552. The question is whether it was clear that Ajaj was entitled to more than he received at ADX in the 2012 to 2015 timeframe.

It was not. In *Abdulhaseeb v. Calbone*, the Tenth Circuit found that the denial of halal foods could potentially violate RLUIPA,[5] but it specifically relied on the fact that the plaintiff "had not been given the opportunity to eat kosher meals." 600 F.3d 1301, 1317 (10th Cir. 2010) (observing that prison "policy restricts kosher meals to certain religions, not including Islam"). The Court explained that other cases, where no violation was found—for example, because the inmates could consumer kosher meals—were "clearly distinguishable from our present facts." *Id.* As the

_____

[5] RLUIPA is the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1. It contains language similar to that of RFRA. *See Abdulhaseeb*, 600 F.3d at 1312-13 & n.5.

concurrence put it, "[w]e thus have no opportunity to consider whether a prisoner who may eat [a prison's] vegetarian diet but who is denied any access to halal-certified meats can state a RLUIPA claim." *Id.* at 1325-26 (Gorsuch, J., concurring). Numerous courts have similarly concluded that the availability of a kosher or vegetarian option suffices to avoid a violation. *See Jones v. Carter*, 915 F.3d 1147, 1148-49 (7th Cir. 2019); *Robinson v. Jackson*, 615 F. App'x 310, 313-14 (6th Cir. 2015); *Williams v. Wilkinson*, 645 F. App'x 692, 701 (10th Cir. 2016); *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 814-15 (8th Cir. 2008); *Williams v. Morton*, 343 F.3d 212, 218 (3d Cir. 2003); *see also Perez v. Westchester Cnty. Dep't of Corr.*, 587 F.3d 143, 144 n.1 (2d Cir. 2009) ("Kosher meat is halal."). Simply put, the law was far from clearly established that providing kosher and vegetarian options to an inmate seeking a halal diet violated the law.

Moreover, *Abdulhaseeb* did not clearly establish *any* violation, even where the inmate was denied kosher or vegetarian options. As the Tenth Circuit ultimately concluded: "Even with genuine issues of material fact concerning substantial burden, however, it does not necessarily follow that Mr. Abdulhaseeb has established a RLUIPA violation." 600 F.3d at 1318. If the facts in *Abdulhaseeb* did not necessarily establish a violation, it is impossible that the facts in this case could have clearly established, beyond debate, that the individual defendants violated the law.

Here, as Ajaj himself admits, he had access to both kosher and vegetarian meals, including meal available for purchase through the commissary. ECF No. 29 ¶ 209 (Ajaj could purchase "four vegetarian Halal-certified meals through commissary). No clearly established law in the 2012 to 2015 timeframe provided that the kosher and vegetarian options were not sufficient to accommodate Ajaj's religious beliefs. *See Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 794 (5th Cir. 2012) (distinguishing request for generally available kosher diet from request for "particularly nuanced version of halal food"); *Strope v. Cummings*, 381 F. App'x 878, 881 (10th

Cir. 2010) (holding that "scattered and minor complaints about kosher meals" were legally insufficient to show substantial burden). And there certainly was no clearly established law that would have made it clear, beyond debate, to ADX officials, that they must provide Ajaj a menu curated to his intricate, detailed requirements, covering everything from slaughtering techniques to the operation of food-processing factories. ECF No. 29 *e.g.* ¶¶ 186-187.

Nor was it within the power of the ADX officials to provide such food for Ajaj. Menus for BOP inmates are determined at a national level, not by local institution staff. *See* Program Statement 4700.06, *Food Service Manual*, at 16 (Sept. 13, 2011) ("The National Menu, which includes the approved menu, recipes, and product specifications, will be used for food procurement, preparation, and meal services *at all institutions* . . . . Planned changes or substitutions to the approved National Menu, recipes, or product specification *will not be made at the local or Regional level* . . .) (emphasis added), available at https://www.bop.gov/policy/progstat/4700_006.pdf; *see also Matthews v. Wiley*, 744 F. Supp. 2d 1159, 1172 (D. Colo. 2010) (BOP policies subject to judicial notice). The individual defendants are aware of no law holding that prison officials violate an inmate's rights by offering him options from a menu they have no power to alter. And Ajaj's stratagem of attempting to hold local prison officials personally responsible for national decisions would place those officials in a catch-22 position, leaving them no option but to spend their own funds to ensure that Ajaj received the food he desired. No clearly established law requires that.

To sum up, the lack of control over menu choices at the prison level emphasizes that the individual defendants "*might not have known for certain*" that following the requirements for pre-established National Menus that they had no ability to alter "was unlawful." *See Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1867 (2017) (emphasis added). Wardens Berkebile and Oliver, Associate Warden

Hall, Chaplain Henderson, Religious Counselor Knox, and Inmate Trust Fund Supervisor Crank are entitled to qualified immunity on Ajaj's halal diet RFRA claim.

> **B.**     **Ajaj failed to allege the personal participation of any individual defendant.**

Because decisions about the types and content of menus were determined at the national level, *see* Program Statement 4700.06 at 16, Ajaj has failed to allege the personal participation of ADX officials in the decision not to offer him a menu catered to his unique preferences. All of the individual defendants—Berkebile, Oliver, Hall, Henderson, Knox, and Crank—receive qualified immunity for this additional reason. And to the extent Ajaj's claim is based on the participation of all "Defendants," collectively, in responding to his grievances, ECF No. 29 ¶ 371 & ¶¶ 200, 213, 241, that only serves to highlight Ajaj's failure to allege their personal participation. *Sherratt*, 545 F. App'x at 747.

In sum, Wardens Berkebile and Oliver, Associate Warden Hall, Chaplain Henderson, Religious Counselor Knox, and Inmate Trust Fund Supervisor Crank are entitled to qualified immunity on Ajaj's halal diet claim.

> **III.**     **No clearly established law required ADX to hire an imam for weekly personal meetings with Ajaj.**

> **A.**     **No law entitled Ajaj to a prison-provided personal spiritual advisor.**

Ajaj claims that Wardens Berkebile and Oliver, Associate Warden Hall, Chaplain Henderson, and Religious Counselor Knox failed to provide him "meaningful" access to an imam. ECF No. 29 ¶¶ 375-381. But he does *not* allege that anyone took any action to block his access when an imam was available. Rather, the problem Ajaj identifies is that there was no imam on staff, no religious Muslim volunteers at ADX, and a part-time imam who did not visit often or long enough. *Id.* ¶¶ 255-291.

No clearly established law required prison officials to affirmatively seek out or hire an imam to meet with Ajaj on a more frequent basis. Indeed, the clearly established law is to the contrary: a prison is *not* required to provide a spiritual leader of any particular faith. *Abdulhaseeb*, 600 F.3d at 1320-21 (holding that prison was not required to hire Muslim spiritual leader); *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) ("[I]t is well-settled that the First Amendment does not require prison administration to provide inmates with the chaplain of their choice.") (citing *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972)). No case establishes, contrary to *Abdulhaseeb*, an affirmative duty on the part of individual prison officials to seek out an imam who was willing and able to meet with Ajaj as often as he desired.

Even more obvious is the point that no existing law—in 2012 to 2015 or now—required prison officials to accommodate an inmate's desire for weekly, hour-long sessions with his own personal spiritual advisor on an indefinite basis. The individual defendants know of no case articulating this unrealistic and unworkable standard (and one that would require them to find a suitable personal spiritual advisor for weekly sessions for every inmate who wanted one). No reasonable official could have known for certain that they had such an obligation to Ajaj.

Neither did the individual defendants have any clearly established, affirmative legal obligation to locate an imam for Ajaj who would satisfy all of his exacting standards for what an imam should be—a difficulty this Court recognized in rejecting Ajaj's imam claim against the BOP in this case. *See* 2018 WL 4356787, at *6 (Sept. 13, 2018) ("The BOP cannot reasonably be expected to screen applicants to make sure that their views match the specific views of Mr. Ajaj, who is just one of many Muslims."). And the absence of any clearly established legal obligation to secure an imam to personally meet with Ajaj once a week is further emphasized by the fact that *Ajaj himself* could have taken steps to procure his own imam to visit with him. *See* Program

Statement 5360.09, *Inmate Religious Beliefs and Practices*, at 16 (Dec. 31, 2004), available at

https://www.bop.gov/policy/progstat/5360_009.pdf (setting forth procedures for inmate to identify

a "minister of record" to be placed on inmate's visitor list).

Ajaj can point to no clearly established law supporting his demand for weekly, one-on-one

meetings with an imam. In earlier briefing, Ajaj cited cases that involved the *denial* of pastoral

visits or more general statements about a prisoner's right to worship. *See Kikumura v. Hurley*, 242

F.3d 950, 961 (10th Cir. 2001); *see also* ECF No. 72 at 22. But in *Kikumura*, an appeal from the

denial of a motion for a preliminary injunction, the Tenth Circuit found only that the inmate might

be able to show that "the denial of pastoral visits" was a substantial burden under RFRA. *See* 242

F.3d at 951. The Court *did not* find a violation of RFRA, and thus established no law binding the

individual defendants here. *Id.* Regardless, *Kikumura* is not "particularized to the facts of this

case," where Ajaj does not allege that he identified an imam—that is, a "minister of record"—who

was available to meet with him and was prohibited from doing so.

In sum, no law clearly established, beyond debate, a personal obligation on the part of

Wardens Berkebile and Oliver, Associate Warden Hall, Chaplain Henderson, and Religious

Counselor Knox to seek out an imam who was willing and able to meet with Ajaj for an hour every

week into the indefinite future. They are entitled to qualified immunity.

### B.      Ajaj failed to allege any individual defendants' personal participation.

Neither does Ajaj allege that any of the individuals was personally responsible for, or had

any authority to, launch a nationwide search on behalf of BOP to find an imam who would agree to

work with an inmate—one with the "specific views of Mr. Ajaj," *see* 2018 WL 4356787, at *6—in

a remote southern Colorado town. Ajaj has not plausibly alleged that wardens and Religious

Services staff charged with running ADX and meeting the daily needs of inmates were also

required to undertake the task of scouring the United States (contacting mosques, sending emails, and making phone calls) to procure an imam for Ajaj's personal use. That, of course, is what the minister of record process is for.

At bottom, Ajaj attacks a BOP-wide challenge to obtain qualified imams who are willing to work with inmates and who can meet the requirements for the job. Individual prison officials should not be obliged to pay Ajaj, out of their own pockets, for an issue over which they have no personal control. Additionally, no plausible inference of personal participation by any of the individual defendants arises from their responding to grievances about the imam issue. *Id.* ¶¶ 349, 378; *Sherratt*, 545 F. App'x at 747.

All of the individuals sued on the imam claim—Wardens Berkebile and Oliver, Associate Warden Hall, Chaplain Henderson, and Religious Counselor Knox—are entitled to qualified immunity.

## IV.     There is no clearly established right to group prayer at ADX.

### A.     No law requires congregate prayer in a maximum security prison.

Ajaj's last RFRA claim is that Wardens Berkebile and Oliver, Associate Wardens Hall and Johnson, Religious Counselor Knox, and Correctional Officer Parry did not permit him to engage in group prayer at ADX five times a day and Jumu'ah prayer on Friday. ECF No. 29 ¶¶ 293-316; ¶¶ 382-390.

Again, Ajaj cannot identify any on-point case that clearly established that right, particularly given the unique security concerns of ADX. The security concerns in that institution, "the most restrictive and secure prison" in the federal system, may—and often do—warrant restrictions beyond those that are permitted in general population prisons. *Rezaq*, 677 F.3d at 1005; *see* 42 U.S.C. § 2000bb-1(b) (allowing substantial burden on exercise of religion if it is the least

restrictive means of furthering compelling government interest). Indeed, Ajaj specifically alleges that security concerns were the basis for the ADX restrictions on group prayer. ECF No. 29 ¶ 312.

No case holds that inmates at ADX, who are otherwise restricted from most group activities, must be permitted to congregate for prayer at all—much less five times daily. Indeed, the Supreme Court has held that restrictions precluding inmates from attending Jumu'ah did *not* violate the First Amendment. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-51 (1987). And years after Ajaj was at ADX, the Tenth Circuit confirmed that there was no law that established, beyond debate, Ajaj's entitlement to any form of group prayer in a maximum-security prison. *Williams v. Miller*, 696 F. App'x 862, 864 (10th Cir. 2017) (rejecting First Amendment claim of Muslim inmate who requested to participate in Jumu'ah in a maximum-security prison, and finding that even a complete prohibition on group prayer is "rationally connected to the safety and security risks associated with escorting maximum-security inmates to and from group activities").

In earlier briefing, the best Ajaj was able to muster was the general principle that religious exercise may include group worship, and an out-of-circuit case holding that an inmate who was prohibited from participating in group prayer in an open-population prison during Ramadan because he violated prison policy potentially might establish a violation of RLUIPA. *See Lovelace v. Lee*, 472 F.3d 174, 187-88 (4th Cir. 2006); *see also* ECF No. 72 at 19. But that case would not have put every reasonable official at ADX on notice that they were obliged to implement congregate worship at the ADX—five times every day, as well as Jumu'ah—or violate the law. Nor could a single out-of-circuit decision clearly establish the law, *see Estate of Smart*, 951 F.3d at 1168-69, especially a decision that did not even find a violation. *Lovelace*, 472 F.3d at 188, 193 (concluding that the specific policy at issue "could be justified by compelling considerations of

19

security or good order," and remanding to give the prison "the opportunity to present its rationale on remand").

In short, the absence of any clearly established law, particularized to the facts here—a bid for group prayer five times daily at a highly restrictive and dangerous maximum-security prison—compels a finding that Wardens Berkebile and Oliver, Associate Wardens Hall and Johnson, Religious Counselor Knox, and Correctional Officer Parry are entitled to qualified immunity.

### B. Ajaj has not alleged that Knox, a prison counselor, and Parry, a correctional officer, participated in setting ADX policy regarding group prayer.

Ajaj has not alleged that Knox, a counselor and "assistant" to Chaplain Henderson, ECF No. 29 ¶ 282, and Parry, a correctional officer, had any authority to alter ADX policy on group prayer. As for Counselor Knox, Ajaj's allegations are primarily based on his dissatisfaction with Knox's response to various complaints and grievances. *Id.* ¶¶ 225, 274, 276, 282-283; *Sherratt*, 545 F. App'x at 747. These allegations are insufficient to establish Knox's personal participation in the challenged prayer policy. And nothing Ajaj alleges plausibly suggests that a boots-on-the-ground correctional officer in Parry's position could have implemented the expansive prayer privileges Ajaj demanded.

Ajaj's failure to alleged Knox's and Parry's personal participation in setting ADX policy concerning group prayer entitles them to qualified immunity for this additional reason.

*          *          *

Ajaj falls far short, on every claim, of alleging that ADX officials would have known "for certain" that they were violating the law by not acceding to his torrent of demands for religious privileges. They are entitled to qualified immunity on this basis alone. And there are also numerous deficiencies in Ajaj's obligation to plead personal participation, as explained above.

## CONCLUSION

The fourteen individual defendants are entitled to qualified immunity on Ajaj's RFRA

claims. The Court should grant the motion and dismiss all claims with prejudice.

Respectfully submitted on September 1, 2022.

COLE FINEGAN
United States Attorney

*s/ Susan Prose*
Susan Prose
Assistant United States Attorney
1801 California Street, Suite 1600
Denver, Colorado 80202
Phone: (303) 454-0100
Fax: (303) 454-0411
susan.prose@usdoj.gov

Counsel for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on September 1, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following recipients:

arandolph@law.du.edu
lrovner@law.du.edu

s/ *Susan Prose*
Susan Prose